# Exhibit F

# PROJECT CONSTRUCTION/TERM LOAN AGREEMENT

by and among

## 48-52 FRANKLIN, LLC,
as the Borrower

and

## NORTH FORK BANK, A DIVISION OF CAPITAL ONE, N.A.,
individually as a Lender and as the Agent for all of the Lenders

and

## CERTAIN OTHER LENDERS HEREAFTER SIGNATORY HERETO,
each as an additional Lender

Dated: December 21, 2007

## TABLE OF CONTENTS

**PREAMBLE AND RECITALS** ................................................................1

## ARTICLE I

DEFINITIONS ................................................................................2

## ARTICLE II

THE IMPROVEMENTS ................................................................15

| | | |
|---|---|---|
| 1. | Construction of the Improvements | 15 |
| 2. | Construction | 16 |
| 3. | Completion of the Improvements | 16 |
| 4. | Inspecting Engineer | 16 |
| 5. | Leases | 16 |

## ARTICLE III

LOANS AND ADVANCES ................................................................17

| | | |
|---|---|---|
| 1. | The Loan Facility | 17 |
| 2. | The Notes and the Mortgage | 29 |
| 3. | Borrower's Certification and Advance Forms for each Advance | 31 |
| 4. | Title Insurance Endorsements | 31 |
| 5. | Monthly Advances; Monthly Advance Fee | 31 |
| 6. | Project Cost Statement | 31 |
| 7. | Reallocation of the Project Cost Statement Items | 31 |
| 8. | *Intentionally Omitted* | 32 |
| 9. | Conditions to Advances of Proceeds of the Loan Facility | 32 |
| 10. | No Obligation of the Agent or the Lenders as to Proper Application of Advances | 32 |
| 11. | Lien Releases; No Lien Rights of the Borrower or its Affiliates | 32 |
| 12. | Advances for Soft Costs | 33 |
| 13. | Change Orders | 33 |
| 14. | *Intentionally Omitted* | 33 |
| 15. | Final Advance | 33 |
| 16. | *Intentionally Omitted* | 34 |
| 17. | Additional Conditions Relating to Loan Advances | 34 |
| 18. | Conditions Relating to Disbursement of Monies from Collateral Account | 34 |
| 19. | Equity Contribution | 34 |

## ARTICLE IV

REPRESENTATIONS, WARRANTIES AND COVENANTS ................................................................35

| | | |
|---|---|---|
| 1. | Additional Covenants of the Borrower | 35 |
| 2. | Representations and Warranties | 38 |

i

3.   Negative Covenants of the Borrower ..........................................40
4.   Additional Representations, Warranties and Covenants
     with respect to the Condominium..........................................41
5.   Partial Releases of Mortgage..................................................43

## **ARTICLE V**

EVENTS OF DEFAULT .........................................................................44

1.   Events of Default....................................................................44
2.   Remedies ...............................................................................46

## **ARTICLE VI**

THE AGENT .......................................................................................48

1.   Appointment...........................................................................48
2.   Delegation of Duties...............................................................48
3.   Nature of Duties; Independent Credit Investigation................48
4.   Actions in Discretion of the Agent; Instructions from
     the Lenders.............................................................................49
5.   Reimbursement and Indemnification of the Agent by
     the Borrower ..........................................................................49
6.   Exculpatory Provisions; Limitations of Liability ....................50
7.   Reimbursement and Indemnification of the Agent by the Lenders.........51
8.   Reliance by the Agent .............................................................51
9.   Notice of Event of Default ......................................................52
10.  Notices and Information ..........................................................52
11.  Lenders in Their Individual Capacities ...................................52
12.  Holders of Notes.....................................................................52
13.  Equalization of the Lenders.....................................................52
14.  Successor Agent ......................................................................53
15.  Beneficiaries ..........................................................................53
16   Effect of a Lender's Failure to Make an Advance of
     Proceeds of the Loan Facility .................................................53
17.  Cure by Delinquent Lender .....................................................55
18.  Calculations ...........................................................................56
19.  Agent's Fee ............................................................................56

## **ARTICLE VII**

MISCELLANEOUS...............................................................................56

1.   Incorporation of Provisions.....................................................56
2.   Further Assurances .................................................................56
3.   Construction of Agreement......................................................56
4.   Trust Fund ..............................................................................56
5.   Parties Bound, etc....................................................................57
6.   Amendments and Waivers........................................................57
7.   Governing Law........................................................................58
8.   Waiver of Jury Trial ...............................................................58

9.      Severability................................................................................58
10.     Notices.....................................................................................58
11.     Fees and Expenses....................................................................59
12.     Counterparts ............................................................................60
13.     Lenders' Obligation to Advance Proceeds of the Loan Facility ............60
14.     Erection of Sign.......................................................................60
15.     Successors and Assigns.............................................................60
16.     Taxes ......................................................................................61
17.     Changes; Legal Restrictions ......................................................63
18.     Increased Capital .....................................................................64
19.     Credit Support Document...........................................................64

## EXHIBITS

Exhibit "A"      Metes and Bounds Description of the Land
Exhibit "B"      Form of Assignment and Assumption Agreement
Exhibit "C"      Form of Request for Advance
Exhibit "C-1"    Form of Construction Affidavit
Exhibit "C-2"    Form of Application and Certification for Payment
Exhibit "C-3"    Form of Waiver of Lien for Material of Labor
Exhibit "C-4"    Form of Final Lien Waiver
Exhibit "D"      Permitted Exceptions
Exhibit "E"      Project Cost Statement
Exhibit "F"      Form of Budget Reallocation Request

## SCHEDULES

Schedule 1       Ownership of the Borrower as of the Closing Date

[PROJECT CONSTRUCTION/TERM LOAN AGREEMENT]

## PROJECT CONSTRUCTION/TERM LOAN AGREEMENT

**THIS PROJECT CONSTRUCTION/TERM LOAN AGREEMENT** (hereinafter, as it may be from time to time amended, modified, extended, renewed, substituted, and/or supplemented, referred to as this "Loan Agreement"), is dated this 21st day of December, 2007, by and among

**48-52 FRANKLIN, LLC,** a limited liability company duly organized, validly existing and in good standing under the laws of the State of New York, having a mailing address located at 1094 River Avenue, Area C, Lakewood, New Jersey 08701 (hereinafter referred to as the "Borrower"),

**AND**

**NORTH FORK BANK, A DIVISION OF CAPITAL ONE, N.A.,** a national banking association organized under the laws of the United States of America, having an office located at 275 Broadhollow Road, Melville, New York 11747, in its capacity as a Lender hereunder (hereinafter sometimes referred to as a "Lender" or "North Fork Bank"),

**AND**

**OTHER FINANCIAL INSTITUTIONS,** that are either signatories to this Loan Agreement or who from time to time may become a lender under this Loan Agreement (hereinafter, together with North Fork Bank, sometimes collectively referred to as the "Lenders" and individually referred to as a "Lender"),

**AND**

**NORTH FORK BANK, A DIVISION OF CAPITAL ONE, N.A.,** a national banking association organized under the laws of the United States of America, having an office located at 275 Broadhollow Road, Melville, New York 11747, in its capacity as agent for North Fork Bank and any other Lender which may from time to time become a party hereto (hereinafter, together with its successors and assigns, referred to as the "Agent").

## W I T N E S S E T H:

**WHEREAS,** the Borrower is the owner of a fee simple estate and interest in and to certain land and improvements located at 48-52 Franklin Street in the Borough of Manhattan, City of New York, County of New York, State of New York, being also known as Lot 27, in Block 172 on the Tax Maps of the City of New York, New York (hereinafter referred to as the "Land"), upon which the Borrower intends to construct and develop the "Project" (as such term is defined below), all as such Land is more fully described on Exhibit "A" attached hereto and made a part hereof; and

**WHEREAS,** the Borrower has requested that the Lenders make available to the Borrower, and the Lenders have agreed to make available to the Borrower, a project and soft costs loan which may, together with a land loan and building loan being made available to the Borrower of even date herewith pursuant to the "Building Loan Agreement" (as such term is hereinafter defined), be converted to a term loan (provided certain conditions set forth herein are satisfied by the Borrower) in the aggregate maximum principal amount of up to Three Million Six Hundred Sixteen Thousand Forty-Seven and 00/100 ($3,616,047.00) Dollars (hereinafter, as it may be from time to time amended, modified, extended, renewed, substituted, and/or supplemented , referred to as the "Loan Facility") for the purposes of financing a portion of certain "soft" costs, certain interest expenses, and certain other non-construction costs and expenses associated with the development and construction of the Project on the Land; and

WHEREAS, the Borrower understands and agrees that the "Lenders" (as such term is defined below) shall have the right, subject to the terms, conditions and provisions of this Loan Agreement, to sell, transfer, convey or otherwise dispose of all or a portion of the Loan Facility to one or more additional Lenders (provided same is at no expense to the Borrower and same does not cause any undue or material inconvenience to the Borrower), and in such event the Borrower and each such additional Lender(s) hereby acknowledge, covenant and agree that the Agent shall have the duties, responsibilities, rights and interests in its capacity as agent for all of the Lenders, all as provided for herein; and

WHEREAS, the Lenders have requested that the Agent act as administrative and collateral agent for the Lenders in connection with the Loan Facility, and the Agent has agreed to accept such responsibilities and duties, subject to the terms, conditions and provisions hereinafter set forth.

NOW, THEREFORE, in consideration of these premises and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Agent, the Lenders, and the Borrower hereby covenant and agree as follows:

## ARTICLE I

## DEFINITIONS

The following terms, as used in this Loan Agreement, shall have the following meanings, unless the context clearly indicates, provides or requires otherwise:

1.      "**Advance**" or "**Advances**" shall refer to one or more advances of proceeds of the Loan Facility, as the context may require.

2.      "**Agent**" shall have the meaning ascribed and assigned to such term as set forth in the preamble of this Loan Agreement.

3.      "**Agent's Consultants**" shall have the meaning assigned and ascribed to such term as set forth in Article VI, Paragraph 5 of this Loan Agreement.

4.      "**Agent's Fee**" shall have the meaning assigned and ascribed to such term as set forth in Article VI, Paragraph 19 of this Loan Agreement.

5.      "**Agent's Letter** shall mean that certain letter dated of even date herewith from the Agent to the Borrower (and acknowledged by the Borrower) which letter sets forth certain understandings and agreements between the Agent and the Borrower in connection with the Loan Facility, none of which understandings or agreements adversely affect or impair either the Borrower's obligations under the Loan Documents or the Agent's duties and responsibilities under this Loan Agreement and/or any of the other Loan Documents.

6.      "**Agreement of Guaranty**" that certain Payment and Performance Guaranty dated of even date herewith, executed by the Guarantor in favor of the Agent, for the benefit of the Lenders, pursuant to which the Guarantor has agreed to unconditionally guaranty the full and prompt payment and performance of certain obligations of the Borrower owed to the Agent and the Lenders in connection with the Loan Facility, all as more fully set forth and subject to the terms and conditions set forth therein, as said Payment and Performance Guaranty may be hereafter amended, modified, extended, renewed, refinanced and/or supplemented.

7.      "**Applicable Environmental Laws**" shall mean a collective reference to the following: (i)

the Clean Air Act, as amended, 42 U.S.C. Section 7401 *et seq.*; (ii) the Federal Water Pollution Control Act, as amended, 33 U.S.C. Section 1251 *et seq.*; (iii) the Resource Conservation and Recovery Act of 1976, as amended, 42 U.S.C. Section 6901 *et seq.*; (iv) the Comprehensive Environment Response, Compensation and Liability Act of 1980, as amended (including the Superfund Amendments and Reauthorization Act of 1986), 42 U.S.C. Section 9601 *et seq.*; (v) the Toxic Substances Control Act, as amended, 15 U.S.C. Section 2601 *et seq.*; (vi) the Occupational Safety and Health Act, as amended, 29 U.S.C. Section 651; (vii) the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. Section 11001 *et seq.*; (viii) the Mine Safety and Health Act of 1977, as amended, 30 U.S.C. Section 801 *et seq.*; (ix) the Safe Drinking Water Act, 42 U.S.C. Section 300f *et seq.*; (x) all comparable state and local laws, laws of other jurisdictions or orders and regulations; and (xi) any and all other Federal, state and local environmental laws, regulations and executive orders, as all or any of the foregoing may be amended, modified, replaced, or supplemented from time to time.

8.   "**Applicable Margin**" shall mean (i) at all times prior to the date on which the Agent has approved (which approval shall not be unreasonably withheld) the pre-sale of at least thirty-five percent (35%) of the Condominium Units (i.e., twenty-five (25) Condominium Units) under Qualified Contracts, two hundred twenty-five basis points (2.25%), (ii) at all times from and after the date on which the Agent has approved (which approval shall not be unreasonably withheld) the pre-sale of at least thirty-five percent (35%) of the Condominium Units (i.e., twenty-five (25) Condominium Units) under Qualified Contracts but prior to the date on which the Agent has approved (which approval shall not be unreasonably withheld) the pre-sale of at least seventy percent (70%) of the Condominium Units (i.e., fifty (50) Condominium Units) under Qualified Contracts, two hundred basis points (2.00%), and (iii) at all times from and after the date on which the Agent has approved (which approval shall not be unreasonably withheld) the pre-sale of at least seventy percent (70%) of the Condominium Units (i.e., fifty (50) Condominium Units) under Qualified Contracts, one hundred seventy-five basis points (1.75%).

9.   "**Application and Certification for Payment**" shall mean the Agent's form of Application and Certification for Payment attached hereto as Exhibit "C-2", with all blanks and other information appropriately completed and/or attached, as applicable, as said form may be amended, modified, and/or supplemented by the Agent.

10.   "**Appraiser**" shall mean The Oxford Group Appraisal and Consultation, Inc., having an office located at 1055 Parsippany Boulevard, Suite 204, Parsippany, New Jersey 07054, or any other third party MAI appraiser selected by the Agent for the purpose of appraising the Mortgaged Premises.

11.   "**Architect**" shall mean a collective reference to (i) Rawlings architects pc having an office located at 34 West 15th Street, 7th Floor, New York, New York 10011, and (ii) any other architectural firm engaged in connection with the construction and development of the Improvements on the Mortgaged Premises, which architectural firm shall be acceptable to the Required Lenders in their reasonable discretion.

12.   "**Assignment and Assumption Agreement**" shall mean that certain Assignment and Assumption Agreement in the form attached hereto as Exhibit "B", pursuant to which any Lender may sell, assign, convey or otherwise dispose of a portion of its respective Commitment in the Loan Facility to another Person in accordance with the terms, conditions and provisions of Article VII, Paragraph 15 of this Loan Agreement.

13.   "**Assignment of Construction Documents**" shall mean that certain Absolute Assignment of Construction Related Documents dated of even date herewith, executed by the Borrower and delivered to the Agent, for the benefit of the Lenders, pursuant to which the Borrower has granted, transferred and assigned to the Agent, for the benefit of the Lenders, subject to the provisions thereof, all of the Borrower's rights, title and interests in and to all of the Construction and Development Documents, as said Absolute

Assignment of Construction Related Documents may be hereafter amended, modified, extended, renewed, refinanced and/or supplemented.

14.    "**Assignment of Leases**" shall mean that certain Absolute Assignment of Leases, Rents, Income and Profits dated of even date herewith, executed by the Borrower and delivered to the Agent, for the benefit of the Lenders, pursuant to which the Borrower has granted, transferred and assigned to the Agent all of the Borrower's rights, title and interests in and to all Leases with respect to the Mortgaged Premises, as said Absolute Assignment of Leases, Rents, Income and Profits may be hereafter amended, modified, extended, renewed, refinanced and/or supplemented.

15.    "**Assignment of Purchase Contracts**" shall mean that certain Absolute Assignment of Purchase Contracts and Deposits dated of even date herewith, executed by the Borrower in favor of the Agent, for the benefit of the Lenders and consented to by such parties as the Agent may require, pursuant to which the Borrower has assigned to the Agent, for the benefit of the Lenders, any and all rights, title, and interests which the Borrower has in and to any Purchase Contracts now or hereafter entered into for the sale of any Condominium Unit or Parking Space, including, without limitation, all Purchaser Deposits made pursuant to said Purchase Contracts, as said Absolute Assignment of Purchase Contracts and Deposits, as said Absolute Assignment of Purchase Contracts may be from time to time amended, modified, extended, renewed, substituted, and/or supplemented.

16.    "**Base Rate**" shall mean the greater of (i) the Prime Rate or (ii) the Federal Funds Effective Rate plus fifty basis points (0.50%).

17.    "**Borrower**" shall have the meaning ascribed and assigned to such term as set forth in the preamble of this Loan Agreement.

18.    "**Building Loan Agreement**" shall mean that certain Building Construction/Term Loan Agreement dated of even date herewith executed by and among the Borrower, the Agent, and the Lenders, containing the terms, conditions and provisions upon which the Land Loan Facility and the Building Loan Facility is to be advanced, as said Building Construction/Term Loan Agreement may be from time to time amended, modified, extended, renewed, substituted, and/or supplemented.

19.    "**Building Loan Documents**" shall mean a collective reference to the Land Loan Notes, the Building Loan Notes, the Land Loan Mortgage, the Building Loan Mortgage, the Building Loan Agreement and all other loan documents evidencing, securing, guaranteeing and/or executed in connection with the Land Loan Facility and/or the Building Loan Facility.

20.    "**Building Loan Facility**" shall mean that certain building construction/term loan facility made available by the Lenders to the Borrower in the maximum aggregate principal amount of up to Thirty-Two Million Two Hundred Eighty-Three Thousand Nine Hundred Fifty-Three and 00/100 ($32,283,953.00) Dollars, which building construction/term loan facility is being advanced pursuant to the terms of the Building Loan Agreement to finance "hard" costs of construction and certain permitted "soft" costs and expenses associated with the development and construction of the Project on the Land, and which building construction/term loan facility is evidenced by the Building Loan Notes, and is secured by, *inter alia*, the Building Loan Documents, the Assignment of Leases, the Assignment of Purchase Contracts, the Agreement of Guaranty, the Environmental Indemnification Agreement, and the Assignment of Construction Documents.

21.    "**Building Loan Mortgage**" shall mean that certain Building Loan Mortgage dated of even date herewith, executed by the Borrower and delivered to the Agent, for the benefit of the Lenders, pursuant to which the Agent, for the benefit of the Lenders, is granted a second lien mortgage on the Mortgaged

Premises for the purposes of securing the obligations of the Borrower in connection with the Building Loan Notes and the Building Loan Facility, as said Building Loan Mortgage may be from time to time amended, modified, extended, renewed, substituted, and/or supplemented.

22.    "**Building Loan Note**" and "**Building Loan Notes**" shall mean a collective reference to (i) as of the Closing Date, that certain Building Construction/Term Loan Note dated of even date herewith, executed by the Borrower, as the maker, and delivered to North Fork Bank, as the payee, in the maximum principal amount of up to Thirty-Two Million Two Hundred Eighty-Three Thousand Nine Hundred Fifty-Three and 00/100 ($32,283,953.00) Dollars, as said Building Construction/Term Loan Note may be hereafter amended, modified, extended, renewed, substituted, and/or supplemented, evidencing North Fork Bank's commitment with respect to the Building Loan Facility and (ii) at any time after the Closing Date, any note executed by the Borrower and delivered to the applicable lender, whether as assignee or as assignor, evidencing said lender's respective commitment in the Building Loan Facility (which loan note shall be in the form of the assigning lender's Building Loan Note in effect at the time of such assignment).

23.    "**Business Day**" or "**Business Days**" shall mean (a) for purposes of the Borrower performing its payment obligations under this Loan Agreement, any day excluding Sunday and any day which is a legal holiday under the laws of the State of New Jersey and the State of New York, or is a day upon which banking institutions located in such state are required or authorized by law or other governmental action to close, (b) for purposes of the Agent or the Lenders performing their respective obligations under this Loan Agreement, any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New Jersey and the State of New York, or is a day upon which banking institutions located in such state are required or authorized by law or other governmental action to close, and (c) if the applicable day relates to the LIBO Rate or an Interest Period for the Loan Facility, a Business Day under the foregoing clauses (a) and (b), as applicable, and a day on which dealings on dollar deposits are also carried on in the London interbank market and banks are open for business in London.

24.    "**Bylaws**" shall mean those certain By-Laws of the Condominium Owners' Association which are to be completed on or before June 20, 2008, as said By-Laws may be from time to time amended, modified, extended, renewed, and/or supplemented in accordance with and subject to the terms, conditions, and provisions of this Loan Agreement.

25.    "**Cash Collateral Agreement**" shall mean that certain Cash Collateral Agreement dated of even date herewith, executed by the Borrower in favor of the Agent pursuant to which the Borrower has granted to the Agent, for the benefit of the Lenders, a first priority security interest in and to all monies held in the Collateral Account, as said Cash Collateral Agreement may be from time to time amended, modified, extended, renewed, refinanced and/or supplemented.

26.    "**Closing Date**" shall mean December 21, 2007.

27.    "**Code**" shall mean the Uniform Commercial Code, as in effect from time to time in the State of New York.

28.    "**Collateral Account**" shall mean that certain account no. 4304006929 owned by the Borrower and opened and maintained with the Agent, for the benefit of the Lenders, as of the Closing Date, which account shall be subject to the terms, conditions, and provisions of the Cash Collateral Agreement, as such account may be from time to time modified, substituted, and/or supplemented.

29.    "**Commitment**" shall mean (i) with respect to North Fork Bank, as of the Closing Date $3,616,047.00 and thereafter such other amount of the Loan Facility as North Fork Bank may continue to own and hold, and (ii) with respect to any other Lender, the amount of the Loan Facility owned and held by

said Lender at any date of determination. At no time shall the aggregate of all Commitments of all Lenders (including North Fork Bank) with respect to the Loan Facility ever exceed the maximum aggregate principal amount of the Loan Facility.

30.     "**Commitment Percentage**" shall mean the proportion that a Lender's Commitment bears to all of the Commitments of all of the Lenders, being, at the time of execution hereof, with respect to North Fork Bank, 100.00%.

31.     "**Commitments**" shall mean the aggregate of the Commitment of each of the Lenders.

32.     "**Common Areas**" shall mean those portions of the Mortgaged Premises consisting of the common areas and roads which are to be conveyed to the Condominium Association pursuant to the offering plan approved by the Office of the Attorney General for the State of New York.

33.     "**Completion Date**" shall have the meaning assigned and ascribed to such term as set forth in Article III, Paragraph 1(ii)(f) of this Loan Agreement.

34.     "**Condominium**" shall mean that certain condominium to be formed with respect to the Mortgaged Premises which condominium is contemplated to be known as "50 Franklin Street Condominium", and which condominium shall be determined and formed on or before June 20, 2008, all pursuant to the terms, conditions, and provisions of the Declaration.

35.     "**Condominium Act**" shall mean the terms, conditions, and provisions of Article 9-B of the New York Real Property Law and all applicable regulations, amendments and supplements thereto.

36.     "**Condominium Association**" shall mean the condominium owner's association to be formed by the Borrower (or which exists as a matter of law) in connection with the Borrower's creation of the Condominium.

37.     "**Condominium Conversion Date**" shall mean the date on which all of the following shall have occurred: (i) the Offering Plan shall have been filed with, and approved by, the Office of the Attorney General for the State of New York, (ii) the Declaration shall have been filed of record in the Office of the Register of New York County, New York, and (ii) all other Federal, state, and local requirements with respect to the conversion of the Mortgaged Premises to a condominium form of ownership have been satisfied, in the sole and absolute discretion of the Agent.

38.     "**Condominium Documents**" shall mean a collective reference to the Offering Plan, the Declaration, the Bylaws, and any rules and regulations promulgated in connection therewith, as any of the foregoing may be from time to time amended, modified, extended, renewed, and/or supplemented in accordance with and subject to the terms, conditions, and provisions of this Loan Agreement.

39.     "**Condominium Unit**" and "**Condominium Units**" shall mean one or more of the approximately seventy-two (72) residential condominium units to be constructed on the Mortgaged Premises in connection with the development of the Project.

40.     "**Confirmations**" shall have the meaning assigned and ascribed to such term as set forth in any Master Agreement.

41.     "**Construction Affidavit**" shall mean the Agent's form of Construction Affidavit attached hereto as Exhibit "C-1", with all blanks and other information appropriately completed and/or attached, as applicable, as said form may be amended, modified, and/or supplemented by the Agent.

42.    "**Construction and Development Documents**" shall mean any and all plans, specifications, budgets, schedules, surveys, drawings, reports and governmental permits and approvals between the Borrower and any other Person and any amendment or modification thereof, in connection with the Project, including, without limitation, the Plans and Specifications, the Preliminary Survey, and the Project Cost Statement.

43.    "**Construction Period**" shall mean the period of time commencing on the Closing Date and ending on the Initial Maturity Date or, if said maturity date is extended pursuant to the terms, conditions, and provisions of Article III, Paragraph (iii)(a) of this Loan Agreement, the Extended Maturity Date.

44.    "**Credit Support Document**" shall have the meaning assigned and ascribed to such term as set forth in any Master Agreement.

45.    "**Debt**" shall mean all present and future indebtedness and other liabilities of the Borrower owing to the Agent, the Lenders, or any other Person pursuant to the terms, conditions, and provisions of this Loan Agreement, or any of their respective successors, transferees or assigns, of every type and description, arising under or in connection with this Loan Agreement or any other Loan Document, whether or not for the payment of money, whether direct or indirect (including those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and however acquired, including, without limitation, any and all obligations, liabilities, duties and other responsibilities owed by the Borrower to the Agent or the Lenders in connection with any Master Agreement, any other interest or currency "swap agreement" (as such term is defined at 11 U.S.C. § 101), future, option, collar, cap, hedge, derivative or any other such agreement providing for the transfer or mitigation of interest risks entered into in connection with the Loan Facility.  The term "**Debt**" further includes, without limitation, all interest, charges, expenses, fees, reasonable attorneys' fees and disbursements, and any other sum chargeable to the Borrower under this Loan Agreement or any other Loan Document.

46.    "**Declaration**" shall mean that certain Declaration of the Condominium, which Declaration shall be recorded in the Office of the Register of New York County, New York on or before June 20, 2008, as said Declaration may be from time to time amended, modified, extended, renewed, restated, and/or supplemented in accordance with and subject to the terms, conditions, and provisions of this Loan Agreement.

47.    "**Default Rate**" shall mean a rate of interest equal to the lesser of (i) five percent (5%) per annum above the then current interest rate with respect to the Loan Facility or (ii) the maximum rate allowed to be charged by law.

48.    "**Delinquency Amount**" shall have the meaning assigned and ascribed to such term as set forth in Article VI, Paragraph 16 of this Loan Agreement.

49.    "**Delinquency Notice**" shall have the meaning assigned and ascribed to such term as set forth in Article VI, Paragraph 16 of this Loan Agreement.

50.    "**Delinquent Lender**" or "**Delinquent Lenders**" shall have the meaning assigned and ascribed to such term as set forth in Article III, Paragraph 1(x) of this Loan Agreement.

51.    "**Electing Lender**" shall have the meaning assigned and ascribed to such term as set forth in Article VI, Paragraph 16 of this Loan Agreement.

52.    "**Election Notice**" shall have the meaning assigned and ascribed to such term as set forth in Article VI, Paragraph 16 of this Loan Agreement.

53.    "**Election Period**" shall have the meaning assigned and ascribed to such term as set forth in Article VI, Paragraph 16 of this Loan Agreement.

54.    "**Environmental Indemnification Agreement**" shall mean that certain Environmental Indemnification Agreement dated of even date herewith, executed by the Borrower and the Guarantor, on a joint a nd s everal basis, in favor of the Agent, for the benefit of the Lenders, as said Environmental Indemnification Agreement may be from time to time amended, modified, extended, renewed, substituted, and/or supplemented.

55.    "**Equity Contribution**" shall mean the Borrower's contribution of at least $16,379,500.00 in equity into the Project (such equity to be comprised of (i) $12,600,000.00 in land value and (ii) $3,779,500.00 in soft costs.

56.    "**Event of Default**" or "**Events of Default**" shall have the meaning assigned and ascribed to such terms as set forth in Article V of this Loan Agreement.

57.    "**Extended Maturity Date**" shall mean December 20, 2010.

58.    "**Federal Funds Effective Rate**" shall mean for any day the rate per annum (based on a year of 360 days and actual days elapsed, and rounded upward to the nearest 1/100 of 1%) announced by the Federal Reserve Bank of New York (or any successor) on such day as being the weighted average of the rates on overnight federal funds transactions arranged by federal funds brokers on the previous trading day, as computed and announced by such Federal Reserve Bank (or any successor) in substantially the same manner as such Federal Reserve Bank computes and announces the weighted average it refers to as the "Federal Funds Effective Rate" as of the Closing Date; provided, however, that if such Federal Reserve Bank (or its successor) does not announce such rate on any day, the "Federal Funds Effective Rate" for such day shall be the Federal Funds Effective Rate for the last day on which such rate was announced.

59.    "**Final Lien Waiver**" shall mean the Agent's form of Final Lien Certification attached hereto as Exhibit "C-4", with all blanks and other information appropriately completed and/or attached, as applicable, as said form may be amended, modified, and/or supplemented by the Agent.

60.    "**Following Business Day Convention**" shall mean that an adjustment will be made if any relevant date would otherwise fall on a day that is not a Business Day so that the applicable date will be the first following day that is a Business Day.

61.    "**General Construction Contract**" shall mean that certain construction contract entitled "Standard Form of Agreement between Owner and Contractor (where the basis of payment is a Stipulated Sum), AIA Document A101 - 2007" dated as of July 9, 2007, with respect to the Mortgaged Premises executed by and between the Borrower and CM & Associates Construction Management LLC, and all exhibits and attachments thereto, as the same may be amended, modified, and/or supplemented from time to time with the consent of the Agent and in accordance with the terms, conditions, and provisions of this Loan Agreement.

62.    "**General Contractor**" shall mean a collective reference to (i) CM & Associates Construction Management LLC, having an address located at 1 Washington Park, 15th Floor, Newark, New Jersey 10011, and (ii) any other general contracting firm or construction management company engaged to

undertake and complete, or to manage the undertaking and completion of, the Improvements, which general contracting firm and/or construction management company shall be acceptable to the Required Lenders in their sole and absolute discretion.

63.     "**Governmental Authority**" or "**Governmental Authorities**" shall mean all Federal, state, county and local governmental authorities having jurisdiction over the Borrower, the Guarantor, the Mortgaged Premises, the Project and/or the Improvements.

64.     "**Guarantor**" shall mean Marshall Weisman, an individual with a residence address of 240 Oak Knoll Road, Lakewood, New Jersey 08701, together with his heirs, administrators, executors, executrices, and legal representatives.

65.     "**Improvements**" shall mean all site work (including, without limitation, all on-site and off-site work), buildings, structures and other improvements, which are to be developed, built and constructed by the Borrower on the Land, including, without limitation, the construction and development of a condominium project to be known as "50 Franklin Street Condominium", consisting of seventy-two (72) Condominium Units and ten (10) first floor Parking Spaces, said condominium building to include a full basement with gym area, conference room, and mechanical areas.

66.     "**Initial Maturity Date**" shall mean December 20, 2009.

67.     "**Inspecting Engineer**" shall mean a collective reference to (i) EMJ Associates, with an address located at 55 Jericho Turnpike, Suite 205, Jericho, New York 11753, and (ii) any other inspecting engineering firm or consulting firm engaged by the Agent, on behalf of the Lenders, at the Borrower's sole cost and expense for the purpose of inspecting the construction and development of the Improvements.

68.     "**Interest Period**" shall mean a period of time during which the LIBO Rate is applicable to the Loan Facility, and each such period of time shall be for a duration of one (1) month from its respective commencement date (each such commencement date being the first day of a month); provided, however, the initial Interest Period shall commence on the Closing Date and continue up through and including December 31, 2007. Interest to be paid as to advances made on a date other than the beginning of an Interest Period shall be calculated at the interest rate being charged for the then existing Interest Period.

69.     "**Interest Rate**" shall have the meaning assigned and ascribed to such term as set forth in Article III, Paragraph 1(ii)(a)(1) of this Loan Agreement.

70.     "**Interest Rate Determination Date**" and "**Interest Rate Determination Dates**" shall mean the date on which the Agent determines the Interest Rate applicable to the Loan Facility. The Interest Rate Determination Date shall be the second (2nd) Business Day prior to the end of the then current Interest Period.

71.     "**Land**" shall have the meaning ascribed and assigned to such term as set forth in the first recital of this Loan Agreement.

72.     "**Land Loan Facility**" shall mean that certain land loan facility made available by the Lenders to the Borrower in the original aggregate principal amount of up to Seventeen Million and 00/100 ($17,000,000.00) Dollars, which land loan facility is being advanced pursuant to the terms of the Building Loan Agreement to finance a portion of the Borrower's costs in connection with the acquisition of the Land, and which land loan facility is evidenced by the Land Loan Notes, and is secured by, *inter alia*, the Building Loan Documents, the Assignment of Leases, the Assignment of Purchase Contracts, the

Agreement of Guaranty, the Environmental Indemnification Agreement, and the Assignment of Construction Documents..

73.  **"Land Loan Mortgage"** shall mean that certain Amended and Restated Land Loan Mortgage dated of even date herewith, executed by the Borrower and delivered to the Agent, for the benefit of the Lenders, pursuant to which the Agent, for benefit of the Lenders, is granted a <u>first</u> lien mortgage on the Mortgaged Premises for the purposes of securing the obligations of the Borrower in connection with the Land Loan Note and the Land Loan Facility, as said Amended and Restated Land Loan Mortgage may be from time to time amended, modified, extended, renewed, substituted, and/or supplemented.

74.  **"Land Loan Note"** and **"Land Loan Notes"** shall mean a collective reference to (i) as of the Closing Date, that certain Amended and Restated Land Loan Note dated of even date herewith, executed by the Borrower, as the maker, and delivered to North Fork Bank, as the payee, in the original principal amount of up to Seventeen Million and 00/100 ($17,000,000.00) Dollars, as said Amended and Restated Land Loan Note may be hereafter amended, modified, extended, renewed, substituted, and/or supplemented, evidencing North Fork Bank's commitment with respect to the Land Loan Facility, and (ii) at any time after the Closing Date, any note executed by the Borrower and delivered to the applicable lender, whether as assignee or as assignor, evidencing said lender's respective commitment in the Land Loan Facility (which loan note shall be in the form of the assigning lender's Land Loan Note in effect at the time of such assignment).

75.  **"Lease"** or **"Leases"** shall mean the collective reference to any and all leases, rental agreements and other forms of written agreements executed now or hereafter by the Borrower, as landlord, and any Person, as a tenant, pursuant to which such Person or entity agrees to lease from the Borrower all or any portion of the Mortgaged Premises.

76.  **"Lender"** and **"Lenders"** shall mean (i) North Fork Bank during the term of the Loan Facility in which it holds and owns all or any portion of the Loan Facility, and (ii) any other institutional lender which may hereafter hold and own all or any portion of the Loan Facility, all as more fully disclosed and evidenced by any executed and delivered Assignment and Assumption Agreement(s).

77.  **"LIBO Rate"** shall mean, with respect to any Interest Period applicable to a LIBO Rate Loan, an interest rate per annum as determined on the basis of the offered rates for deposits in U.S. dollars, for a period of time comparable to such Interest Period for the Loan Facility which appears on the Dow Jones Markets Service display page 3750 as of 11:00 A.M. (London time) on the day that is two (2) Business Days preceding the first (1st) day of such applicable Interest Period; <u>provided, however</u>, that if the rate described above does not appear on the Dow Jones Markets Service display page 3750 on any applicable Interest Rate Determination Date, then the LIBO Rate shall be the rate (rounded upwards, if necessary, to the nearest one hundred-thousandth of a percentage point), determined on the basis of the offered rates for deposits in U.S. dollars for a period of time comparable to such applicable Interest Period which are offered by four (4) major banks in the London interbank market at approximately 11:00 A.M. (London time) on the day that is two (2) Business Days preceding the first day of such applicable Interest Period as selected by the Agent. The principal London office of each of the four (4) major London banks will be requested to provide a quotation of its U.S. dollar deposit offered rate. If at least two (2) such quotations are provided, the rate for that date shall be the arithmetic mean of the quotations. If fewer than two (2) quotations are provided as requested, the rate for that date shall be determined on the basis of the rates quoted for loans in U.S. dollars to leading European banks for a period of time comparable to the applicable Interest Period for the Loan Facility offered by major banks in New York City at approximately 11:00 A.M. (New York City, New York time), on the day that is two (2) Business Days preceding the first day of such applicable Interest Period. In the event that the Agent is unable to obtain any such quotation, it will be deemed that the LIBO Rate in connection with the Loan Facility cannot be determined. In the event that

the Federal Reserve Board shall impose a Reserve Percentage with respect to LIBO Rate deposits of the Agent, then for any period during which such Reserve Percentage shall apply, the LIBO Rate shall be equal to the amount determined above divided by an amount equal to 1.00 minus the Reserve Percentage. The LIBO Rate shall be adjusted automatically on and as of the effective date of any change in the Reserve Percentage.

78.    "**LIBO Rate Loan**" shall mean a borrowing and advance of all or any portion of the Loan Facility which bears interest based upon the LIBO Rate.

79.    "**Loan Agreement**" shall have the meaning ascribed and assigned to such term in the preamble of this Loan Agreement.

80.    "**Loan Facility**" shall have the meaning assigned and ascribed to such term as set forth and contained in the second recital of this Loan Agreement.

81.    "**Loan Documents**" shall mean the collective reference to this Loan Agreement, the Notes, the Mortgage, the Assignment of Leases, the Agreement of Guaranty, the Assignment of Construction Documents, the Assignment of Purchase Contracts, the Environmental Indemnification Agreement, the Cash Collateral Agreement, any Master Agreement, the UCC-1 Financing Statements and any other agreements, instruments, documents or certificates executed and/or delivered by the Borrower, the Guarantor, and/or any other Person in connection with the Loan Facility, together with all amendments, modifications or supplements to any or all of them.

82.    "**Major Subcontracts**" shall mean any contract or contracts entered into with any single subcontractor or materialman employed by the Borrower and/or the General Contractor in connection with the construction of the Improvements in excess of the greater of (i) five percent (5%) of the overall hard cost budget, as set forth and described in the Project Cost Statement, or (ii) $1,400,000.00.

83.    "**Master Agreement**" shall mean a reference to any ISDA Master Agreement, as such form may be revised, amended and/or modified from time to time, including without limitation, all schedules, confirmations and other documents exchanged between the parties thereto in connection with confirming the transactions thereunder, executed and delivered by the Borrower pursuant to which the Borrower and the Agent enter into one or more transactions thereunder for the purposes of mitigating the interest rate risk in connection with the Loan Facility.

84.    "**Mortgage**" shall mean that certain Project Loan Mortgage dated of even date herewith, executed by the Borrower and delivered to the Agent, for the benefit of the Lenders, pursuant to which the Agent, for the benefit of the Lenders, is granted a third lien mortgage on the Mortgaged Premises for the purposes of securing the obligations of the Borrower in connection with the Project Loan Notes and the Loan Facility, as said Project Loan Mortgage may be from time to time amended, modified, extended, renewed, substituted, and/or supplemented.

85.    "**Mortgaged Premises**" shall mean a collective reference to (i) the Borrower's fee simple estate and interest in and to the Land, (ii) all buildings, improvements and other structures now or hereafter located on the Land, including, without limitation, the Improvements, and (iii) all easements and other property rights benefiting the Land, all as more fully described in the Mortgage, less such parts thereof, including, without limitation, Condominium Units and Parking Spaces which have been sold pursuant to and in accordance with the terms, conditions, and provisions of this Loan Agreement, as shall from time to time be released from the lien of the Mortgage.

86.    "**Non-Delinquent Lender**" or "**Non-Delinquent Lenders**" shall mean all Lenders other

than the Delinquent Lenders.

87.  "**North Fork Bank**" shall have the meaning ascribed and assigned to such term as set forth in the preamble of this Loan Agreement.

88.  "**Note**" and "**Notes**" shall mean a collective reference to (i) as of the Closing Date, the Project Loan Note, evidencing North Fork Bank's commitment with respect to the Loan Facility, and (ii) at any time after the Closing Date, any note executed by the Borrower and delivered to the applicable lender, whether as assignee or as assignor, evidencing said lender's respective commitment in the Loan Facility (which loan note shall be in the form of the assigning lender's Project Loan Note in effect at the time of such assignment).

89.  "**Offering Plan**" shall mean the offering plan with respect to the Condominium approved by the Office of the Attorney General for the State of New York, and any amendments and/or supplements thereto.

90.  "**Option to Convert**" shall mean the Borrower's option, subject to the terms, conditions, and provisions of Article III, Paragraph 1(iii), of this Loan Agreement, to convert the Loan Facility into a term loan.

91.  "**Other Subcontracts**" shall mean any contracts other than Major Subcontracts entered into by the Borrower and/or the General Contractor with subcontractors or materialmen in connection with the construction of the Improvements.

92.  "**Parking Space**" and "**Parking Spaces**" shall mean one or more of the approximately ten (10) first floor parking spaces to be constructed on the Mortgaged Premises in connection with the Project.

93.  "**Permitted Encumbrances**" shall mean (i) all Permitted Exceptions and (ii) any other liens, easements, encumbrances and other restrictions affecting the Mortgaged Premises which have been approved and permitted by the Required Lenders, in their sole and absolute discretion.

94.  "**Permitted Exceptions**" shall mean (i) those title exceptions which are set forth in that certain commitment issued by Commonwealth Land Title Insurance Company dated November 6, 2007, No. GR27-18239CWMBL, as continued and modified by endorsement through the Closing Date, issued to the Agent, for the benefit of the Lenders, by the Title Company, and (ii) those items listed on Exhibit "D" attached hereto and made a part hereof.

95.  "**Permitted Transfers**" shall mean (i) a Transfer by any member of the Borrower, of said member's membership interest in the Borrower to any other member of the Borrower, and (ii) a Transfer by any member of the Borrower of said member membership interest in the Borrower (a) to any member of any such member's immediate family or (b) to any trust, corporation, or partnership composed of or for the benefit of any member of the Borrower or the immediate family members of any member of the Borrower; provided, however, (1) the Agent shall have the right to receive at least thirty (30) days prior express written notice of any intended Permitted Transfer, (2) no assignment, conveyance or transfer of any membership interest in the Borrower shall release the Guarantor from his obligations under the Agreement of Guaranty or the Environmental Indemnification Agreement, (3) no assignment, conveyance or Transfer of a membership interest in the Borrower shall be (A) to a Person having ties to criminal elements, (B) to any Person the business and moral reputation of which or of whom are not reasonably acceptable to the Agent, and (C) with whom the Agent has a policy against conducting business, (4) each Person to whom any Permitted Transfer is to be made shall be in compliance with the Uniting and

Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56, as the same has been, or shall hereafter be, renewed, extended, amended or replaced, and (5) at all times during the term of the Loan Facility, the Guarantor (x) shall remain the Managing Member of the Borrower and (y) shall retain, directly or indirectly, at least fifty-one percent (51%) of the membership interests in the Borrower.

96.     "**Person**" or "**Persons**" shall mean any natural person, general partnership, limited partnership, limited liability partnership, corporation, joint stock company, trust, unincorporated association, joint venture, limited liability company, bank or other organization whether or not a legal entity.

97.     "**Plans and Specifications**" shall mean any and all plans, maps, surveys, drawings, specifications, or lists of materials submitted to the Agent, for the benefit of the Lenders, by the Borrower on behalf of any tenant in connection with the construction of any of the Improvements which plans, maps, surveys, drawings, specifications, or lists of materials have been approved by the Required Lenders, in their sole and absolute discretion, as any of them may be from time to time hereafter changed, amended, modified, and/or otherwise supplemented.

98.     "**Potential Default**" shall mean an event, condition, or situation which, with the giving of any required notice and/or the passage of any required grace or cure periods, or any combination of the foregoing, would constitute an Event of Default.

99.     "**Preliminary Survey**" shall mean that certain survey of the Land entitled "ALTA/ACSM Land Title Survey situated in The Borough of Manhattan, City of New York, State of New York" prepared by John J. Vida, for True North Surveyors, Inc., dated February 20, 2007, as last revised on November 27, 2007.

100.    "**Prime Rate**" shall mean the fluctuating interest rate per annum announced by the Agent from time to time as its prime rate or prime lending rate, which prime rate of interest is determined from time to time by the Agent as a means of pricing some loans to its customers and is neither tied to any external rate of interest or index, nor does it necessarily reflect the lowest rate of interest actually charged by the Agent to any particular class or category of customers of the Agent.

101.    "**Prime Rate Loan**" and "**Prime Rate Loans**" shall mean any Advance which bears interest based upon the Prime Rate in accordance with the terms, conditions, and provisions of this Loan Agreement.

102.    "**Project**" shall mean the construction and development on the Land of a condominium project to be known as "50 Franklin Street Condominium", consisting of seventy-two (72) Condominium Units and ten (10) first floor Parking Spaces, said condominium building to include a full basement with gym area, conference room, and mechanical areas.

103.    "**Project Cost Statement**" shall mean a statement in the form of Exhibit "E" attached hereto and made a part hereof, setting forth, by category, the "soft" costs, interest expenses, and other non-construction costs and expenses associated with the development and construction of the Project and the amounts of the Loan Facility to be advanced in connection therewith, as it may be hereafter amended and/or modified in accordance with the terms, conditions and provisions of this Loan Agreement.

104.    "**Property Manager**" shall mean a reference to any property manager of all or any portion of the Mortgaged Premises approved by the Agent, in its sole and absolute discretion.

105.    "**Purchase Contract**" and "**Purchase Contracts**" shall mean the Borrower's standard

form of purchase contract, approved by the Agent to be used by the Borrower in connection with the sale of Condominium Units and/or Parking Spaces, each of which such purchase contracts shall require, amongst other things, that the purchaser thereunder shall be obligated to provide at least a ten percent (10%) non-refundable Purchaser Deposit in connection with the purchase of any Condominium Unit and/or Parking Space, as said form of purchase contract may be from time to time amended, modified, extended, renewed, substituted, and/or supplemented by the Borrower with the prior express written consent of the Agent.

106.   "**Purchaser Deposits**" shall mean any and all reservation deposits, downpayments, or the like with respect to Purchase Contracts or reservation receipts for Condominium Units and/or Parking Spaces.

107.   "**Qualified Contract**" and "**Qualified Contracts**" shall mean a fully executed and delivered Purchase Contract which Purchase Contract: (i) is with a bona fide third-party purchaser, (ii) has no contingencies other than (a) timely completion and (b) a mortgage contingency in the event the applicable buyer has provided written evidence to the Borrower that they have been pre-qualified for a mortgage by their lender, (iii) provides that the buyer under said contract must qualify for a permanent mortgage commitment, (iv) is not assignable, (v) provides for a minimum non-refundable deposit in the amount of ten percent (10%) of the gross sales price of said Condominium Unit and any Parking Space being acquired in connection therewith, which deposits are to be (a) maintained in the Collateral Account and (b) subject to the contingencies described in the foregoing clause (ii), non-refundable, and (vi) provides for a gross sales price in an amount which has been approved in writing by the Agent.

108.   "**Release Payment**" and "**Release Payments**" shall mean the principal payments required to be made pursuant to Article III, Paragraphs 1(ii)(b) of this Loan Agreement in connection with the sale of any Condominium Unit and any related Parking Space being acquired in connection therewith.

109.   "**Request for Advance**" shall mean with respect to a proposed borrowing pursuant to Article III, Paragraph 1(iii) hereof, a written loan authorization and certificate duly executed by the Borrower and delivered to the Agent in the form of Exhibit "C" attached hereto, including, without limitation, a Construction Affidavit.

110.   "**Required Lenders**" shall mean Lenders having in the aggregate at least sixty-six and sixty-six one-hundredths percent (66.66%) of (i) the total Commitments or (ii) solely in the event the Commitments have been terminated, the outstanding principal balance of the Loan Facility; provided, however, at all times while there are no more than two (2) Lenders, the defined term "Required Lenders" shall mean all Lenders.

111.   "**Requirements of Law**" shall mean all Federal, state and local laws, rules, regulations, orders and other governmental approvals, permits or requirements applicable to the Mortgaged Premises, the Project and/or the Improvements, including, without limitation, those pertaining to zoning, subdivision, site plan approvals, health, safety, labor and the environment.

112.   "**Reserve Percentage**" shall mean for any date that percentage, if any (expressed as a decimal, rounded upward to the nearest 1/100 of 1%), as determined in good faith by the Agent (which determination shall be conclusive absent manifest error) which is in effect on such date, as prescribed by the Federal Reserve Board, for determining the maximum aggregate reserve requirement (including, without limitation, any basic, supplemental, marginal, emergency and other reserves) for a member bank of the Federal Reserve System in respect of any "eurocurrency liabilities" (as defined in Regulation D) having a term equal to the applicable Interest Period (or in respect of any other category of liabilities which includes deposits by reference to which the interest rate on the Loan Facility when bearing interest at a rate based upon

the LIBO Rate is determined or any category of extensions of credit or other assets which includes loans by a non-United States office of any bank to United States residents).

113.  "**Schedules**" shall have the meaning assigned and ascribed to such term as set forth in any Master Agreement.

114.  "**Section 421-a**" shall mean Section 421-a of the Real Property Tax Law of the State of New York, together with any and all rules and regulations promulgated in connection therewith or related thereto, and any and all amendments, modifications, and supplements thereto.

115.  "**Stored Materials**" shall mean, with respect to the Project, structural steel and any other materials requested by the Borrower with the prior express written consent of the Agent.

116.  "**Term Period**" shall mean the period commencing on the first day immediately following the Initial Maturity Date and ending on the Extended Maturity Date.

117.  "**Title Company**" shall mean Commonwealth Land Title Insurance Company by its agent National Granite Title Insurance Agency Inc.

118.  "**Transfer**" shall mean (i) the direct or indirect sale, transfer, pledge, or conveyance of the Mortgaged Premises or any portion thereof or interest therein, whether legal or beneficial and whether direct or indirect, (ii) the execution of an installment sale contract or similar instrument affecting all or a portion of the Mortgaged Premises, (iii) the direct or indirect sale, transfer, pledge, or conveyance of any membership interest in the Borrower, (iv) the termination or dissolution of the Borrower, (v) the amendment of the Borrower's operating agreement, (vi) the inclusion as a new member of the Borrower of any Person who is not a member of the Borrower on the Closing Date, and (vii) the direct or indirect sale, transfer, pledge, or conveyance of any interest (stock or other form of interest, legal or beneficial and however remote) held by any Person in any member of the Borrower.

119.  "**UCC-1 Financing Statements**" shall mean any UCC-1 financing statements filed by the Agent, on behalf of the Lenders, in connection with the perfection of its security interest in the Mortgaged Premises and/or any other collateral for the Loan Facility.

120.  "**Waiver of Lien for Material of Labor**" shall mean the Agent's form of Waiver of Lien for Material of Labor attached hereto as Exhibit "C-3", with all blanks and other information appropriately completed and/or attached, as applicable, as said form may be amended, modified, and/or supplemented by the Agent.

## ARTICLE II

## THE IMPROVEMENTS

1.  **Construction of the Improvements**.  As of the Closing Date, the Borrower has submitted to the Agent and the Inspecting Engineer, the Plans and Specifications for the Improvements. Each addition or modification to the Plans and Specifications shall be approved as a change order to the extent required in Article III, Paragraph 13 hereof, in writing by the Agent, the Inspecting Engineer, and, to the extent required by applicable law, the appropriate Governmental Authorities.  The Borrower shall not commence any work on any stage or phase of the Improvements unless all Plans and Specifications for the Project have been approved by the Agent and the Inspecting Engineer (which Plans and Specifications the Agent hereby acknowledges and agrees have been so approved as of the Closing Date) and all required permits, including, without limitation, building permits, certificates, licenses and

approvals for such construction have been issued or obtained from the appropriate Governmental Authorities as it relates to the Advance required, and such permits, certificates, licenses and approvals remain in full force and effect. The Borrower shall construct the Improvements in accordance with the Project Cost Statement, the Plans and Specifications, all Requirements of Law, and the terms, conditions, and provisions of this Loan Agreement, free and clear of all liens, encumbrances and security instruments, other than the Mortgage and the Permitted Encumbrances. The Plans and Specifications, as approved by the Agent and the Lenders, have been absolutely assigned to the Agent, for the benefit of the Lenders, as provided for in the Assignment of Construction Documents. Compliance with the provisions of this Paragraph 1 and any other provisions of this Loan Agreement relating to the construction and equipping of the Improvements shall be determined in the sole judgment of the Inspecting Engineer, the Agent, and the Required Lenders. At all times the Agent, the Inspecting Engineer, the Lenders, and their respective agents and employees, shall have the right of entry and free access to the Mortgaged Premises to inspect the Improvements upon reasonable prior notice and during reasonable hours.

2.      **Construction**.  The Borrower hereby represents and warrants to the Agent and the Lenders that, as of the Closing Date, it has commenced construction of the Improvements. The Borrower hereby covenants and agrees that it shall diligently continue with such construction until the Improvements are completed in accordance with the Plans and Specifications, the Project Cost Statement, all Requirements of Law, and the terms, conditions, and provisions of this Loan Agreement.

3.      **Completion of the Improvements**.  The Borrower shall construct and complete the Improvements with first-class materials and in a good, substantial and workmanlike manner in accordance with (i) the applicable Plans and Specifications, (ii) the provisions and terms of all Requirements of Law, (iii) the terms, conditions, and provisions of this Loan Agreement; and (iv) the Project Cost Statement. All of the Improvements, once commenced, shall be completed on or before the Initial Maturity Date.

4.      **Inspecting Engineer**.  The Borrower hereby acknowledges and agrees that (i) the Inspecting Engineer has been retained by the Agent, for the benefit of the Lenders, to act as a consultant, and only as a consultant, to the Agent in connection with the construction of the Improvements, (ii) the Inspecting Engineer shall in no event have any power or authority to make any decision or to give any approval or consent or to do any other thing which is binding upon the Agent, for the benefit of the Lenders, and any such purported decision, approval, consent or act by the Inspecting Engineer for the benefit of the Agent and/or the Lenders shall be void and of no force or effect, (iii) the Agent, for the benefit of the Lenders, reserves the right to make any and all decisions required to be made by the Agent under this Loan Agreement, in its sole and absolute discretion, and without in any instance being bound or limited in any manner whatsoever by any opinion expressed or not expressed by the Inspecting Engineer to the Agent or any other Person with respect thereto, (iv) the Agent, for the benefit of the Lenders, reserves the right in its sole and absolute discretion to disregard or to disagree, in whole or in part, with any opinion expressed, advice given or information, certificate or report furnished or provided by the Inspecting Engineer to the Agent or any other Person, and (v) the Agent, with the prior express written consent of the Required Lenders, reserves the right in its sole and absolute discretion to replace the Inspecting Engineer with another inspecting engineer at any time and without prior notice to or approval by the Borrower.

5.      **Leases**.  All Leases with respect to the Mortgaged Premises shall be (i) subject to the prior express written consent of the Agent as to form, content and tenancy which consent shall not be unreasonably withheld or delayed, (ii) fully subordinated to the lien of the Mortgage and (iii) delivered to the Agent for review (a) with respect to Leases which are required to be in effect as of the Closing Date, at least fifteen (15) days prior to the Closing Date and (b) with respect to all other Leases, at least fifteen (15) days prior to the execution and delivery of said Leases. Any tenants shall execute and deliver all documentation required by the Agent and the Required Lenders in the form of estoppel certificates and

subordination and attornment agreements. The Agent and the Required Lenders shall grant non-disturbance only in their sole and absolute discretion. Among the provisions of the estoppel certificates will be a certification that the Lease remains unchanged.

## ARTICLE III

## LOANS AND ADVANCES

1.  **The Loan Facility**

    (i)   Availability.

         (a)   Subject to the terms, conditions, and provisions set forth in this Loan Agreement, including, without limitation, the restrictions on the Borrower's right to request Advances of the Loan Facility contained in Article III, Paragraph 1(i) (e), (f), (g), and (h) below, and provided no Event of Default or Potential Default shall have occurred and be continuing, the Lenders severally and not jointly hereby agree to lend to the Borrower during the Construction Period the proceeds of the Loan Facility for the purposes of financing the construction and development of the Project, all as more fully set forth and described in the Project Cost Statement, in an amount based upon each Lender's Commitment Percentage. The Loan Facility shall be evidenced by the Notes. Each Lender is hereby authorized to record the date and amount of each disbursement of proceeds of the Loan Facility by entering such information into said Lender's automated loan tracking system, and any such recordation shall constitute prima facie evidence of the accuracy of the information so recorded; provided, however, the failure to make such notation(s) with respect to any such disbursement of proceeds of the Loan Facility shall not limit or otherwise affect the obligation of the Borrower to the Lenders under this Loan Agreement or under the Notes. Each Lender's interest in the Loan Facility shall be of equal priority with the interest of each of the other Lenders.

         (b)   All disbursement of proceeds of the Loan Facility shall be made by the Lenders simultaneously and proportionally to their respective Commitment Percentage. It shall be understood that no Lender (other than North Fork Bank pursuant to Article VI, Paragraph 16(vi) of this Loan Agreement) shall be responsible for any failure by any other Lender to perform its obligation to make a disbursement of proceeds of the Loan Facility hereunder and that the Commitment Percentage of any Lender shall not be increased or decreased as a result of the failure by any other Lender to perform its obligation to make any disbursement of proceeds of the Loan Facility.

         (c)   The proceeds of the Building Loan Facility shall be used by the Borrower solely for the purposes of financing a portion of certain "soft" costs, certain interest expenses, and certain other non-construction costs and expenses associated with the development and construction of the Project on the Land, all as more fully set forth and described on the Project Cost Statement as "indirect costs".

         (d)   Each Lender's Commitment to make Advances to the Borrower in accordance with the provisions of the Project Cost Statement shall expire on the last day of the Construction Period without further action on the part of the Lenders. The final payment of all principal, unpaid accrued interest, fees and expenses, if any, owing to the Lenders on the Loan Facility shall be repaid by the Borrower, no later than the Initial Maturity Date or, if applicable, the Extended Maturity Date.

         (e)   Notwithstanding anything contained in this Loan Agreement or any other Loan Document to the contrary (including, without limitation, the terms, conditions, and provisions of Article III, Paragraphs 1(i)(f), (g), and (h) below), until such time as the Borrower shall obtain fixed price Major

17

Subcontracts with respect to at least seventy-five percent (75%) of the "hard" costs portion of the Project Cost Statement and until such Major Subcontracts have been reviewed and approved by the Agent and the Inspecting Engineer, the Borrower shall have no right to request, and the Lenders shall have no obligation to make, Advances of proceeds of the Loan Facility other than (1) an Advance for the increased value of the Land in the aggregate principal amount of $1,900,000.00 and (2) Advances to reimburse the Borrower for amounts paid by the Borrower in respect of interest due and owing on the Loan Facility.  The foregoing limitation on the Borrower's right to request Advances of proceeds of the Loan Facility shall terminate at such time as the Borrower shall have complied with the requirements of the first sentence of this subparagraph (i)(e).

(f)      Notwithstanding anything contained in this Loan Agreement or any other Loan Document to the contrary, until such time, if at all, as (1) North Fork Bank shall have obtained one or more additional Lenders acceptable to the Borrower, which additional Lenders shall have provided Commitments for the Loan Facility and "Commitments" (as such term is defined in the Building Loan Agreement) for the Land Loan Facility and the Building Loan Facility in an aggregate maximum principal amount as amongst the Loan Facility, the Land Loan Facility, and the Building Loan Facility of at least $4,660,000.00 and (2) the Borrower shall have demonstrated to the Agent that the Borrower has at least thirty-five percent (35%) of the Condominium Units (i.e., twenty-five (25) Condominium Units) under Qualified Contracts, the Borrower's right to receive Advances of proceeds of the Loan Facility, subject to the restriction on the availability of Advances set forth and described in Article III, Paragraph 1(i)(e) above, shall be limited to $3,513,513.00, which amount shall be funded and made available to the Borrower in the following amounts:

| Loan Proceeds | Use |
|---|---|
| $1,900,000.00 | Land (advanced as described in Paragraph 1(i)(e)(1) above) |
| $1,431,428.00 | General Conditions |
| $   182,085.00 | Interest Reserve for the Loan Facility |
| $3,513,513.00 | Total |

(g)      At such time, if at all, as the Borrower shall have satisfied the conditions set forth and described in Article III, Paragraph 1(i)(f) above, the Borrower's right to receive Advances of proceeds of the Loan Facility, subject to the restriction on the availability of Advances set forth and described in Article III, Paragraph 1(i)(e) above, shall include the right to request Advances in the aggregate maximum principal amount of up to $3,564,780.00, which amount includes the initial amount described in Article III, Paragraph 1(i)(f) above and the following additional aggregate amounts:

| Loan Proceeds | Use |
|---|---|
| $    51,267.00 | Interest Reserve for the Loan |
| $    51,267.00 | Total |

(h)      At such time, if at all, as (1) the Borrower shall have satisfied the conditions set forth and described in Article III, Paragraphs 1(i)(f) and (g) above and (2) the Borrower shall have demonstrated to the Agent that the Borrower has at least fifty percent (50%) of the Condominium Units (i.e., thirty-six (36) Condominium Units) under Qualified Contracts, the Borrower's right to receive Advances of proceeds of the Loan Facility, subject to the restriction on the availability of Advances set forth and described in Article III, Paragraph 1(i)(e) above, shall include the right to request Advances in the aggregate maximum principal amount of up to $3,616,047.00, which amount includes the increased amount described in Article III, Paragraph 1(i)(g) above and the following additional aggregate amounts:

| Loan Proceeds | Use |
|---|---|
| $   51,267.00 | Interest Reserve for the Loan |
| $   51,267.00 | Total |

(i)      The Borrower may enter into an interest rate "swap" transaction with North Fork Bank and purchase an interest rate protection product separate and apart from the Loan Facility for the purposes of artificially fixing the interest rate with respect to all or any portion of the Loan Facility. The Borrower shall provide North Fork Bank with the first and last opportunity to provide a bid on any such interest rate protection product.

(ii)      Construction Period.  The Loan Facility shall commence on the Closing Date and continue as a project and soft costs loan during the Construction Period, during which time the Borrower may request disbursements of proceeds of the Loan Facility for the purposes more fully set forth and described in subparagraph (i)(c) above.

(a)      Interest Rates and Payment of Interest.

(1)      All interest on outstanding Advances shall be paid monthly on the first (1st) day of each and every month, with the first (1st) such interest payment commencing on January 1, 2008.  Subject to the terms, conditions, and provisions of subparagraph (a)(4)(x) below with respect to the unavailability of the LIBO Rate, the Loan Facility shall bear interest computed daily on the outstanding principal balance thereof from the Closing Date until paid in full at a floating interest per annum (fixed for each day in an Interest Period only) for each day during an Interest Period equal to the sum of (a) the LIBO Rate for such Interest Period plus (b) the Applicable Margin (hereinafter such sum shall be referred to as the "Interest Rate").  The Agent shall give prompt notice to the Borrower of the LIBO Rate, determined or adjusted in accordance with the provisions hereof, which determination or adjustment shall be conclusive (absent manifest error) if made by the Agent in good faith.  The LIBO Rate shall be calculated in accordance with the Reserve Percentage if the Agent is required to hold such reserves.  Notwithstanding any term, condition, or provision of this Loan Agreement to the contrary, all agreements between the Borrower and the Agent are hereby expressly limited so that in no contingency or event whatsoever (whether by reason of acceleration of the Initial Maturity Date or, if applicable, the Extended Maturity Date or otherwise), shall the amount paid or agreed to be paid to the Agent for the use or the forbearance of the indebtedness evidenced hereby exceed the maximum rate permitted by applicable law.  As used in this Paragraph 1(ii)(a)(1), the term "applicable law" shall mean the law in effect as of the Closing Date; provided, however, that in the event there is a change in the law which results in a higher permissible rate of interest, than this provision shall be governed by such new law as of its effective date.  In this regard, it is expressly agreed that it is the intent of the Borrower and the Agent in the execution, delivery, and acceptance of this Loan Agreement, the Mortgage, and the other Loan Documents to contract in strict compliance with the laws of the State of New York from time to time in effect.  If, under or from any circumstances whatsoever, the fulfillment of any provision hereof or of any of the other Loan Documents, at the time performance of such provision shall be due, shall involve transcending the limit of such validity prescribed by such applicable law, then the obligation to be fulfilled shall automatically be reduced to the limits of such validity and if the Agent should ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the reduction of the outstanding principal balance of the Loan Facility and not to the payment of interest.  This provision shall control every other provision of this Loan Agreement and the other Loan Documents.

(2)      The Following Business Day Convention shall be used to adjust

19

any relevant date if that date would otherwise fall on a day that is not a Business Day.  All payments hereunder shall be adjusted in accordance with the Following Business Day Convention.

(3)   Except as otherwise described in the last sentence of this clause (3), interest on the Loan Facility shall be computed on the basis of the actual number of days elapsed over a 360 day year.  In computing interest on the Loan Facility, the date of the making of any Advance or the first (1st) day of each Interest Period shall be included and the date of payment or the expiration date of each Interest Period shall be excluded; provided, however, that if any Advance is repaid on the same day on which it is made, one day's interest shall be paid on such Advance.

(4)   Except as provided in subparagraph (a)(4)(x) below with respect to certain determinations on Interest Rate Determination Dates, in the event that after the date hereof (A) the adoption of or any change in any law, treaty, rule, regulation, guideline or determination of a court or Governmental Authority or any change in the interpretation or application thereof by a court or Governmental Authority or (B) compliance by the Agent with any request or directive (whether or not having the force of law and whether or not the failure to comply therewith would be unlawful) from any central bank or other Governmental Authority or quasi-Governmental Authority:

(x)   does or may impose, modify, or hold applicable, in the determination of the Agent, any reserve, special deposit, compulsory loan, FDIC insurance, capital allocation or similar requirement against assets held by, or deposits or other liabilities in or for the account of advances or loans by, commitments made, or other credit extended by, or any other acquisition of funds by, the Agent or any applicable lending office of the Agent (except to the extent that such reserve requirements are reflected in the definitions of "Prime Rate" or "LIBO Rate"); or

(y)   does impose on the Agent any other condition materially more burdensome in nature, extent or consequence than those in existence as of the Closing Date;

and the result of any of the foregoing is to increase the cost to the Agent of making, renewing or maintaining the Loan Facility or to reduce any amount receivable thereunder, then, in any such case, the Borrower shall pay to the Agent, upon demand and delivery to the Borrower by the Agent of the statement described in the next sentence, such amount or amounts (based upon an allocation thereof by the Agent to the financing transactions contemplated by this Loan Agreement and effected by this clause (4) as may be necessary to compensate the Agent for any such additional cost incurred or reduced amount received.  The Agent shall deliver to the Borrower a written statement of the costs or reductions claimed and the basis therefor, and the allocation made by the Agent of such costs and reductions shall be conclusive, absent manifest error if made in good faith.  If the Agent subsequently recovers any amount previously paid by the Borrower pursuant to this clause (4), the Agent shall, within thirty (30) days after receipt of such recovery and to the extent permitted by applicable law, pay to the Borrower the amount of any such recovery.

(b)   Required Principal Payments.  The Borrower shall pay to the Agent, for the benefit of the Lenders, upon the sale of any Condominium Unit (whether with or without a Parking Space), the Borrower shall repay to the Agent, for the benefit of the Lenders, principal with respect to the Loan Facility in an amount equal to the greater of (1) ninety percent (90%) of the actual gross sales price of said Condominium Unit (including any Parking Space being acquired in connection therewith) or (2) $1,058.00 per square foot of space in said Condominium Unit. Notwithstanding anything contained in this subparagraph (ii)(b) to the contrary, the Borrower shall not be entitled to obtain a release of any Condominium Unit or Parking Space, nor shall the Agent or the Lenders be obligated to provide any such release, at any time while any Event of Default has occurred and is continuing.  The payment of any Release Payment under this Loan Agreement shall simultaneously satisfy the payment of any such

Release Payment required to be paid under the Building Loan Agreement.

(c)    No Additional Principal Amortization; Initial Maturity Date. Subject to the terms, conditions, and provisions of subparagraph (ii)(b) above, and provided no Event of Default or Potential Default exists under the Loan Documents, there shall be no payments of principal required. The Borrower shall repay to the Agent, for the benefit of the Lenders, the entire outstanding principal balance of the Loan Facility, together with all accrued and unpaid interest fees, expenses and any other sums due and owing to the Agent and/or the Lenders in connection with the Loan Facility on the earlier to occur of (1) the Initial Maturity Date (if not extended for the duration of the Term Period), or (2) the date of termination of the Loan Facility pursuant to Article V, Paragraph 2 of this Loan Agreement.

(d)    Construction Loan Facility Fee. As of the Closing Date, the Borrower has paid to the Agent, for the benefit of the Lenders, a non-refundable commitment fee in accordance with the Agent's Letter in consideration for the Lenders holding themselves ready, willing, and able to make the Loan Facility available to the Borrower.

(e)    Project and Soft Costs Loan. The Construction Period shall commence on the Closing Date and the Loan Facility shall continue as a project and soft costs loan up through and including the last day of the Initial Maturity Date.

(f)    Completion Date.   The Improvements, once commenced, shall be completed no later than the Initial Maturity Date (hereinafter the actual date of completion of the Improvements shall be referred to as the "Completion Date").

(iii)   Option to Convert to Term Loan; Term Period.

(a)    Option to Convert to Term Loan. The Borrower may, at its option, elect to convert the Loan Facility from a project and soft costs loan to a term loan upon the satisfaction of each of the following terms, conditions, and provisions:

(1)    the Borrower shall have delivered to the Agent written notice of its desire to exercise the Option to Convert at least sixty (60) days, but not more than ninety (90) days, prior to the Initial Maturity Date; and

(2)    no Event of Default shall have occurred and be continuing under the Loan Documents as of the date upon which the Borrower delivers to the Lender its written notice pursuant to clause (a)(1) above and as of the Initial Maturity Date; and

(3)    the Borrower shall have paid to the Agent, for the ratable benefit of the Lenders, a nonrefundable extension fee in an amount equal to (A) the sum of (I) the outstanding principal balance of the Loan Facility as of the first day of the Term Period plus (II) the aggregate maximum principal amount remaining to be advanced under the Building Loan Facility as of the first day of the Term Period multiplied by (B) twenty-five basis points (0.25%); and

(4)    the Project shall have been completed in accordance with (A) the Plans and Specifications, (B) the Project Cost Statement, (C) the terms, conditions, and provisions of this Loan Agreement and the other Loan Documents, and (D) all Requirements of Law necessary to obtain a temporary conditional certificate of occupancy (with conditions acceptable to the Agent, in its reasonable discretion) with respect to the Project; and

(5)    the Borrower shall have obtained a temporary conditional

certificate of occupancy (with conditions acceptable to the Agent, in its reasonable discretion) with respect to the Project; and

(6)     no material adverse change shall have occurred in the financial condition of the Borrower or the Guarantor as of the giving of the written notice described in the foregoing clause (a)(1) and as of the Initial Maturity Date.

(b)     Required Principal Payments.  During the Term Period, the Borrower shall only make the payments of principal with respect to the Loan Facility described in Article III, Paragraph 1(ii)(b) above.

(c)     No Additional Principal Amortization; Extended Maturity Date.  Subject to terms, conditions, and provisions of subparagraph (ii)(b) above, and provided no Event of Default or Potential Default exists under the Loan Documents, there shall be no payments of principal required during the Term Period.  The Borrower shall repay to the Agent, for the benefit of the Lenders, the entire outstanding principal balance of the Loan Facility, together with all accrued and unpaid interest fees, expenses and any other sums due and owing to the Agent and/or the Lenders in connection with the Loan Facility on the earlier to occur of (1) the Extended Maturity Date or (2) the date of termination of the Loan Facility pursuant to Article V, Paragraph 2 of this Loan Agreement.

(d)     No Additional Extensions.  Other than with respect to the Term Period, there shall be no further extensions of the term of the Loan Facility.

(iv)     Request for Advance.

(a)     Provisions of Request for an Advance.  Upon the Borrower's compliance with the terms, conditions and provisions of Paragraphs 3 through 19 below (as confirmed by the Agent in writing), the Borrower may on any Business Day, request that the Lenders make Advances, by delivery to the Agent of a Request for Advance not later than 12:00 NOON (New York, New York time) at least three (3) Business Days prior to the proposed date of said Advance.  The Request for Advance shall specify (1) the date of the proposed Advance (which shall be a Business Day), and (2) the amount of the proposed Advance which shall not be less than $50,000.00.  In lieu of delivering the above-described Request for Advance, the Borrower may give the Agent telephonic notice of any proposed Advance by the time required under this Paragraph 1(iv); provided, however, that such notice shall be confirmed in writing by delivery to the Agent promptly (but in no event later than the date of the proposed Advance) of a Request for Advance.  Any such Request for Advance (or telephonic notice in lieu thereof) shall be irrevocable.

(b)     Making of Advances.

(1)     On the date of its receipt of a Request for Advance (or telephonic notice in lieu thereof), the Agent shall promptly notify the Lenders, by telex or telecopy or other similar form of teletransmission provided for in Article VII, Paragraph 10 of this Loan Agreement, of the proposed Advance and that the amount set forth therein has been approved by the Agent.  Each such Lender shall make the amount of its Commitment Percentage of each Advance available to the Agent in immediately available funds, to such bank account in Edison, New Jersey as the Agent may designate, not later than 10:00 A.M. (New York, New York time) on the date of the proposed Advance specified in the Borrower's Request for Advance.  After the Agent's receipt of the proceeds of such Advance, the Agent shall make the proceeds of such Advance available to the Borrower in Edison, New Jersey on the date specified in the Borrower's Request for Advance and shall disburse such funds in immediately available funds to an account of the Borrower maintained with the Agent and thereafter to any substitute account, designated in writing by the Borrower in the Request for Advance.

(2)     In connection with Advances of the Loan Facility made pursuant to clause (b)(1) above, unless the Agent shall have been notified by any Lender prior to the date on which any Advance is made that such Lender does not intend to make available to the Agent such Lender's Commitment Percentage of the requested Advance on such date, the Agent may assume that such Lender has made such amount available to the Agent on such date and the Agent in its sole discretion may, but shall not be obligated to, make available to the Borrower a corresponding amount on such date.  If such corresponding amount is not, in fact, made available to the Agent by such Lender on or prior to the date of any Advance, such Lender agrees to pay (and, provided the Agent funded said amount, the Borrower agrees to repay the Agent in accordance with the terms of the Loan Documents, including, notwithstanding the reference below to the "Base Rate", interest at the rate per annum described in Paragraph 1(ii)(a)(1) above) such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower until the date such amount is paid or repaid to the Agent, at the Base Rate.  If such non-performing Lender shall pay to the Agent such corresponding amount, such amount so paid shall constitute such Lender's Commitment Percentage of the Advance, and, if both such Lender and the Borrower shall have paid and repaid, respectively, such corresponding amount, the Agent shall promptly return to the Borrower such corresponding amount in same day funds. Nothing in this clause (b)(2) shall be deemed to relieve any Lender of its obligation hereunder to fund its Commitment Percentage of any Advance on any date specified by the Borrower in a Request for Advance.

(3)     On or prior to the proposed borrowing date, the Agent shall notify the Borrower and the Lenders of the applicable interest rate for said borrowing as provided for in Paragraph 1(xi)(c) below.

(v)     Payments.

(a)     Place for Payments.  All payments due in connection with the Loan Facility are payable at the principal administrative office of the Agent located in Melville, New York, or such other place as the Agent shall designate to the Borrower in writing, in any coin or currency of the United States of America which, at the time of payment, is legal tender for the payment of public and private debts.  All sums payable to the Lender which are due on a day which is not a Business Day, shall be made on the next succeeding Business Day and interest thereon shall be payable during such extension.  All such payments shall be applied first to the payment of any outstanding unpaid fees and expenses, next to the payment of interest, with any balance to the payment and reduction of principal. Time is of the essence as to all payment dates set forth herein.

(b)     Time of Payment.  All payments of principal, interest and fees hereunder payable to the Agent and/or the Lenders shall be made without condition or reservation or right, in the applicable currency and in immediately available funds, delivered to the Agent not later than 1:00 P.M. (New York, New York time) on the date due, to such account of the Agent at the Agent's office for the account of the Lenders.  Funds received by the Agent after that time and date shall be deemed to have been paid on the next succeeding Business Day. All payments actually received by the Agent pursuant to the Loan Documents for the account of the Lenders shall be paid on the date of receipt thereof by the Agent, to the Lenders in appropriate amounts as provided for in this Loan Agreement in like funds as received by the Agent. Such payments shall be made to an account designated by each such Lender to the Agent in writing.

(c)     Authorization to Automatically Charge Account.  The Borrower hereby acknowledges and agrees that the Agent shall automatically charge and withdraw from the Borrower's demand deposit account maintained with the Agent, Account No. 4304006853, any and all amounts that

shall become due and payable to the Agent and/or the Lenders in connection with the Loan Facility, including, without limitation, monthly payments of interest. In the event that, as of 3:00 P.M. on the date when due, there are insufficient funds in said account to make in full any payment due and owing to the Agent or the Lenders under this Loan Agreement, then the Agent may charge any other account of the Borrower or the Guarantor maintained with the Agent for any such payment. If any payment required under the terms of this Loan Agreement, the Mortgage, or any of the other Loan Documents cannot be debited from such account due to there being an insufficient balance on the debit date, a late charge of four percent (4%) of the amount due shall become immediately due to the Lenders by the Borrower as liquidated damages for the failure to make timely payment and such late charge shall be secured by the Mortgage and the other Loan Documents. The Borrower's authorization of the Agent to charge said account having sufficient funds on deposit shall constitute payment of the amount so authorized notwithstanding the Agent's failure to charge said account. Any failure or delay by the Agent in submitting invoices for interest and fee payments shall not discharge or relieve the Borrower of the obligation to make such payments into the demand deposit account. In connection with any charge to said account for any monthly payment of interest due on the Loan Facility, the Borrower may requisition, as a part of its next Request for Advance, the amount so deducted from said account. In such event, to the extent permitted by the terms, conditions, and provisions of this Loan Agreement, the Agent shall debit such amount from the interest reserve for the Loan Facility and deposit said amount into said account of the Borrower. The Agent shall not be obligated to make an Advance from the interest reserve funds under the Project Cost Statement in the event the Agent determines that, as a result of making such disbursement, the remaining undisbursed portion of such interest reserve funds would be less than the interest projected by the Lender to be payable on the Loan Facility through the end of the Construction Period (such determination to be based on the Agent's good faith determination of the projected outstanding principal balance of the Loan Facility during the Construction Period and the projected interest rate on the Loan Facility). In the event the Lender is not obligated to make an Advance from said interest reserve as described hereinabove, the Borrower shall be responsible for the current payment of interest on the Loan Facility from the Borrower's own funds.

(d)     Apportionment of Payments. So long as there does not exist an Event of Default, all payments of principal and interest in respect of the Loan Facility, all payments of the fees described herein and all payments in respect of any other obligation shall be allocated amongst the Agent and the Lenders as they may be entitled thereto as provided for herein. After the occurrence and during the continuance of an Event of Default, the Agent may, and shall upon the direction of the Required Lenders, after providing notice to the Borrower that payments and proceeds shall be so applied, apply all payments remitted to the Agent and all amounts and proceeds of collateral received by the Agent, subject to the provisions of this Loan Agreement, (1) first, to pay obligations in respect of any fees, expense reimbursements or indemnities then due and owing to the Agent from the Borrower; (2) second, to pay obligations in respect of any fees, expense reimbursements or indemnities then due and owing to any Lender from the Borrower, (3) third, to pay interest due in respect of the Loan Facility; and (4) fourth, to repay the outstanding principal balance of the Loan Facility and to repay the obligations of the Borrower or the Guarantor to North Fork Bank in connection with any Master Agreement, any other interest or currency "swap agreement" (as such term is defined at 11 U.S.C. § 101), future, option, collar, cap, hedge, derivative or any other such agreement providing for the transfer or mitigation of interest risks entered into in connection with the Loan Facility; provided, however, that if sufficient funds are not available to fund all payments to be made in respect of the obligations owing by the Borrower described in any of the foregoing clauses (1) through (4), the available funds shall be allocated within the last particular clause to the payment of such obligations ratably, based on the proportion of the Agent's and each Lender's proportionate interest in the aggregate outstanding obligations described in such clause.

(e)     Distribution of Funds to Lenders. The Agent shall promptly distribute by wire transfer in immediately available funds to each Lender at its account and its primary address set forth

on the appropriate signature page hereof, or at such other account or primary address as a Lender may request in writing, such funds as it may be entitled to receive, provided that the Agent shall in any event not be bound to inquire into or determine the validity, scope or priority of any interest or entitlement of any Lender and may suspend all payments or seek appropriate relief (including, without limitation, instructions from the Required Lenders or an action in the nature of an interpleader) in the event of any doubt or dispute as to any apportionment or distribution contemplated hereby. The order of priority herein is set forth solely to determine the rights and priorities of the Lenders as among themselves and at any time or from time to time may be changed by the Lenders as they may elect, in writing in accordance with the provisions of <u>Article VII</u>, <u>Paragraph 10</u> of this Loan Agreement, without necessity of notice to or consent of or approval by the Borrower or any other Person.

(f)     <u>Payments on Non-Business Days</u>.    The Following Business Day Convention shall be used to adjust any relevant date if that date would otherwise fall on a day that is not a Business Day. All payments hereunder shall be adjusted in accordance with the Following Business Day Convention.

(g)     <u>Agent's or Lender's Accounting</u>.    The Agent shall maintain a loan account (hereinafter referred to as the "<u>Loan Account</u>") on its books in which shall be recorded (1) the names and addresses of the Lenders and each Lender's respective Commitment and principal amount of the Loan Facility owing to each Lender from time to time; (2) all other appropriate debits and credits as provided for in this Loan Agreement, including, without limitation, all interest, fees, expenses, charges and other obligations; and (3) all payments of obligations made by the Borrower, or for the Borrower's account. All entries in the Loan Account shall be made in accordance with the Agent's customary accounting practices as in effect from time to time, according to the same standard of care exercised by the Agent in administering its own real estate loans. The Agent will render a statement of the Loan Account monthly to the Borrower and will deliver a copy thereof to each Lender. Each and every such statement shall be deemed final, binding and conclusive upon the Borrower and the Lenders in all respects as to all matters reflected therein (if made in good faith, absent manifest error).

(h)     <u>Net Payments</u>. Notwithstanding the terms, conditions, and provisions of this Loan Agreement to the contrary, the Agent and the Lenders hereby covenant and agree that any and all amounts which are owed by any Lender to the Agent pursuant to the terms of <u>Article III</u>, <u>Paragraph 1(iv)(b</u> of this Loan Agreement which are also amounts the Agent would have to pay to such Lender pursuant to the terms of <u>Article III</u>, <u>Paragraph 1(v)(b</u>) of this Loan Agreement may instead be deducted from any amount which such Lender is required to pay to the Agent pursuant to the terms of <u>Article III</u>, <u>Paragraph 1(iv)(b</u>) of this Loan Agreement in connection with such Lender's funding of an Advance.

(vi)     <u>Prepayments</u>. Provided that no Event of Default shall have occurred and be continuing, the Borrower shall have the right to prepay the Loan Facility, in whole or in part <u>provided that</u> (a) the Borrower delivers to the Agent at least one (1) day's prior express written notice of its intention to prepay, (b) each partial prepayment of the Loan Facility shall be in a principal amount of at least the lesser of (1) $50,000.00 or (2) the aggregate outstanding principal balance of the Loan Facility, (c) each such prepayment of the Loan Facility shall be accompanied by the payment of all accrued unpaid interest on the amount of the Loan Facility being prepaid to the date of prepayment and all other sums which may then be owed by the Borrower to the Agent for the benefit of the Lenders in connection with the Loan Facility, and (d) at any time that the Loan Facility is bearing interest at the LIBO Rate, each such prepayment shall be accompanied by the payment of the indemnity payment set forth in <u>Paragraph 1(xi)(f)</u> below.

(vii)     <u>Late Charge</u>.   In the event that any payment, including, without limitation, interest or principal required to be made by the Borrower in connection with the Loan Facility or with any

of the Loan Documents is not paid on the date when due, except for payments due at maturity or upon acceleration, then the Agent may charge, and if so charged, the Borrower shall pay upon demand, a late charge of four cents ($0.04) for each dollar ($1.00) of such delinquent payment for the purpose of defraying the expenses incurred by the Agent in handling and processing such delinquent payment

       (viii)   Default Interest. Notwithstanding the Interest Rate and payment dates specified in Paragraph 1(ii)(a)(1), Paragraph 1(ii)(b), Paragraph 1(iii)(b), Paragraph 1(iii)(c), Paragraph 1(v), Paragraph 1(vi), and Paragraph 1(vii) above, effective immediately upon the occurrence of any Event of Default, for as long thereafter as any such Event of Default shall be continuing and, to the extent permitted by law, the aggregate principal balance of the Loan Facility then outstanding and, to the extent permitted by applicable law, any interest payments on the Loan Facility not paid when due, shall bear interest payable upon demand at the Default Rate. The Borrower hereby acknowledges that: (a) such Default Rate is a material inducement to the Lenders to make the Loan Facility available to the Borrower, (b) the Lenders would not have made the Loan Facility available to the Borrower in the absence of the agreement of the Borrower to pay such Default Rate, (c) such Default Rate represents compensation for increased risk to the Lenders that the Loan Facility will not be repaid and (d) such Default Rate is not a penalty and represents a reasonable estimate of (1) the cost to the Agent and to the Lenders in allocating their respective resources (both personnel and financial) to the on-going review, monitoring, administration and collection of the Loan Facility and (2) compensation to the Lenders for losses that are difficult to ascertain.

       (ix)   Pro-Rata Treatment of Lenders. Each borrowing of proceeds of the Loan Facility and each payment or prepayment by the Borrower with respect to principal, interest, fees or other amounts due and owing from the Borrower hereunder to the Lenders shall (except as to certain fees) be made in accordance with the Commitment Percentages of each Lender, but the Borrower shall not be required to break down and make separate payments or prepayments of principal, interest or other amounts due and owing to each of the individual Lenders, and instead shall aggregate and remit payments or prepayments to the Agent only, who shall then be solely responsible for allocating and distributing the aggregate amount so received from the Borrower among the individual Lenders in accordance with their respective Commitment Percentages. The Borrower's remitting payment to the Agent in such manner shall constitute payment to all of the Lenders for all purposes under the Notes and the other Loan Documents.

       (x)   Delinquent Lender(s). (a) No Lender that has failed to make its pro rata share of any Advance based upon its Commitment Percentage or other payment due from such Lender to the Agent in accordance with the provisions of this Loan Agreement within three (3) Business Days after receiving notice that such required Advance or other payment is due (hereinafter individually referred to as a "Delinquent Lender" and collectively referred to as the "Delinquent Lenders") shall be entitled to (1) its Commitment Percentage of any payment received by the Agent until all indebtedness of the Borrower under the Loan Documents owed to the Non-Delinquent Lenders has been satisfied in full; (2) the proceeds of any collateral under the Loan Documents until all indebtedness of the Borrower under the Loan Documents owed to the Non-Delinquent Lenders has been satisfied in full; or (3) give or deny any approval or consent to be given by the Lenders hereunder, and such Delinquent Lender's Commitment or portion of the outstanding principal balance of the Loan Facility shall be deducted from the aggregate amount of the Commitments or Loan Facility, as applicable, for purposes of determining whether the Lenders' or the Required Lenders' approval or consent has been obtained. Upon the cure by any Delinquent Lender under this Loan Agreement of all defaults which it may have committed under this Loan Agreement, such Lender shall no longer be deemed a Delinquent Lender. A Delinquent Lender shall not be released from its obligations as a Lender hereunder or under any of the other Loan Documents without the prior express written consent of the Agent, the Borrower and the other Lenders, such consent to be granted or denied in the sole and absolute discretion of each such party. Further, a Delinquent Lender shall indemnify, defend and hold harmless the Agent, the Borrower, and each of the Non-Delinquent Lenders from any claims, losses, damages, expenses or costs incurred by the Agent, the Borrower, and/or the Non-Delinquent Lenders as a result of said Delinquent Lender's failure to

comply with the requirements of this Loan Agreement including, without limitation, any and all claims, losses, damages, expenses or costs (including, without limitation, attorneys' fees) incurred by the Agent and any Non-Delinquent Lender as a result of and/or in connection with (A) Non-Delinquent Lender's performing for the benefit of a Delinquent Lender, (B) any enforcement claim, action or proceeding brought by the Agent or the Borrower against a Delinquent Lender and (C) any claim, action or proceeding brought against the Agent and/or the Lenders.

(b)     In cases where a Delinquent Lender fails to fund the portion required to be funded by it of an Advance, and none of the other Lenders elects to be (and if North Fork Bank has already funded Advances to its capacity as described in Article VI, Paragraph 16(vi) of this Loan Agreement) an Electing Lender pursuant to the provisions of Article VI, Paragraph 16 of this Loan Agreement and to fund the Delinquent Lender's share of said requested Advance, then the obligation of any Non-Delinquent Lenders to fund their respective portions of such requested Advance and each subsequent Advance shall be expressly conditioned upon both (1) the Borrower's committing in writing to the Lenders, prior to any such Advance, that it will fund from its own sources the entire Delinquency Amount prior to the Non-Delinquent Lenders' funding of any Advance of proceeds of the Loan Facility and (2) the Borrower's submitting satisfactory evidence to the Agent and the Non-Delinquent Lenders in connection with such requested Advance and at the time of each subsequent Advance, that the Borrower and/or the Guarantor have paid, from their own funds, a portion of the hard and soft costs of the Improvements that are the subject of such Advance in an amount equal to the Delinquent Lender's portion of such Advance.

(xi)     Special Provisions Governing LIBO Rate Loans. Notwithstanding any term, condition or other provision of this Loan Agreement to the contrary, if any, the following provisions shall govern with respect to the Loan Facility as to the matters covered herein:

(a)     Amount of LIBO Rate Loans.  Each LIBO Rate Loan shall be for a minimum amount of at least $50,000.00.

(b)     Determination of Interest Period.  The following provisions shall apply to all Interest Periods:

(1)     Each successive Interest Period shall commence on the day on which the next preceding Interest Period expires; and

(2)     If any Interest Period would otherwise expire on a day which is not a Business Day, such Interest Period shall be extended using the Following Business Day Convention so that such Interest Period shall expire on the next succeeding Business Day.

(c)     Determination of Interest Rate.  As soon as practicable after 11:00 A.M. (New York City, New York time) on any Interest Rate Determination Date, the Agent shall determine (which determination shall, absent manifest error, be presumptively correct) the interest rate which shall apply to the Loan Facility for the applicable Interest Period and shall promptly give notice thereof (in writing or by telephone confirmed in writing) to the Borrower and to each Lender.

(d)     Interest Rate Unascertainable, Inadequate or Unfair.  If, with respect to any Interest Period, the Agent determines that (1) deposits in U.S. dollars (in the applicable amounts) are not being offered in the relevant market for such Interest Period, (2) adequate means do not exist for ascertaining the LIBO Rate, (3) a contingency has occurred which materially and adversely affects the London interbank eurodollar market as a whole, or (4) the effective cost to any Lender of funding the Loan Facility from a corresponding source of funds in the London interbank eurodollar market shall exceed the LIBO Rate which would then be applicable to the Loan Facility, the Agent shall forthwith give

notice thereof to the Borrower whereupon beginning on the last day of the then current Interest Period for the Loan Facility and continuing until the Agent notifies the Borrower that the circumstances giving rise to such suspension no longer exist, the Loan Facility shall bear interest at a rate per annum equal to (A) the Prime Rate plus (B) seventy-five basis points (0.75%).

> (e)     Illegality.   (1)   In the event that on any date any Lender shall have determined (which determination shall, absent manifest error, be final and conclusive and binding upon all parties) that the making or continuation of any LIBO Rate Loan has become unlawful by compliance by that Lender in good faith with any law of any Governmental Authority (whether or not having the force of law and whether or not failure to comply therewith would be unlawful), then, and in any such event, such Lender shall promptly give notice (by telephone promptly confirmed in writing) to the Borrower and the Agent (which notice the Agent shall promptly transmit to each Lender) of that determination.

> (2)     Upon the giving of the notice referred to in Paragraph 1(xi)(e)(1) above, (A) the Borrower's right to request of such Lender and such Lender's obligation to make LIBO Rate Loans shall be immediately suspended, and any pending and subsequent Advances shall bear interest at a rate per annum equal to (I) the Prime Rate plus (II) seventy-five basis points (0.75%), and (B) if the affected LIBO Rate Loan(s) are then outstanding, the Borrower shall immediately (or, if permitted by applicable law, no later than the date permitted thereby, upon at least one (1) Business Day's written notice to the Agent and the affected Lender) convert each such loan into a Prime Rate Loan bearing interest at a rate per annum equal to (I) the Prime Rate plus (II) seventy-five basis points (0.75%).

> (3)     In the event that such Lender determines at any time following the giving of the notice referred to in Paragraph 1(xi)(d) and/or Paragraph 1(xi)(e)(1) above that the circumstances giving rise to the notice delivered pursuant to Paragraph 1(xi)(d) above no longer exists or that such Lender may lawfully make LIBO Rate Loans of the type referred to in the notice delivered pursuant to Paragraph 1(xi)(e)(1) above, such Lender shall promptly give notice (by telephone confirmed in writing) to the Borrower and the Agent (which notice the Agent shall promptly transmit to each Lender) of that determination, whereupon the Borrower's right to request of such Lender, and such Lender's obligation to make, LIBO Rate Loans shall be restored and any outstanding Prime Rate Loans shall be automatically converted into LIBO Rate Loans.

> (f)     Compensation.   In addition to such amounts as are required to be paid by the Borrower pursuant to Paragraph 1(ii)(a)(1), Paragraph 1(vii), and/or Paragraph 1(viii) above, the Borrower shall compensate each Lender, upon demand, for all losses, expenses and liabilities (including, without limitation, any loss or expense incurred by reason of the liquidation or reemployment of deposits or other funds required by such Lender to fund or maintain such Lender's LIBO Rate Loans to the Borrower) which losses, expenses and liabilities such Lender may sustain (1) if for any reason, other than the gross negligence or willful misconduct of the Agent or such Lender, a borrowing of a LIBO Rate Loan does not occur on a date specified therefor in a Request for Advance or in a telephonic request for borrowing or a successive Interest Period does not commence after notice therefor is given pursuant to Paragraph 1(iv) above, (2) if any prepayment of a LIBO Rate Loan (including, without limitation, any prepayment pursuant to Paragraph 1(vi) above) occurs for any reason on a date which is not the last day of the applicable Interest Period, (3) as a consequence of any required conversion of a LIBO Rate Loan to a Prime Rate Loan as a result of any of the events indicated in Paragraph 1(xi)(e) above, (4) as a consequence of any other failure by the Borrower (other than the failure of the Agent to charge any account having sufficient funds as authorized by the Borrower pursuant to Paragraph 1(v)(c) above) to repay LIBO Rate Loans when required by the terms of this Loan Agreement, or (5) following an acceleration of the Loan Facility due to the occurrence of an Event of Default. Such Lender shall deliver to the Borrower a written statement as to such losses, expenses and liabilities which statement shall be

conclusive as to such amounts in the absence of manifest error. Such compensation shall include an amount equal to the positive difference, if any, of (A) the amount of interest which otherwise would have accrued on the principal amount so paid, prepaid or continued (or not continued or borrowed) for the period from the date of such payment, prepayment or continuation (or failure to continue or borrow) to the last day of the then current applicable Interest Period for the LIBO Rate Loan (or, in the case of a failure to continue or borrow, to the last day of the applicable Interest Period for the LIBO Rate Loan which would have commenced on the date specified therefor in the relevant notice) at the applicable rate of interest for the LIBO Rate Loan provided for herein (exclusive of any applicable Lender's margin set forth in the definition of "Applicable Margin") minus (B) the amount of interest (as reasonably determined by such Lender) based upon the interest rate which such Lender would have bid in the London interbank market for dollar deposits, for amounts comparable to such principal amount and maturities comparable to such period. A determination by such Lender as to the amounts payable pursuant to this Paragraph 1(xi)(f) (which calculation and methodology shall be furnished to the Borrower) shall be conclusive absent manifest error. Calculations of all amounts payable to such Lender and other determinations under the provisions of this Paragraph 1(xi)(f) shall be made as though such Lender had actually funded each of its relevant LIBO Rate Loans either (I) by obtaining a Eurodollar deposit bearing interest at the rate such Lender would have offered to first class banks in the interbank market selected by such Lender for U.S. dollar deposits in same day funds in an amount equal to the amount of such LIBO Rate Loan and having a maturity comparable to the relevant Interest Period or (II) through the transfer of such a Eurodollar deposit from an offshore office of such Lender to a domestic office of such Lender in the United States of America; provided, however, each such Lender reserves the right to fund each of its LIBO Rate Loans in any manner it sees fit and the foregoing assumptions shall be utilized only for the purposes of calculating amounts payable and making other determinations pursuant to said sections.

(g)    LIBO Rate Taxes. The Borrower hereby agrees that:

(1)    the Borrower shall pay to the Agent for the benefit of the applicable Lender, on the later of (A) thirty (30) days following its receipt of such request and certificate or (B) the Business Day immediately prior to the date upon which penalties attach thereto, all present and future stamp and other taxes, levies, or costs and charges whatsoever imposed, assessed, levied or collected on or from such Lender on or in respect of a borrowing solely as a result of the interest rate being determined by reference to the LIBO Rate or the provisions of this Loan Agreement relating to the LIBO Rate or the recording, registration, notarization or other formalization of any thereof or any payments of principal, interest or other amounts made on or in respect of a LIBO Rate Loan and/or a Prime Rate Loan made to the Borrower when the interest rate is determined by reference to the LIBO Rate (all such taxes, levies, costs and charges being herein collectively called "LIBO Rate Taxes"), excluding any of the foregoing arising out of the gross negligence or willful misconduct of such Lender; provided, however, that LIBO Rate Taxes shall not include net income or franchise taxes imposed by any Governmental Authority. The Borrower shall also pay such additional amounts equal to increases in LIBO Rate Taxes attributable to payments made by the Borrower pursuant to this clause (1). Promptly after the date on which payment of any such LIBO Rate Tax is due pursuant to the preceding sentence, the Borrower shall, at the request of such Lender, furnish to such Lender evidence, in form and substance satisfactory to such Lender, that the Borrower has met its obligation under this Paragraph 1(xi)(g); and

(2)    the Borrower shall defend, indemnify, and hold harmless each Lender against, and reimburse each Lender on demand for, any LIBO Rate Taxes paid by such Lender in respect of any portion of the Loan Facility made available to the Borrower, as determined by such Lender; provided that such Lender shall have provided the Borrower with (A) appropriate receipts for any payments or reimbursements made by the Borrower pursuant to this clause (2) and (B) such information as may reasonably be required to indicate the basis for such LIBO Rate Taxes; provided, however, that if

a Lender subsequently recovers, or receives a net tax benefit with respect to, any amount of LIBO Rate Taxes previously paid or indemnified by the Borrower pursuant to this <u>Paragraph 1(xi)(g)</u>, such Lender shall, within thirty (30) days after receipt of such refund, and to the extent permitted by applicable law, pay to the Borrower the amount of any such recovery or net tax benefit. The amount of LIBO Rate Taxes due pursuant to the provisions of this <u>Paragraph 1(xi)(g)(2)</u> shall only be payable to the extent such LIBO Rate Taxes exceed the amount paid pursuant to <u>Paragraph 1(xi)(g)(1)</u> above.

(3)   Notwithstanding anything contained in this <u>Paragraph 1(xi)(g)</u> to the contrary, the provisions of <u>Article VII</u>, <u>Paragraph 16</u> hereof applicable to "Taxes" shall be fully applicable, *mutatis mutandis*, to LIBO Rate Taxes, and the Borrower shall not be required to pay any amount under this <u>Paragraph 1(xi)(g)</u> that would not be payable after taking into account the provisions of such <u>Article VII</u>, <u>Paragraph 16</u> below, including, without limitation, any limitation on the amount payable to the Borrower pursuant to <u>subsections (iii) through (viii)</u> inclusive of such <u>Article VII</u>, <u>Paragraph 16</u> below.

(h)   <u>Booking of LIBO Rate Loans</u>.  Any Lender may make, carry or transfer LIBO Rate Loans at, to, or for the account of, any of its branch offices, agencies or the office of a eurodollar affiliate of that Lender; <u>provided</u>, <u>however</u>, no such Lender shall be entitled to receive any greater amount under <u>Article VII</u>, <u>Paragraph 17</u> or <u>Article III</u>, <u>Paragraph 1(xi)(g)</u> above as a result of the transfer of any such LIBO Rate Loan than such Lender would be entitled to immediately prior thereto unless (1) such transfer occurred at a time when circumstances giving rise to the claim for such greater amount did not exist and were not reasonably foreseeable in the view of such Lender and (2) such claim would have arisen even if such transfer had not occurred.

(i)   <u>Affiliates Not Obligated</u>.   Unless expressly provided herein, no eurodollar affiliate or other affiliate of any Lender shall be deemed a party to this Loan Agreement or shall have any rights, liability or obligation under this Loan Agreement.

(j)   <u>"Lender" to Include Participants</u>.  For purposes of this <u>Paragraph 1(xi)</u> the term "Lender" shall, at each Lender's option, be deemed to include such Lender's present and future participants in the Loan Facility to the extent of each such Participant's actual losses, damages, costs or expenses.

2.   **The Notes and the Mortgage**.

(i)   On the Closing Date, the obligation of the Borrower to repay the Loan Facility is set forth in the Notes.  In the event any additional Lenders shall acquire an interest in the Loan Facility as permitted in this Loan Agreement, each of said Lender's Commitment shall be evidenced by a separate Note duly executed and delivered by the Borrower to said Lender.  The Borrower hereby covenants and agrees to cooperate with the Agent and each of the Lenders in consummating the sale, assignment or participation of any Lender's interest in the Loan Facility by executing substitute Notes and any other reasonably required documentation provided that the terms, conditions, and provisions of said Notes and documentation shall not operate to place any additional obligations on the Borrower which are different from those obligations which the Borrower had previously agreed to whether at the closing of the Loan Facility or pursuant to a subsequent amendment or modification thereof.  All of the obligations of the Borrower under this Loan Agreement, the Notes and any of the other Loan Documents are fully secured by the Mortgage and the Assignment of Leases, and certain obligations of the Borrower are guarantied by the Agreement of Guaranty, all as more fully described in said documents.  The Notes, the Mortgage and all of the other Loan Documents are hereby made a part of this Loan Agreement, to the extent and with the same effect as if fully set forth herein.

(ii)     The unpaid amounts of the Loan Facility, as set forth and recorded on the books and records of the Agent, shall be presumptive evidence of the principal amount thereof owing under each of the Notes, absent manifest error, but the failure to record any such amount on the books and records of the Agent shall not limit or affect the obligations of the Borrower hereunder or under the Notes to make payments of principal and interest on the Loan Facility when due.

3.     **Borrower's Certification and Advance Forms for each Advance**. The Borrower hereby agrees that, as a condition precedent to any Advance, the Borrower shall deliver to the Agent, at least ten (10) Business Days prior to the date of the making of the proposed Advance, a Request for Advance, together with the following: (i) an Application and Certification for Payment signed by the Borrower stating with respect to each payment to be made, *inter alia*, (a) the requisition number, (b) the name and address of the Person to whom or to which payment is to be made by the Lenders or, if the payment is to be made to the Borrower for a reimbursable advance, the name and address of the Person to whom or to which such advance was made, together with proof of payment by the Borrower, and (c) the amount to be paid, (ii) a Construction Affidavit, (iii) a Waiver of Lien for Material of Labor, if applicable, from each vendor with respect to whom amounts are being requested in said Advance, and (iv) a Final Lien Waiver, if applicable, from each vendor with respect to whom amounts are being requested in said Advance and whose contracts are completed.

4.     **Title Insurance Endorsements**.  In connection with each request by the Borrower for an Advance, there shall be delivered to the Agent, at the Borrower's expense, on the same day as the proposed Advance, continuation, date-down and interim mechanics lien endorsements to the existing loan title insurance policy previously issued to the Agent by the Title Company, dated the date of the requested Advance, in form and substance satisfactory to the Agent, (i) stating that such Advance is secured by the Mortgage and constitutes a valid third lien on the Borrower's fee simple estate and interest in and to the Mortgaged Premises, subject only to Permitted Encumbrances and without exception for mechanics' liens; (ii) increasing the amount of the title insurance coverage by the amount of such Advance; (iii) updating the date of the title insurance policy to the date of such Advance; and (iv) stating that no additional matters have been found of record since the effective date of the loan title insurance policy (as updated in connection with prior Advances).

5.     **Monthly Advances; Monthly Advance Fee**.  Each Advance shall be made by crediting the Borrower's account maintained with the Agent, which account the Borrower hereby agrees to (i) open at or before the Closing Date and (ii) maintain throughout the term of the Loan Facility.  As a condition precedent to the making of any Advance hereunder, the Borrower shall have paid to the Agent, for its own account, a non-refundable advance fee in accordance with the Agent's Letter, which advance fee shall be separate and distinct from any such advance fee required to be paid by the Borrower under the Building Loan Agreement.

6.     **Project Cost Statement**.  Advances shall be made to the Borrower by the Lenders in accordance with and subject to the provisions of the Project Cost Statement.

7.     **Reallocation of the Project Cost Statement Items**.  The Borrower shall have the right, upon obtaining the prior express written consent of the Required Lenders, to reallocate funds from, by and between or amongst the specified line items set forth in the Project Cost Statement for the Loan Facility and the "Project Cost Statement" (as such term is defined in the Building Loan Agreement) for the Building Loan Facility strictly in accordance with the following terms, conditions and provisions:

(i)     The Borrower shall deliver to the Agent and the Lenders, within seven (7) days prior to any desired reallocation of costs and expense items set forth in the Project Cost Statement for the Loan Facility and the "Project Cost Statement" (as such term is defined in the Building Loan Agreement) for the Building Loan Facility, (a) a Budget Reallocation Request in the form of Exhibit "F" attached hereto and made a part hereof, with all blanks appropriately completed, and (b) if applicable, a "Budget

Reallocation Request" (as such term is defined in the Building Loan Agreement) in the form of Exhibit "F" attached to the Building Loan Agreement and made a part thereof, with all blanks appropriately completed; and

(ii)     No Event of Default or Potential Default shall exist at the time such reallocation notice is delivered to the Agent.

8.     *__Intentionally Omitted__*.

9.     **Conditions to Advances of Proceeds of the Loan Facility**.  Notwithstanding any other provision of this Loan Agreement to the contrary, no Advance shall be made to the Borrower by the Agent on behalf of the Lenders:

(i)     while there is any lien or encumbrance upon the Mortgaged Premises, other than Permitted Encumbrances; provided, however, Advances may be made if the Borrower bonds, stays or otherwise satisfies or releases said lien or encumbrance to the satisfaction of the Agent such that a title insurance company shall continue to insure the third lien of the Mortgage; and

(ii)     unless the Loan Documents shall be in full force and effect and no Event of Default or Potential Default shall have occurred and be continuing; and

(iii)     unless the representations and warranties of the Borrower contained in the Loan Documents shall be true, complete and correct in all material respects as if made on and as of the date of such requested Advance; and

(iv)     unless the Loan Facility is "in balance".  It is expressly understood and agreed that the Loan Facility shall at all times be maintained by the Borrower "in balance."  The Loan Facility shall be deemed to be "in balance" only at such time and from time to time as the Agent or the Inspecting Engineer may determine in its reasonable discretion that the then undisbursed portion of the Loan Facility equals or exceeds the amount necessary for the timely and full payment of (a) all work done and not theretofore paid for or to be done in connection with the completion of the construction of all of the Improvements in accordance with the Project Cost Statement, the Plans and Specifications, all Requirements of Law, and the terms, conditions, and provisions of this Loan Agreement and (b) all other costs (including interest on the Loan Facility ) incurred and not theretofore paid for or to be incurred in connection with the Mortgaged Premises, including, without limitation, those costs evidenced by Major Subcontracts (as and when said Major Subcontracts are entered into in accordance with the requirements of this Loan Agreement).  The Borrower agrees that if the Loan Facility is deemed by the Agent not to be "in balance", the Borrower shall, within ten (10) days after written request by the Agent, deposit the deficiency with the Agent, which deficiency deposit shall first be exhausted before any further Advance is made.

10.     **No Obligation of the Agent or the Lenders as to Proper Application of Advances**. Nothing contained in this Loan Agreement or in any of the other Loan Documents shall impose upon the Agent, the Lenders and/or Inspecting Engineer any obligation to see to the proper application of any Advance by the Borrower, the General Contractor or any subcontractors, and nothing shall prevent the Agent or the Lenders, at its option, from deducting from any Advance, any sums then due and owing to them by the Borrower for unpaid interest or for sums paid and expended by the Agent and/or the Lenders for taxes or assessments, for insurance, and like payments, pursuant to its rights under the terms of the Loan Documents.

11.     **Lien Releases; No Lien Rights of the Borrower or its Affiliates**.  In connection with each Advance (except for the first Advance), the Borrower shall deliver to the Agent Waivers of Lien for Material or Labor and/or Final Lien Waivers, if applicable, from any and all vendors who have done work

[PROJECT CONSTRUCTION/TERM LOAN AGREEMENT]
PRCLIB-466320.4-cjmaurer 12/28/07 11:37 AM

on the Project and such sworn statements, affidavits, indemnities, bonds and other documents or instruments as may be required by the Agent, the Title Company, or the Agent's legal counsel to effectuate the protections afforded or the requirements imposed by any applicable local, state, or Federal mechanics' lien laws, including, without limitation, the New York Lien Law (Chapter 33 of the Consolidated Laws, 1909, *et seq.*). If the Borrower or any of its affiliates acts as a general contractor, architect, engineer, subcontractor, property manager, supplier of materials, or otherwise performs lienable work or services with respect to the Mortgaged Premises or the Improvements, the Borrower hereby irrevocably waives and relinquishes, or shall cause its affiliate(s) to waive and relinquish, as appropriate, any and all lien rights it may obtain as a result of such work or services.

12.     **Advances for Soft Costs**. The Borrower agrees, as a condition precedent to the making of any Advance for the payment of "soft costs" associated with the Improvements, to furnish the Agent with invoices, cancelled checks and other forms of written evidence of the payment of or bill for work on the Improvements.

13.     **Change Orders**. No revision of any of the approved Plans and Specifications may be made without the prior express written consent of the Agent and/or the Required Lenders, as described hereinbelow. The Borrower shall be permitted to make (i) change orders without the Agent's or the Required Lenders' prior express written consent (a) which do not exceed, on an individual basis, $50,000.00 per change order and which do not exceed in the aggregate for all change orders $100,000.00 or (b) which decrease the aggregate cost of the Improvements; provided that in any and in each such event the Borrower shall give the Agent written notice of each said change order, (ii) change orders with the Agent's prior express written consent (a) which exceed, on an individual basis, $50,000.00 per change order but which do not exceed, on an individual basis, $100,000.00 per change order and which do not exceed in the aggregate for all change orders $250,000.00 or (b) which decrease the aggregate cost of the Improvements, and (iii) change orders with the Required Lenders' prior express written consent which exceed, on an individual basis, $100,000.00 per change order and which exceed in the aggregate for all change orders $250,000.00.

14.     ***Intentionally Omitted***.

15.     **Final Advance**. Prior to the disbursement of the final Advance, the Borrower shall be in full compliance with all of the foregoing conditions precedent set forth in this Loan Agreement, as well as the following additional conditions:

(i)      the Improvements must be completed in accordance with (a) the Plans and Specifications, (b) all Requirements of Law, (c) the Project Cost Statement, and (d) the terms, conditions, and provisions of this Loan Agreement, and the Borrower must furnish the Agent with a certificate of completion from the Borrower and the Architect, certifying to the completion of the Improvements made according to the detailed Plans and Specifications; and

(ii)      the Borrower must furnish the Agent with (a) an as-built survey with respect to the Mortgaged Premises prepared by a licensed New York surveyor acceptable to the Agent, certified to the Agent, the Lenders, and the Title Company, brought to date to show the completion of all Improvements and the location of all easements and an endorsement to the Agent's title insurance policy which refers to such as-built survey and sets forth no exceptions other than Permitted Exceptions or those reasonably acceptable to the Agent, and (b) a temporary conditional certificate of occupancy (with conditions acceptable to the Lender, in its reasonable discretion), issued by the appropriate Governmental Authority in the City of New York, New York, providing for the use, occupancy, and individual sale, as Condominium Units, of the Improvements.

16.     *__Intentionally Omitted__*.

17.     **Additional Conditions Relating to Loan Advances**.  The obligation of the Lenders to make any Advances pursuant to this Loan Agreement is subject to the following additional conditions precedent:

(i)     The Borrower shall make available to the Inspecting Engineer, upon request, all shop and related drawings used in connection with the Plans and Specifications and the construction of the Improvements at the location where the same are kept.

(ii)     The Inspecting Engineer shall be of the opinion that the Improvements can be completed on or before the Initial Maturity Date.

(iii)     The Borrower shall have delivered to the Agent and the Inspecting Engineer copies of all of the Major Subcontracts and all Other Subcontracts which have been entered into at the time such Advance is requested by the Borrower.  The Borrower shall not agree to any material modification or termination of the Major Subcontracts or any of the Other Subcontracts without the prior express written consent of the Agent.  Each Major Subcontract will be bonded by the subcontractors thereunder, with all such bonding companies having satisfactory Alfred M. Best ratings and providing dual obligee riders to the Agent, for the benefit of the Lenders.

(iv)     The Lenders shall not be obligated to make an Advance with respect to any subcontractor or materialmen providing work or materials with respect to the Improvements unless such subcontractor or materialman is providing such work or materials under a signed contract or purchase order.

(v)     There shall be no action, suit or proceeding (zoning or otherwise) pending against or materially affecting the Borrower or any of the collateral for the Loan Facility, including, without limitation, the Mortgaged Premises, or with respect to any permits applicable to the Project and/or the Improvements in any court, or before or by any Governmental Authority, whether Federal, state, county or municipal, which, if adversely decided, would be reasonably likely to result in a material adverse change to the financial condition of the Borrower or the Guarantor or to the ability of either the Borrower or the Guarantor to perform their respective obligations under the Loan Documents.

18.     **Conditions Relating to Disbursement of Monies from Collateral Account**.  The Agent shall disburse monies held by it in the Collateral Account, all as more fully set forth and described in the Cash Collateral Agreement.

19.     **Equity Contribution**.  The Borrower shall fund, or cause to be funded or otherwise properly evidenced to the Agent, on or before the Closing Date, the Equity Contribution.  At all times during the term of the Loan, the Borrower shall maintain at least $11,100,000.00 in equity in the Project in the form of land value.

## ARTICLE IV

## REPRESENTATIONS, WARRANTIES AND COVENANTS

1.     **Additional Covenants of the Borrower**.  To induce the Lenders and the Agent to enter into this Loan Agreement and to make the Loan Facility available to the Borrower, the Borrower hereby covenants and agrees to comply with each of the following terms and conditions:

[PROJECT CONSTRUCTION/TERM LOAN AGREEMENT]

PRCLIB-466320.4-cjmaurer 12/28/07 11:37 AM

(i)     No later than the Initial Maturity Date, the Borrower shall obtain and furnish to the Agent the originals or copies of all certificates, licenses, consents and other approvals of the Governmental Authorities and of the appropriate Board of Fire Underwriters, if any, or other similar body, if any, acting in and for the locality in which the Mortgaged Premises are situated which are required for the use of the Improvements.

(ii)    The Borrower shall furnish to the Agent from time to time upon reasonable request (a) the names of all Persons with whom the Borrower has contracted or intends to contract for the construction of the Improvements or the furnishing of labor or materials in connection therewith, (b) a list of all unpaid bills for labor and materials with respect to construction of the Improvements, (c) budgets of the Borrower and revisions thereof in connection with the completion of construction of the Improvements, (d) receipted bills or other evidences of payment of all costs and expenses incurred in connection with the construction of the Improvements and any other costs and expenses relating to the Mortgaged Premises, and (e) such other material information relating to the Borrower, the Improvements, the Mortgaged Premises, the Guarantor, or any other guarantor or indemnitor or other Person or party connected with the Borrower, the Loan Facility, the construction of the Improvements or any collateral for the Loan Facility or other source of repayment of the Loan Facility.

(iii)   The Borrower shall pay on the Closing Date all fees and charges incurred in the procuring and making of the Loan Facility which are due and owing on or prior to the Closing Date, including, without limitation, fees, expenses and reasonable attorneys fees incurred by the Agent, for the benefit of the Lenders, fees of the Inspecting Engineer, appraisal fees, and fees and expenses relating to examination of title, title insurance premiums, surveys and mortgage recording, documentary, transfer or other similar taxes and revenue stamps.

(iv)    The Borrower shall not assign this Loan Agreement or the monies to be advanced and disbursed hereunder or convey, assign, pledge, encumber or mortgage (except for the Mortgage and any Permitted Encumbrances) any part of the Mortgaged Premises, excepting Condominium Units and Parking Spaces for sale, without the prior express written consent of the Lenders.

(v)     The Borrower shall hold the proceeds of any Advances and the right to receive future Advances in a trust fund for the purpose of paying only costs of the Improvements and shall apply the Advances which are made hereunder subsequent to the Advance made on the Closing Date and all such proceeds of the Loan Facility to the payment of, first, all costs of completing the Improvements which are entitled to priority of payment by any statute or applicable court decisions in the order or proportions, if any, specified or required thereby and otherwise in the order or proportions in which Advances are made by the Lenders for such costs, and, second, other costs of completion for which Advances are made by the Lenders before using any part of said Advances for any other purpose.

(vi)    The Borrower shall indemnify the Agent and the Lenders against claims of brokers arising by reason of the execution hereof or the consummation of the transactions contemplated hereunder, other than on account of the Agent's or any Lender's own actions.

(vii)   The Borrower shall deliver to the Agent or the Inspecting Engineer copies of all contracts, bills of sale, statements, receipted vouchers or agreements under which the Borrower claims title to any materials, fixtures or articles incorporated in the Improvements or under which it has incurred costs for which it is entitled to an advance of proceeds of the Loan Facility.

(viii)  The Borrower shall, upon demand of the Agent or the Inspecting Engineer, correct any defects in the Improvements or any departures from the Plans and Specifications not approved