by the Required Lender (with respect to which the Advance of any proceeds of the Loan Facility shall not constitute a waiver of the Agent's right to require correction of any such defects or departures from the Plans and Specifications not theretofore discovered by or called to the attention of the Inspecting Engineer).

(ix)   The Borrower shall employ watchmen or take other reasonable precautions to protect from theft or vandalism all portions of the Improvements and all tools and building materials stored at the Mortgaged Premises.

(x)   The Borrower shall comply with all restrictions, covenants and easements affecting the Mortgaged Premises or the Improvements.

(xi)   The Borrower shall maintain business records in a commonly accepted manner, which records shall be available at all times during normal business hours for inspection by the Agent.

(xii)   The Borrower shall remove and prosecute to completion the removal of all underground storage tanks, if any, known to the Borrower and located on the Mortgaged Premises, in compliance with all Federal, state and municipal laws, ordinances, rules and regulations.

(xiii)   The Borrower shall not create, incur, permit, assume or guaranty any additional indebtedness, except (1) as expressly agreed in writing by the Lenders, and (2) as may be expressly permitted in this Loan Agreement or the other Loan Documents.

(xiv)   The Borrower shall not, without the prior express written consent of the Lenders, create, incur, assume or suffer to exist any additional financing with respect to the Mortgaged Premises, including, without limitation, a mortgage, deed of trust, pledge, lien, security interest, assignment, or encumbrance of any nature upon or with respect to the Mortgage Premises or any of the other assets of the Borrower.

(xv)   The Borrower shall, at its sole cost and expense, provide to, or cause to be provided to, the Agent and the Lenders with the following financial statements and information, all in form and substance satisfactory to the Agent:

(1)   As soon as available, but in any event within ninety (90) days after the close of each fiscal year of the Borrower, "compilation" financial statements of the Borrower, which shall disclose, in reasonable detail, all earnings and expenses with respect to the ownership and operation of the Mortgaged Premises and all contingent obligations of the Borrower, including, without limitation, a statement of income, cash flows and stockholders' equity for the Borrower and, to the extent applicable, a certified rent roll, setting forth in comparative form the corresponding figures for the corresponding dates and periods during the preceding fiscal year. Such financial statements shall be reported upon by the Borrower's independent certified public accountant in the form of a statement substantially to the effect that said independent certified public accountant reviewed the financial statements in accordance with the Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants and said independent certified public accountant is not aware of any material modifications that should be made to the accompanying financial statements of the Borrower in order for them to be in conformity with generally accepted accounting principles applied on a basis consistent with that of the preceding fiscal year;

(2)   As soon as available but in any event within thirty (30) days after the end of each calendar quarter, "management prepared" statements of income, cash flows and stockholders' equity for the Borrower (including, to the extent applicable, a certified rent roll), and a "management

prepared" balance sheet of the Borrower as of the close of such calendar quarter, setting forth in comparative form the corresponding figures for the corresponding dates and periods during the preceding calendar quarter and which shall further include all contingent obligations of the Borrower. The above-described financial statements shall be (A) certified by the Manager of the Borrower as presenting fairly the financial position of the Borrower as of the end of such dates and fiscal periods and the results of its operations and the changes in its financial position and cash flows for such fiscal periods, in conformity with generally accepted accounting principles applied in a manner consistent with that of the most recent financial statements furnished to the Agent and (B) prepared in reasonable detail to evidence all earnings and expenses with respect to the ownership and operation of the Mortgaged Premises; and

(3)     An annual budget with respect to the Project within thirty (30) days after the end of each fiscal year of the Borrower, such budget to be certified to the Agent and the Lenders by the Borrower and showing, in reasonable detail, the anticipated income and expenses of the operations of the Property and the Project; and

(4)     A monthly sales report with respect to the Project within thirty (30) days after the end of each month, such sales report to indicate and describe the unit, type, square footage, base price, upgrades, buyer name, rescission dates, and final price (including upgrades, if any), together with a breakdown of the number and dollar amount of pending sales, reservations, and remaining sales and a breakdown of the number of investors and full time occupants; and

(5)     Signed annual "compilation" financial statements of the Guarantor within ninety (90) days after the end of each calendar year, in form and substance acceptable to the Agent and the Lenders, which shall include a balance sheet (which shall disclose all contingent obligations of the Guarantor), and a statement of cash flows, in each case prepared on the accrual basis of accounting and in accordance with generally accepted accounting principles applied on a consistent basis, prepared by an independent certified public accountant approved by the Agent, in its sole and absolute discretion; and

(6)     Signed certified true and correct copies of the most recent Federal income tax return (together with all exhibits and schedules attached thereto), with respect to the Borrower and the Guarantor, as soon as available, but not later than fifteen (15) days from the date of filing of such tax returns with the Internal Revenue Service. The Borrower and the Guarantor, as applicable, shall notify the Agent immediately upon filing any requests for an extension of time in which to file any of said Federal tax returns with the Internal Revenue Service and shall send the Agent copies of any such extensions of time within fifteen (15) days of filing. The Borrower shall cause the Guarantor to deliver his Federal tax return for the 2006 calendar year to the Agent on or before February 15, 2008; and

(7)     Promptly upon becoming aware of any Event of Default under the Loan Documents, the Borrower and the Guarantor shall give the Agent and the Lenders written notice thereof, together with a written statement of the Borrower setting forth the details thereof and any action with respect thereto taken or contemplated to be taken by the Borrower and the Guarantor; and

(8)     Promptly upon request, any other financial statements, financial reports, or other information with respect to the Borrower, the Guarantor, the Mortgaged Premises, or the Project as the Agent may reasonably request from time to time.

(xvi)     The Borrower shall afford the Agent the right (1) to approve any Property Manager for the Project, the Mortgaged Premises, and/or the Improvements and/or (2) to require the designation of a new Property Manager for the Project, the Mortgaged Premises, and/or the Improvements in the Agent's sole and absolute discretion, with the additional understanding that the Agent reserves the right to approve any

change in or replacement of any Property Manager during the term of the Loan Facility.

(xvii)    The Borrower shall comply with all requirements of Section 421-a with respect to obtaining, maintaining, and preserving partial real estate tax exemption benefits for and with respect to the Mortgaged Premises.

(xviii)  The Borrower shall file an application for a "Preliminary Certificate of Eligibility" (as such term is used in Section 6-05(b) of the Rules of the City of New York) on or before February 20, 2008.

(xix)    The Borrower shall file an application for a "Final Certificate of Eligibility" (as such term is used in Section 6-05(d) of the Rules of the City of New York) at least thirty (30) days prior to January 5th of the year immediately following the Completion Date.

(xx)     The Borrower shall maintain all operating accounts and deposit accounts for itself and for the Mortgaged Premises with the Agent until the Loan Facility is indefeasibly paid in full. The Borrower, affiliates of the Borrower, and the Guarantor shall maintain deposit accounts with the Agent which, at all times until the Loan Facility is indefeasibly paid in full, shall maintain a minimum average balance of at least $1,000,000.00.

2.     **Representations and Warranties**.  To induce the Lenders and the Agent to enter into this Loan Agreement and to make the Loan Facility available to the Borrower, the Borrower hereby represents and warrants to the Agent, for the benefit of the Lenders, as follows:

(i)      Construction of the Improvements has commenced as of the Closing Date.

(ii)     No condemnation or eminent domain proceeding has been commenced or to the knowledge of the Borrower is about to be commenced against the Mortgaged Premises, or any portion thereof.

(iii)    The Borrower has the full power and authority to execute and deliver this Loan Agreement and the other Loan Documents, and the same constitute the binding and enforceable obligations of the Borrower in accordance with their terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws now or subsequently in effect concerning the rights and remedies of creditors generally.

(iv)     The Borrower is a limited liability company duly organized, validly existing and in good standing under the laws of the State of New York and has full power and authority to consummate the transactions contemplated hereby.  As of the date hereof, the ownership of the Borrower consist of the Persons shown on Schedule 1 attached hereto and made a part hereof.

(v)      Prior to the submission of any Plans and Specifications to the Required Lenders for approval, such Plans and Specifications shall be satisfactory to the Borrower and shall have been reviewed and approved by the Guarantor and, to the extent required by applicable Federal, state, and municipal law or any effective covenant, by all Governmental Authorities.  The planned use of the Improvements complies with applicable zoning and land use ordinances, regulations and restrictive covenants affecting the Mortgaged Premises as well as all environmental, ecological, landmark and other applicable Federal, state, and municipal laws and regulations.

(vi)     The Borrower has obtained or will obtain from the appropriate Governmental Authorities all required approvals (including, without limitation, all environmental approvals) with

respect to the Plans and Specifications and the Improvements, and all necessary permits, certificates, licenses and other approvals required for the construction of the Improvements. No such approvals, permits, certificates, licenses or other approvals have been invalidated, rescinded or suspended and work on the Project has not been stopped by any Governmental Authority or by any court of competent jurisdiction. The Borrower is not aware of any problem or requirements which would preclude the issuance of any permit or approval for the Improvements, including, without limitation building permits. The Improvements shall be constructed and equipped in compliance with the requirements of the Governmental Authorities and the appropriate Board of Fire Underwriters, if any, or other similar body, if any, acting in and for the locality in which the Mortgaged Premises are situated. The Borrower has reviewed and hereby confirms the information in, approves of and agrees with all of the opinions set forth in that certain opinion letter dated of even date herewith, delivered to the Agent, for the benefit of the Lenders, by Silberberg & Kirschner LLP, permits and approvals counsel to the Borrower and the Guarantor. Neither the Borrower nor the Guarantor is aware of any material inaccuracy or misstatement of fact contained in said opinion letter or the supporting documents relied upon therein.

(vii)     All financial statements of the Borrower and the Guarantor which have been heretofore delivered to the Agent are true, correct and current in all respects as of the date when made, have been prepared (with respect to the Borrower) in accordance with generally accepted accounting principles consistently applied and fairly present the respective financial conditions of the Persons thereof as of the respective dates thereof. No material adverse change has occurred in the financial conditions reflected therein since the respective dates thereof and, except for the Loan Facility, no borrowings secured by or which might give rise to a lien or claim against the Mortgaged Premises, Improvements or proceeds of the Loan Facility have been made by the Borrower or others since the respective dates thereof.

(viii)     There are no actions, suits or proceedings pending or, to the knowledge of the Borrower, threatened against or affecting the Borrower, the Mortgaged Premises, or the Guarantor, or the validity or enforceability of the Mortgage or the priority of the liens thereof, whether at law, or in equity or before or by any Governmental Authority, except actions, suits or proceedings which are fully covered by insurance (subject to any required deductible acceptable to the Agent) or would, if adversely determined, not materially impair the ability of the Borrower or the Guarantor to pay when due any amounts which may become payable under the Notes, the Mortgage, or any guaranty in connection herewith. To the best of the Borrower's knowledge, it is not in default with respect to any order, writ, injunction, decree or demand of any court or any Governmental Authority.

(ix)     The consummation of the transactions hereby contemplated, performance of this Loan Agreement, the execution and payment of the Notes and the granting of the Mortgage have not and will not result in any breach of, or constitute a default under, any mortgage, deed of trust, lease, bank loan or credit agreement, corporate charter, by-laws, partnership agreement, operating agreement or other instrument to which the Borrower is a party or by which it or the Mortgaged Premises may be bound or affected.

(x)     All utility services necessary for the construction of the Improvements and the operation and use thereof for their intended purposes are available at the boundaries of the Mortgaged Premises at standard utility rates and hook-up charges, including water supply, storm and sanitary sewer, gas, electric power and telephone facilities.

(xi)     The Borrower has not entered into any contract or arrangement of any other kind the performance of which by the other party thereto would give rise to a lien on the Mortgaged Premises or any of the Improvements prior to the lien of the Mortgage, except for Permitted Encumbrances.

(xii)   Roads necessary for the full utilization of the Improvements for their intended purposes have been completed, or the necessary rights of way therefor have been provided or acquired by the appropriate Government Authority or dedicated to public use and accepted by said Governmental Authority, and all necessary steps have been taken by the Borrower and said Governmental Authority to assure the complete construction and installation thereof no later than the Initial Maturity Date or any earlier date required by an law, order, or regulation.

(xiii)   No Event of Default on the part of the Borrower under the Loan Documents and no Potential Default has occurred or exists.

(xiv)   The tax identification number of the Borrower is: 20-5712882.

(xv)   "Commencement of Construction" (as such term is defined in Section 6-01(c) of the Rules of the City of New York) of the Improvements has commenced as of the Closing Date.

(xvi)   No part of the Improvements shall be used for hotel or single room occupancy.

(xvii)   Prior to the "Commencement of Construction" (as such term is defined in Section 6-01(c) of the Rules of the City of New York) of the Improvements, the Land was entirely vacant and contained no "Class A dwelling units" (as such term is used in Section 6-02(e)(3) of the Rules of the City of New York) as of one month prior to said Commencement of Construction.

(xviii)   The Borrower has not filed an application for a "Preliminary Certificate of Eligibility" (as such term is used in Section 6-05(b) of the Rules.of the City of New York).

3.   **Negative Covenants of the Borrower**.   The Borrower hereby represents, warrants and covenants, as of the date hereof and at all times until the Loan Facility has been terminated and the indebtedness evidenced by the Notes has been paid in full, that the Borrower:

(i)   has not and will not guarantee or otherwise become liable for any obligation of any other Person without the prior express written consent of the Lenders; and

(ii)   does not now own and will not own any encumbered asset other than (a) the Mortgaged Premises, (b) incidental personal property necessary for the operation of the Mortgaged Premises, and (c) Stored Materials during construction pursuant to the terms, conditions, and provisions of this Loan Agreement; and

(iii)   is not engaged and will not engage, either directly or indirectly, in any business other than the ownership, management and operation of the Mortgaged Premises; and

(iv)   without the prior express written consent of the Lenders, has not incurred and will not incur any debt, secured or unsecured, direct or contingent (including guarantying any obligation), other than the indebtedness evidenced by the Notes, no other debt may be secured (senior, subordinate, or *pari passu*) by the Mortgaged Premises; and

(v)   has not made and will not make any loan or advances to any third party (including any affiliate).

4.   **Additional Representations, Warranties and Covenants with respect to the Condominium**.   The Borrower hereby represents, warrants and covenants, as of the date hereof and at all times until the Loan Facility has been terminated and the indebtedness evidenced by the Notes has been

paid in full, as follows:

        (i)     Prior to the Offering Plan having been filed with the Office of the Attorney General for the State of New York, the Agent shall have an opportunity to review and approve a complete set of the Condominium Documents.  As a condition precedent to the Agent's approval of the Condominium Documents, the Agent shall have received confirmation from the Title Company that the Title Company has affirmatively committed to issue an ALTA-4.1 Condominium Endorsement to the Agent's title insurance policy upon submission of the Mortgaged Premises to condominium ownership pursuant to the Condominium Documents. The Condominium Documents shall be in form and content acceptable to the Agent and shall prohibit (without the Agent's prior express written consent) the creation of time share estates, or any other form of multiple ownership, with respect to any "Units" (as such term is defined in the Declaration).  Once the Offering Plan has been submitted to the Office of the Attorney General for the State of New York and the Borrower has received notice that the Office of the Attorney General for the State of New York has approved/accepted the Offering Plan, the Borrower shall provide the Agent with a written copy of said notice.

        (ii)    The Borrower hereby covenants and agrees that it shall comply with (a) all requirements of the Condominium Act, (b) all regulations promulgated from time to time pursuant to the Condominium Act, including without limitation, the filing requirements for the Condominium Documents and the Borrower's obligations as sponsor of the Condominium, and (c) all requirements and requests of the Office of the Attorney General for the State of New York in connection with the filing of the Offering Plan and the Declaration.

        (iii)   At such time as the Condominium Documents shall have been approved by the Agent, the Agent shall enter into a subordination agreement in form and substance reasonably satisfactory to the Agent for the purposes of subordinating the lien of the Mortgage to the Declaration. As soon after the Condominium Conversion Date as is practical, the Borrower shall enter into an amendment to this Loan Agreement, the Mortgage, and the other Loan Documents, which amendment shall be filed of record in the Office of the New York City Register at the sole cost and expense of the Borrower, for the purposes of amending the legal description of the Mortgaged Premises to reflect the legal description of the Condominium Units, such amendment to be in form and substance acceptable to the Agent.

        (iv)   The Borrower shall deposit all Purchaser Deposits with the Agent in the Collateral Account and in no event shall any Purchaser Deposits be released by the Agent or used by the Borrower to fund the construction and development of the Project.  Additionally, the Borrower shall disclose to any purchaser under a Purchase Contract all items required to be disclosed to such a purchaser under the Condominium Act. The Borrower shall ensure that all Purchase Contracts shall be non-assignable by the purchaser thereunder, except to the Agent. The Borrower shall ensure that all Purchase Contracts shall be supported by evidence satisfactory to the Agent of the purchaser's ability to close on such Purchase Contract, which evidence shall consist of either (a) a mortgage approval letter citing a sufficient mortgage loan amount or (b) evidence to the Agent's satisfaction of such purchaser's possession of sufficient funds to close. Additionally, the Borrower shall ensure that all Purchase Contracts shall be expressly subordinate to the lien of the Mortgage.

        (v)    At all times after the Condominium Conversion Date, the Borrower hereby further covenants and agrees with the Agent as follows:

        (a)   The Borrower shall pay when due, and before any fine, penalty, interest or cost may be added thereto for the late payment or non-payment thereof, all assessments, special assessments, and common expenses described in the Declaration and all other sums payable from time to time by the Borrower pursuant to the Condominium Documents in effect from time to time.  The

[PROJECT CONSTRUCTION/TERM LOAN AGREEMENT]

PRCLIB-466320.4-cjmaurer 12/28/07 11:37 AM

Borrower shall deliver to the Agent, promptly after request, evidence satisfactory to the Agent that all such payments then required to have been made have in fact been made.

(b)     The Borrower shall not further divide, partition, or segment the residential Condominium Units without the prior express written consent of the Agent.  Except as expressly permitted herein, the Borrower shall not amend, modify, or supplement, or permit any amendment, modification, and/or supplement of, the Condominium Documents. The Borrower shall not give any consent, vote or approval required of the Borrower under the Condominium Documents as a condition to any action thereunder which, if taken, would have a material adverse effect on the security of the Agent.

(c)     The Borrower shall comply with the Condominium Documents and shall do all things necessary to preserve and keep unimpaired its rights, powers and privileges under the Condominium Documents and to prevent, so long as it is in the Borrower's power to do so, the termination or expiration of the Condominium or the Condominium Documents or the withdrawal of the Premises from a condominium form of ownership under applicable New York law, without the prior express written consent of the Agent.  The Borrower shall not cause or suffer any such termination, expiration, or withdrawal of the Condominium (whether pursuant to applicable New York law or otherwise), and the Borrower shall not commence or prosecute any action or proceeding, and the Borrower shall permit the Agent to participate in any such action or proceeding (but the Agent shall not be obligated so to do) with respect to such a termination, expiration, or withdrawal of the Condominium. The Borrower shall promptly deliver to the Agent a copy of each notice, pleading, brief, and preliminary, interim and final determination or decision and other papers received by the Borrower in connection with any such action or proceeding.

(d)     The Borrower shall promptly notify the Agent of the receipt by the Borrower of (1) any notice from the executive board, board of directors, and/or the condominium association of the Condominium or from the owner of any other unit in the Condominium asserting or claiming a default by the Borrower under, or lack of compliance by the Borrower with, the Condominium Documents or (2) any notice or request from said executive board, board of directors, and/or condominium association or from the owner of any other unit in the Condominium relating to any action, pending, intended or purported termination, expiration, or withdrawal of or relating to the Condominium or the Condominium Documents. The Borrower shall cause a copy of each such notice or request, as well as a copy of any other notice, statement, or other communication from time to time issued by said executive board, board of directors, and/or condominium association to be promptly delivered to the Agent.

(e)     The Borrower shall, within fifteen (15) days after demand from the Agent, obtain from the executive board of the Condominium (or its managing agent(s)) and deliver to the Agent a duly signed and acknowledged certificate (signed also by the Borrower) that the Condominium Documents are unmodified and in full force and effect (or, if the Condominium Documents have been modified in compliance with the terms, conditions, and provisions of this Loan Agreement, that the Condominium Documents are in full force and effect as so modified and that there have been no other modifications), stating the dates to which the assessments, special assessments, common expenses, and other sums payable from time to time by the Borrower under the Condominium Documents have been paid and stating whether, to the best of their knowledge and belief, the Borrower is in compliance with the Condominium Documents, or, if not, specifying each default or failure of compliance known to them.

(f)     The Agent may (but shall not be obligated to) take any action that the Agent deems necessary or desirable to prevent or cure, in whole or in part, any failure of compliance by the Borrower with the Condominium Documents. The Borrower hereby expressly and irrevocably grants

42

to the Agent, and agrees that the Agent at all times shall have, the absolute right, subject to the rights of other owners of units in the Condominium, if any, and subject to the rights of tenants under then existing leases, if any, to enter in and upon the Mortgaged Premises at all reasonable hours and upon reasonable prior notice to such extent and as often as the Agent, in its sole and absolute discretion, deems necessary or desirable in order to prevent or cure any such default or alleged default by the Borrower under the Condominium Documents. Nothing set forth herein shall limit the generality of any rights or remedies of the Agent under this Loan Agreement or any of the other Loan Documents.

5.     **Partial Releases of Mortgage**.

(i)     At the time of closing of the sale of any Condominium Unit and/or Parking Space, the Agent shall release the lien of the Mortgage from said Condominium Unit and/or Parking Space using the Agent's standard form of release of lien (such form to be current as of the date of such release); provided that (a) the Agent shall have received the required Release Payment with respect to such Condominium Unit and/or Parking Space, (b) the Borrower shall have complied with all of the conditions and restrictions set forth in this Loan Agreement with respect to the sale of such Condominium Unit and/or Parking Space, (c) no Potential Default or Event of Default shall then be continuing hereunder, (d) the Borrower shall promptly pay all of the Agent's costs and expenses (including, without limitation, any reasonable attorneys' fees and expenses) incurred in connection with the preparation, review, and approval of such release, and (e) the Borrower shall have submitted to the Agent a fully executed copy of the final signed closing statement with respect to the sale of such Condominium Unit and/or Parking Space.

(ii)     All Release Payments may be applied (a) first to any past due interest (i.e., interest which was not paid when due and is outstanding, including any default interest) on the Notes, (b) then to any unpaid late charges, costs, or expenses of the Agent or the Lenders hereunder which are due but have not been paid, and (c) finally to the payment of the principal balance of the Notes, on a *pro rata* basis. Notwithstanding the foregoing to the contrary, if an Event of Default shall have occurred and is continuing hereunder, the Agent may apply any Release Payment and any other amounts received by the Agent or the Lenders after the occurrence of such Event of Default in such order of priority as the Agent shall deem appropriate, in its sole and absolute discretion. If any covenant, agreement, or obligation remains to be paid or performed by the Borrower when the outstanding principal balance of the Loan Facility has been fully paid, then, notwithstanding anything to the contrary contained herein, in the Mortgage, or in any of the other Loan Documents, the Agent shall have no obligation to release any portion of the Mortgaged Premises remaining subject to the Mortgage, including, without limitation, any Parking Spaces and any Condominium Units (hereinafter collectively referred to as the "Remaining Property"), and the Remaining Property shall continue to secure the payment and performance of the continuing obligations of the Borrower and remain subject to the Mortgage.

## ARTICLE V

## EVENTS OF DEFAULT

      1.    **Events of Default**.  The term "Event of Default" as used in this Loan Agreement shall mean the occurrence of any one or more of the following events:

      (i)    Any representation or warranty made by the Borrower, the Guarantor, and/or any other Person (excluding the Agent and the Lenders) in this Loan Agreement or in any of the other Loan Documents, or in any other writing including the loan application, given in connection herewith shall prove to have been materially false, incorrect, or misleading on the date as of which made; or

      (ii)    The Borrower shall have failed to make any payment of any installment of interest on the Notes on their respective due dates; or

      (iii)    The Borrower shall have failed to make any payment of principal on the Notes on their respective due dates; or

      (iv)    The Borrower or the Guarantor shall have failed to duly observe or perform any covenant, condition or agreement with respect to the payment of monies on the part of the Borrower or the Guarantor, to be observed or performed pursuant to the terms of the Loan Documents, other than the payment of principal and interest which shall be governed by subparagraphs (ii) and (iii) above; or

      (v)    The Borrower and/or the Guarantor shall have failed to duly observe or perform any covenant, condition or agreement on the part of the Borrower and/or the Guarantor to be observed or performed pursuant to the terms of the Loan Documents other than the payment of monies which shall be governed by subparagraphs (ii), (iii), and (iv) above, and such default shall have remained uncured for a period of thirty (30) days after written notice thereof to the Borrower and/or the Guarantor by the Agent; or

      (vi)    The Borrower shall have failed to comply with any law, ordinance, order, rule or regulation of any Governmental Authority having jurisdiction over the Project and/or the Improvements or shall have failed to remove any work condemned by any of the said Governmental Authorities or prohibited by law and such default shall have remained uncured for a period of thirty (30) days after written notice thereof to the Borrower; or

      (vii)    A mechanics' lien or any other lien or encumbrance shall have been filed against the Project and/or the Improvements and the Borrower shall have failed to procure within thirty (30) days after the same is filed, a cancellation of said lien or a discharge thereof, in the manner and form provided by law, or a bond against said lien or encumbrance, in form and amount satisfactory to the Agent; or

      (viii)    If the Mortgage made by the Borrower shall not give to the Agent, for the benefit of the Lenders, a valid third lien on the Borrower's fee simple estate and interest in the Mortgaged Premises, subject to Permitted Encumbrances, for the indebtedness to be secured thereby; or

      (ix)    *Intentionally Omitted*; or

      (x)    The Improvements erected on the Mortgaged Premises encroach upon any street or adjoining property or violate restrictive covenants of record or local zoning ordinances (other than as permitted pursuant to variances obtained by the Borrower from all applicable Governmental Authorities which variances remain in full force and effect) and such default shall have remained uncured for a period of

ninety (90) days after written notice thereof to the Borrower; or

(xi)     If any materials, fixtures or articles used in the construction of the Improvements which are fully paid for with the proceeds of the Loan Facility shall not be purchased so that the ownership thereof will vest in the Borrower, free from all encumbrances and liens upon delivery to the Mortgaged Premises; or

(xii)    If the Borrower does not permit a representative of the Agent to enter upon the Mortgaged Premises to inspect the Improvements thereon at a reasonable time; or

(xiii)   The Borrower and/or the Guarantor shall have applied for or consented to the appointment of a custodian, receiver, trustee or liquidator of all or a substantial part of their respective assets; a custodian shall have been appointed with or without consent of the Borrower and/or the Guarantor and shall not have been dismissed for a period of sixty (60) consecutive days; the Borrower and/or the Guarantor shall generally not be paying their respective debts as they become due; the Borrower and/or the Guarantor shall have made a general assignment for the benefit of their respective creditors; the Borrower and/or the Guarantor shall have filed a voluntary petition in bankruptcy, or a petition or an answer seeking reorganization or an arrangement with their respective creditors, or shall have taken advantage of any insolvency law, or shall have filed an answer admitting the material allegations of a petition in bankruptcy, reorganization or insolvency proceeding; or a petition in bankruptcy shall have been filed against the Borrower and/or the Guarantor or if an Order for Relief has been entered under the Federal Bankruptcy Code and shall not have been dismissed for a period of sixty (60) consecutive days; or an order, judgment or decree shall have been entered without the application, approval or consent of the Borrower and/or the Guarantor by any court of competent jurisdiction appointing a receiver, trustee, custodian or liquidator of the Borrower and/or the Guarantor of a substantial part of their respective assets and such order, judgment or decree shall have continued unstayed and in effect for any period of sixty (60) consecutive days; or

(xiv)    The Borrower shall have caused or permitted a security interest, perfected or otherwise, other than the security interest specifically provided for or permitted hereunder or under the other Loan Documents, to be created in any collateral provided for under the Loan Documents without the prior express written consent of the Agent, or shall have failed to take any action reasonably requested by the Agent to perfect or protect the security interest provided for herein; or

(xv)     A change in the present management of the Borrower without the prior express written consent of the Agent; or

(xvi)    Default by the Borrower and/or the Guarantor beyond any applicable grace period in any of the terms or conditions of any agreement and/or any other payment of borrowed money from the Lender or any other lender or creditor; or

(xvii)   The reasonable determination of any officer of the Agent having a title of vice president or more senior, that a material adverse change has occurred in the financial condition of the Borrower and/or the Guarantor or in the assets and properties of the Borrower and/or the Guarantor; or

(xviii)  The death of the Guarantor; or

(xix)    Any judgment shall be entered against the Borrower and/or the Guarantor which shall become a lien on the Borrower's and/or the Guarantor's respective properties or assets or any portion thereof or interest therein and such execution, attachment or similar process is not released, bonded, satisfied, vacated or stayed within thirty (30) days after its entry or levy; or

(xx)     A writ of execution or attachment or any similar process shall be issued or levied against all or any part of or interest in any of the properties or assets of the Borrower and/or the Guarantor or the seizure or foreclosure of any of the properties or assets of the Borrower and/or the Guarantor pursuant to process of law or by respect of legal self-help, shall be entered against the Borrower and/or the Guarantor which writ or attachment is not bonded or discharged within thirty (30) days of its entry; or

(xxi)     Except for Permitted Transfers, the occurrence of any Transfer, whether such Transfer is done voluntarily, involuntarily or by operation of law; or

(xxii)     Any substantial change (whether direct or indirect) in the nature or character of the Borrower's business; or

(xxiii)     The Borrower shall have entered into any secondary financing or shall have consented to the placing of any lien on the Mortgaged Premises (other than Permitted Encumbrances), whether such financing or lien is prior to or subordinate to the lien of the Mortgage; or

(xxiv)     Except for a Permitted Transfer, the Guarantor shall have permitted a lien, pledge, assignment, security interest or any other form of encumbrance to attach to his ownership interests in and to the Borrower; or

(xxv)     The conveyance or lease of the air development rights with respect to the Mortgaged Premises without the prior express written consent of the Agent (the Borrower hereby agreeing that such sale or lease shall conclusively impair the security interest granted to the Agent by the terms of the Mortgage); or

(xxvi)     The Condominium Conversion Date shall have failed to occur on or before June 20, 2008; or

(xxvii)     The Borrower shall have failed to obtain and deliver to the Agent and the Inspecting Engineer fixed price Major Subcontracts with respect to at least seventy-five percent (75%) of the "hard" costs portion of the Project Cost Statement, which fixed price Major Subcontracts are reviewed and approved by the Agent and the Inspecting Engineer, in their sole and absolute discretion, on or before February 5, 2008; or

(xxviii)     There shall have occurred any "Event of Default" (as such term is defined in the Building Loan Agreement or any of the other Building Loan Documents).

2.     **Remedies**.

(i)     Upon the occurrence and during the continuance of an Event of Default, the Commitments of the Lenders shall automatically terminate and the Agent, for the benefit of the Lenders, may, with the approval of the Required Lenders, (a) declare the Debt immediately due and payable, whereupon all such Debt shall forthwith become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower, (b) cease to make Advances, and (c) pursue any and all remedies provided for in the Loan Documents, or otherwise available.

(ii)     Upon the occurrence and during the continuance of an Event of Default, whether or not the Debt shall be or shall have been declared due and payable or the Agent, for the benefit of the Lenders, shall have instituted any foreclosure or other action for the enforcement of the Loan Documents, the Agent, for the benefit of the Lenders, may, in addition to any other remedies which the Agent may

have under the Loan Documents, with the approval of the Required Lenders, (a) enter upon the Mortgaged Premises and complete the Improvements in accordance with the Plans and Specifications with such changes therein as the Agent may deem appropriate and employ watchmen to protect the Improvements, all at the risk, cost and expense of the Borrower, (b) at any time discontinue any work commenced in respect of the Improvements or change any course of action undertaken by it and not bound by any limitations or requirements of time whether set forth herein or otherwise, (c) assume any construction contract made by the Borrower in any way relating to the Improvements and take over and use all or any part of the labor, materials, equipment, furniture, fixtures and articles of personal property contracted for by the Borrower, whether or not previously incorporated into the Improvements, (d) force place any insurance required by the Agent, in its sole and absolute discretion, at the cost and expense of the Borrower, and (e) in connection with any construction of the Improvements undertaken by the Agent pursuant to the provisions of this <u>subparagraph (ii)</u>, (1) engage builders, contractors, engineers and others for the purpose of furnishing labor, materials, equipment, furniture, fixtures and articles of personal property in connection with the construction of the Improvements, (2) pay, settle or compromise all bills or claims which may become liens against the Mortgaged Premises, or any portion thereof, or which have been or may be incurred in any manner in connection with completing construction of the Improvements or for the discharge of liens, encumbrances or defects in the title of the Mortgaged Premises, or any portion thereof, and (3) take or refrain from taking such action hereunder as the Agent may from time to time determine with the approval of the Required Lenders.  The Borrower shall be liable to the Agent for all sums paid or incurred by the Agent for or for the benefit of the Lenders to construct and equip the Improvements whether the same shall be paid or incurred pursuant to the provisions of this <u>subparagraph (ii)</u> or otherwise, and all payments made or liabilities incurred by the Agent and/or the Lenders hereunder of any kind whatsoever shall be paid by the Borrower to the Agent, for the benefit of the Lenders (to the extent any or all of the Lenders contributed to the making of said payments), upon demand with interest at the Default Rate, <u>provided, however,</u> that such interest rate shall in no event exceed the maximum interest rate which the Borrower may by law pay, from the date of payment by the Agent and/or the Lenders to the date of payment to the Agent and/or the Lenders, which sums and interest shall be secured by the Mortgage.  For the purpose of exercising the rights granted by this <u>subparagraph (ii)</u>, the Borrower hereby irrevocably constitutes and appoints the Agent its true and lawful attorney-in-fact to execute, acknowledge and deliver any instruments and to do and perform any acts in the name and for the benefit of the Borrower.

(iii)    Upon the occurrence and during the continuance of an Event of Default, the Agent, for the benefit of the Lenders, may, with the approval of the Required Lenders, institute and maintain foreclosure proceedings in accordance with the laws of the State of New York.  In the event of the foreclosure of the Mortgage for any default in the provisions thereof prior to the time when the Improvements shall be fully completed, it is hereby expressly agreed between the parties hereto that all work remaining to be done and materials still to be furnished shall be considered as work necessary for the conservation and preservation of the subject matter secured by the Mortgage, to wit: the Improvements contemplated to be constructed under this Loan Agreement.

(iv)    Upon the occurrence and during the continuance of an Event of Default, the Agent, for the benefit of the Lenders, may, with the approval of the Required Lenders, institute legal proceedings (whether at law or in equity) to collect any obligations, liabilities and/or indebtedness in connection with the Loan Facility without instituting foreclosure proceedings.

(v)    Upon the occurrence and during the continuance of an Event of Default, the Agent and/or the Lenders shall have the right, immediately and without notice or other action, in addition to (and without limitation of) any right of set-off, bankers' lien or counterclaim the Agent or any other Lender may otherwise have, to set-off against any of the Borrower's liabilities owed to the Agent and/or the Lenders under the Loan Documents (a) any money owed by the Agent and/or the Lenders in any

capacity to the Borrower whether due or not, including, without limitation, any balances (general or special, time or demand, provisional or final) held by them for the account of the Borrower, and/or (b) any property of the Borrower in the possession of the Agent and/or the Lenders, and the Agent and the Lenders shall be deemed to have exercised such right of set-off and to have made a charge against any such money immediately upon the occurrence of such event of default, even though the actual book entries may be made at some time subsequent thereto.

   (vi) Upon the occurrence and during the continuance of an Event of Default, the Agent, for the benefit of the Lenders, may take any of the remedies otherwise available to it under the Agreement of Guaranty or under any of the other Loan Documents.

   (vii) Upon the occurrence and during the continuance of an Event of Default, the Agent, for the benefit of the Lenders, may, with the approval of the Required Lenders, take any of the remedies otherwise available to it as a matter of law or equity.

## ARTICLE VI

## THE AGENT

   1. **Appointment.** Each Lender hereby irrevocably designates, appoints and authorizes North Fork Bank to act as the Agent for such Lender under this Loan Agreement and to execute and deliver or accept for the benefit of each of the Lenders the other Loan Documents. Each Lender hereby irrevocably authorizes, and each holder of any Note by the acceptance of a Note shall be deemed irrevocably to authorize the Agent to take such action on its behalf under the provisions of this Loan Agreement and the other Loan Documents and any other instruments and agreements referred to herein, and to exercise such powers and to perform such duties hereunder as are specifically delegated to or required of the Agent by the terms hereof, together with such powers as are reasonably incidental thereto. North Fork Bank agrees to act as the Agent for the benefit of the Lenders to the extent provided in this Loan Agreement. The Borrower shall be entitled to rely conclusively on the authority of the Agent to speak for and bind the Lenders and shall be under no duty to inquire into the status or authorization of the Agent to act on their behalf. Any payment, delivery or notice made or given by the Borrower to the Agent shall constitute payment, delivery or notice, as the case may be, to all Lenders.

   2. **Delegation of Duties.** The Agent may perform any of its duties hereunder by or through agents or employees (provided such delegation does not constitute a relinquishment of its duties as Agent) and, subject to Paragraphs 5 and 6 of this Article VI hereof, shall be entitled to engage and pay for the advice or services of any attorneys, accountants or other experts concerning all matters pertaining to its duties hereunder and to rely upon any advice so obtained.

   3. **Nature of Duties; Independent Credit Investigation.** The Agent shall perform its obligations under this Loan Agreement and the other Loan Documents in good faith according to the same standard of care as that customarily exercised by the Agent in administering its own real estate loans, and shall at all times keep accurate books of account reflecting the interests of the Lenders in the Loan Facility. Such books shall be available to the Lenders for inspection and copying during business hours with reasonable notice to the Agent. Except as stated in the preceding two (2) sentences or as otherwise expressly set forth in this Loan Agreement, the Agent shall have no duties or responsibilities except those expressly set forth in this Loan Agreement or required by law, and no implied covenants, functions, responsibilities, duties, obligations, or liabilities shall be read into this Loan Agreement or otherwise exist. The duties of the Agent shall be mechanical and administrative in nature and the Agent shall not have by reason of this Loan Agreement or any other Loan Document a fiduciary relationship in

respect of any Lender. Nothing in this Loan Agreement or any other Loan Document, expressed or implied, is intended to or shall be so construed as to impose upon the Agent any obligations in respect of this Loan Agreement, except as expressly set forth herein. Without limiting the generality of the foregoing, the use of the term "agent" in this Loan Agreement with reference to the Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties. Each Lender expressly acknowledges (i) that the Agent has not made any representations or warranties to them and that no act by the Agent hereafter taken, including any review of the affairs of the Borrower, shall be deemed to constitute any representation or warranty by the Agent to any Lender; (ii) that it has made and will continue to make, without reliance upon the Agent, its own independent investigation of the financial creditworthiness of the Borrower and the Guarantor in connection with this Loan Agreement and the making and continuance of the Loan Facility hereunder; and (iii) except as expressly provided herein, that the Agent shall have no duty or responsibility, either initially or on a continuing basis, to provide any Lender with credit or other information with respect thereto, whether coming into its possession before the making of the Loan Facility or at any time or times thereafter.

4.    **Actions in Discretion of Agent; Instructions from the Lenders**. (i) The Agent agrees, upon the written request of the Required Lenders (which such request shall be sent by any of the means described and set forth in Article VII, Paragraph 10 of this Loan Agreement), to take or refrain from taking any action of the type specified as being within the Agent's rights, powers or discretion herein, provided that the Agent shall not be required to take any action which exposes the Agent to personal liability or which is contrary to the terms, conditions and provisions of this Loan Agreement or any other Loan Document or applicable law. In the absence of a request by the Required Lenders, the Agent shall have authority, in its sole discretion, to take or not to take any action unless this Loan Agreement specifically requires the consent of the Required Lenders or all of the Lenders. Any action taken or failure to act pursuant to such instructions or directions shall be binding on the Lenders, subject to Paragraph 7 of this Article VI. Subject to the provisions of Paragraph 7 of this Article VI, no Lender shall have any right of action whatsoever against the Agent as a result of the Agent acting or refraining from acting hereunder in accordance with the instructions of the Required Lenders or all of the Lenders, or, in the absence of such instructions, in the absolute discretion of the Agent.

(ii)    North Fork Bank, in its capacity as the Agent, hereby acknowledges that the exercise of any rights and remedies granted to it (whether as such lender or as the Agent) under the terms, conditions and provisions of this Loan Agreement, the Agreement of Guaranty, the Mortgage, the Assignment of Leases and of the other Loan Documents are subject to the terms, conditions and provisions of Article V and Article VI of this Loan Agreement.

(iii)    Notwithstanding any term, condition, or provision of the Loan Documents to the contrary, the Agent, following consultation with the Lenders, shall take only such action with respect to an Event of Default, including, with respect to the exercise of remedies, including, without limitation, acceleration of the Debt, or the realization on, or operation or disposition of, any or all of the Mortgaged Premises or any other collateral for the Loan Facility as may be directed by the Required Lenders; provided, however, unless and until the Agent shall have received such directions, the Agent may take such action, or refrain from taking such action, with respect to an Event of Default as the Agent shall deem to be in the best interests of the Lenders.

5.    **Reimbursement and Indemnification of Agent by the Borrower**. The Borrower hereby unconditionally agrees to pay or reimburse the Agent and the Lenders and to defend, indemnify, and hold the Agent and the Lenders harmless from and against (i) liability for the payment of all reasonable out-of-pocket costs, expenses and advances, including, but not limited to, the reasonable fees

[PROJECT CONSTRUCTION/TERM LOAN AGREEMENT]
PRCLIB-466320.4-cjmaurer 12/28/07 11:37 AM

and expenses of the "Agent's Consultants" (as such term is hereinafter defined), actually incurred by the Agent and/or the Lenders (a) in connection with costs incurred in connection with the closing of the Loan Facility for the development, preparation, administration, printing, execution, interpretation and performance of this Loan Agreement and the other Loan Documents, provided that the Borrower shall not be responsible for any costs, expenses or advances associated with any Lender's soliciting, negotiating, entering into after the date hereof or performing any Assignment and Assumption Agreement or with the Agent's administration of its relationship with the Lenders, including accounting for and remitting to the individual Lenders any payments made by the Borrower under the Loan Documents, (b) relating to any amendments, waivers or consents requested by the Borrower pursuant to the provisions hereof and (c) in connection with any workout or restructuring, or in connection with the protection, preservation, exercise or enforcement of this Loan Agreement or any other Loan Document or collection of amounts due hereunder or thereunder or the proof and allowability of any claim arising under this Loan Agreement or any other Loan Document, whether in bankruptcy or receivership proceedings or otherwise, and (ii) all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or advances of any kind or nature whatsoever which may be imposed on, incurred by or asserted against the Agent, in its capacity as such, or the Lenders in any way relating to or arising out of this Loan Agreement or any other Loan Documents or any action taken or omitted by the Agent or the Lenders hereunder or thereunder, provided that the Borrower shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or advances (1) if the same results from the Agent's or any Lender's gross negligence or willful misconduct, or (2) if the Borrower was not given notice of the subject claim and the opportunity to participate in the defense thereof, at its expense (except that the Borrower shall remain liable to the extent such failure to give notice does not result in a loss to the Borrower), or (3) if the same results from a compromise or settlement agreement entered into without the consent of the Borrower, which shall not be unreasonably withheld, or (4) if the same relates to a dispute; provided that such dispute does not relate to any action or inaction on the part of the Borrower or the Guarantor, between the Agent and any one or more Lenders, including any claim by or for the benefit of any Lender that the Agent has failed to discharge its responsibilities as such in the manner required by the Loan Documents, or has failed to allocate, distribute or remit payments received from the Borrower to the Lenders in accordance with their respective interests in the Loan Facility or as otherwise agreed among the Lenders, or (5) if the same results from a Delinquent Lender's failure to fund any advance of Loan Facility proceeds. Notwithstanding anything to the contrary contained hereinabove, in no event shall the provisions of this Paragraph 5 be deemed to obligate the Borrower or the Guarantor to indemnify the Agent against or in respect of any matter which is expressly excluded from the scope of the Borrower's indemnification obligations under the Mortgage. For the purposes of the foregoing, the term "Agent's Consultants" shall mean the Inspecting Engineer, the appraiser, and the Agent's and/or any of the Lenders' legal counsel (including staff counsel), insurance consultant and other third-party consultants retained pursuant to the Loan Documents in connection with the foregoing.

6.     **Exculpatory Provisions; Limitations of Liability.**   Neither the Agent nor any of its directors, officers, employees, agents or Affiliates shall (i) be liable to any Lender for any action taken or omitted to be taken in good faith by it or them hereunder, or in connection herewith or any other Loan Document, (ii) be responsible in any manner to any Lender for the effectiveness, enforceability, genuineness, validity or the due execution of this Loan Agreement or any other Loan Document or for any recital, representation, warranty, document, certificate, report or statement herein or made or furnished under or in connection with this Loan Agreement or any other Loan Document, or (iii) be under any obligation to any of the Lenders to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions hereof or thereof on the part of the Borrower, or the financial condition of the Borrower or the Guarantor, or the existence or possible existence of any Event of Default or Potential Default, subject, however, in each case to the standard of care set forth in Paragraph 3 above. No claim may be made by the Borrower, any Lender, or the Agent against the Agent, any Lender or any of their respective directors, officers, employees, agents, attorneys or Affiliates, or any of them, for any

special, indirect or consequential damages or, to the fullest extent permitted by law, for any punitive damages in respect of any claim or cause of action (whether based on contract, tort, statutory liability, or any other ground) based on, arising out of or related to any Loan Document or the transactions contemplated hereby or any act, omission or event occurring in connection therewith, including the negotiation, documentation, administration or collection of the Loan Facility, and the Borrower, the Agent and each Lender hereby waive, release and agree never to sue upon any claim for any such damages, whether such claim now exists or hereafter arises and whether or not it is now known or suspected to exist in its favor, except for such claim or cause of action which arises out of the gross negligence or willful misconduct of the Agent, its directors, officers, employees, agents or Affiliates. Nothing contained in this <u>Paragraph 6</u> shall impair or be deemed to constitute a waiver of the Borrower's right to enforce the obligations of the Agent and the Lenders, including any Delinquent Lender, under this Loan Agreement or any other Loan Document by specific performance or any other remedy available to the Borrower at law or in equity, or to assert, prove or recover the Borrower's direct damages by reason of breach of any such obligations. Each Lender agrees that, except for notices, reports and other documents expressly required to be furnished to the Lenders by the Agent hereunder or given to the Agent for the account of or with copies for the Lenders, the Agent and each of its directors, officers, employees, agents, attorneys or Affiliates shall not have any duty or responsibility to provide any Lender with a credit report or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of the Borrower which may come into the possession of the Agent or any of its directors, officers, employees, agents, attorneys or Affiliates, except as may be expressly required by <u>Article VI</u>, <u>Paragraph 10</u> of this Loan Agreement.

       7.     **<u>Reimbursement and Indemnification of Agent by Lenders</u>**.  Each Lender hereby agrees to reimburse and defend, indemnify, and hold harmless the Agent (to the extent not reimbursed by the Borrower or the Guarantor and without limiting the obligation of the Borrower or the Guarantor to do so) in proportion to each Lender's Commitment (including any Delinquent Lender's Commitment), from and against all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or advances, including attorneys' fees and advances (including the allocated costs of staff counsel), and costs of appraisers and environmental consultants, of any kind or nature whatsoever which may be imposed on, incurred by or asserted against the Agent, in its capacity as such, in any way relating to or arising out of this Loan Agreement or any other Loan Document or any action taken or omitted by the Agent hereunder or thereunder, <u>provided</u> <u>that</u> no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or advances (i) if the same results from the Agent's gross negligence or willful misconduct, or (ii) if such Lender was not given notice of the subject claim and the opportunity to participate in the defense thereof, at its expense (except that such Lender shall remain liable to the extent such failure to give notice does not result in a loss to the Lender), or (iii) if the same results from a compromise and settlement agreement entered into without the consent of such Lender.  In addition, each Lender agrees promptly upon demand to reimburse the Agent for the reasonable fees and expenses of Agent's Consultants (to the extent not reimbursed by the Borrower or the Guarantor and without limiting the obligation of the Borrower or the Guarantor to do so) in proportion to each Lender's Commitment Percentage.  The Agent hereby represents and warrants to the Lenders that, as of the Closing Date, other than the customary fees and closing expenses described in this Loan Agreement or the Agent's Letter (for which the Lenders are not liable), there are no other costs, fees, expenses, liabilities, obligations or losses which are due and owing to the Agent in connection with the Loan Facility.

       8.     **<u>Reliance by Agent</u>**.  The Agent shall be entitled to rely upon any writing, telegram, telex or teletype message, resolution, notice, consent, certificate, letter, cablegram, statement, order or other document or conversation by telephone or otherwise believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons, and upon the advice and opinions of counsel and other professional advisers selected by the Agent.  The Agent shall be fully justified in failing or

refusing to take any action not expressly authorized hereunder unless it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.

9.    **Notice of Event of Default**.  The Agent shall not be deemed to have knowledge or notice of the occurrence of any Potential Default or Event of Default unless the Agent has actual knowledge thereof or has received written notice from a Lender or the Borrower referring to this Loan Agreement, describing such Potential Default or Event of Default, and stating that such notice is a "notice of default." In the event, that the Agent has such actual knowledge or receives such notice of the occurrence of a Potential Default or Event of Default, then the Agent shall promptly give notice thereof or furnish a copy thereof to the Lenders.

10.    **Notices and Information**.  The Agent shall promptly send to each Lender (i) a copy of all written notices, requests or demands received from the Borrower, the Guarantor or any Lender pursuant to the provisions of this Loan Agreement or the other Loan Documents, including, without limitation, all Request for Advances, (ii) a copy of all financial reports and information furnished by the Borrower and the Guarantor pursuant to this Loan Agreement and the Agreement of Guaranty, (iii) a copy of all backup documentation submitted to the Agent by the Borrower pursuant to and/or in connection with Article III, Paragraphs 3 through 19 inclusive of this Loan Agreement, including, without limitation, a copy of the Application and Certification for Payment signed by the Borrower and a copy of the Inspecting Engineer's report described in Article III, Paragraph 16 of this Loan Agreement with respect to each advance of proceeds of the Loan Facility, and (iv) no later than five (5) days after each advance of proceeds of the Loan Facility, a copy of each title insurance "rundown" and endorsement with respect to each advance of proceeds of the Loan Facility.  The Agent shall promptly notify the Borrower and the Lenders of each change in the LIBO Rate and the amount and the effective date thereof.

11.    **Lenders in Their Individual Capacities**.  With respect to its Commitment and Advances made pursuant thereto, the Agent shall have the same rights and powers hereunder as any other Lender may exercise the same as though it were not the Agent, and the term "Lenders" shall, unless the context otherwise indicates, include the Agent in its individual capacity.  The Agent and its affiliated entities and each of the Lenders and their respective affiliated entities may, without liability to account, except as prohibited herein, make loans to, accept deposits from, discount drafts for, act as trustee under indentures of, and generally engage in any kind of banking or trust business with the Borrower or the Guarantor, in the case of the Agent, as though it were not acting as Agent hereunder and in the case of each Lender, as though such Lender were not a party to this Loan Agreement.  The Lenders acknowledge that, pursuant to such activities, the Agent, the Lenders, or their respective Affiliates may receive information regarding the Borrower or the Guarantor in connection with other transactions or business and acknowledge that the Agent, such Lenders, and their respective Affiliates shall be under no obligation to provide such information to the other Lenders or to the Agent.

12.    **Holders of Notes**.  The Agent may deem and treat any payee of any Note as the owner thereof for all purposes hereof unless and until written notice of the assignment or transfer thereof shall have been filed with the Agent.  Any request, authority or consent of any Person who at the time of making such request or giving such authority or consent is the holder of any Note shall be conclusive and binding on any subsequent holder, transferee or assignee of such Note or of any Note or Notes issued in exchange therefor.

13.    **Equalization of Lenders**.  The Lenders and the holders of any participations in any Notes agree among themselves that, with respect to all amounts received by any Lender for application on any obligation hereunder or under any Note or under any participation thereof, whether received by voluntary payment, by realization upon security, by the exercise of the right of set-off or banker's lien, by

counterclaim or by any other non-pro rata source, equitable adjustment will be made in the manner stated in the following sentence so that, in effect, all such excess amounts will be shared ratably among the Lenders in proportion to the outstanding amount of their Commitments, except as otherwise provided in this Loan Agreement. The Lenders or any such holder receiving any such amount shall purchase for cash from each of the other Lenders an interest in each Lender's portion of the Loan Facility in such amount as shall result in a ratable participation by the Lenders in the aggregate unpaid amount under the Notes, provided that if all or any portion of such excess amount is thereafter recovered from the Lender making such purchase, such purchase shall be rescinded and the purchase price restored to the extent of such recovery, together with interest, if any, required by law (including court order) to be paid by the Lender or the holder making such purchase.

14.     **Successor Agent**.  The Agent (i) may resign as Agent following the occurrence of an Event of Default or (ii) shall resign if such resignation is requested by the Required Lenders (if the Agent is a Lender, the Agent's Commitment Percentage shall be considered, unless the Agent is a Delinquent Lender, in determining whether the Required Lenders have requested such resignation), in either case of clause (i) or (ii) above by giving not less than thirty (30) days' prior written notice to the Borrower and the Lenders.  If the Agent shall resign under this Loan Agreement, then either (a) the Required Lenders shall appoint from among the Lenders a successor agent for the Lenders, or (b) if a successor agent shall not be so appointed and approved within the thirty (30) day period following the Agent's notice to the Lenders of its resignation, then the Agent shall appoint (provided there exists no Event of Default or Potential Default, with the consent of the Borrower, such consent not to be unreasonably withheld), a successor agent who shall serve as Agent until such time as the Required Lenders appoint a successor agent.  The Borrower shall be responsible for any and all reasonable fees charged by the new Agent.  Upon its appointment pursuant to either clause (a) or (b) above, such successor agent shall succeed to the rights, powers and duties of the Agent and the term "Agent" shall mean such successor agent, effective upon its appointment, and the former Agent's rights, powers and duties as Agent shall be terminated without any other or further act or deed on the part of such former Agent or any of the parties to this Loan Agreement.  After the resignation of the Agent hereunder, the provisions of this Article VI shall inure to the benefit of such former Agent and such former Agent shall not by reason of such resignation be deemed to be liable for any actions taken or not taken by it while it was an Agent under this Loan Agreement except for its own gross negligence or willful misconduct.

15.     **Beneficiaries**.  The provisions of this Article VI are solely for the benefit of the Agent and the Lenders, and, except as otherwise provided herein, Borrower shall not have any rights to rely on or enforce any of the provisions hereof.  In performing its functions and duties under this Loan Agreement, the Agent shall act solely as agent of the Lenders and does not assume and shall not be deemed to have assumed any obligation toward or relationship of agency or trust with or for the Borrower.

16.     **Effect of a Lender's Failure to Make an Advance of Proceeds of the Loan Facility**. In the event any Lender fails for any reason to fund the portion it is required to fund of any advance of proceeds of the Loan Facility by 3:00 P.M. (New York, New York time) on the second Business Day after the date established by the Agent as the date such advance is to be made to the Agent, such Lender shall be a Delinquent Lender for all purposes hereunder until and unless such delinquency is cured in accordance with the terms, conditions and provisions of and within the time period permitted under Paragraph 17 below, and the following terms, conditions and provisions shall apply:

(i)     the Agent shall notify (such notice being hereinafter referred to as the "Delinquency Notice") each Lender and the Borrower of any Lender's failure to fund a request for proceeds of the Loan Facility.  Each Non-Delinquent Lender shall have the right, but in no event or under any circumstance (other than as set forth and described in Paragraph 16(vi) below) the obligation, to fund

such Delinquent Lender's portion of such advance, *provided that* within twenty (20) days of the date of the Delinquency Notice (hereinafter referred to as the "Election Period"), such Non-Delinquent Lender or Lenders (each such Lender, hereinafter referred to as an "Electing Lender") irrevocably commit(s) by notice in writing to the Agent, the other Lenders and the Borrower (hereinafter referred to as the "Election Notice") to fund the Delinquent Lender's portion of the advance that is the subject of the delinquency and to assume the Delinquent Lender's obligations with respect to the advancing of the entire undisbursed portion of the Delinquent Lender's Commitment (such entire undisbursed portion of the Delinquent Lender's Commitment, including its portion of the advance that is the subject of the delinquency shall be hereinafter referred to as the "Delinquency Amount"). If the Agent receives more than one Election Notice within the Election Period, then the Electing Lenders sending such notices shall be deemed to have committed to fund ratable shares of the Delinquency Amount based upon the amounts of their respective Commitments if there are one or more Electing Lenders and the Delinquent Lender fails to cure during the Election Period as provided for in Paragraph 17 below, then upon the expiration of the Election Period, each Electing Lender's Commitment shall be automatically increased by the Delinquency Amount (if there is only one Electing Lender) or such Electing Lender's ratable share, determined as aforesaid, of the Delinquency Amount (if there are two or more Electing Lenders), and the Delinquent Lender's Commitment shall be automatically reduced by the Delinquency Amount. The Agent shall thereupon notify the Borrower and each Lender of (a) the adjusted amounts of the Commitments and (b) if the Advance that was the subject of the delinquency was not made pursuant to Article III, Paragraph 1(iv)(b)(2) of this Loan Agreement or was refunded by the Borrower pursuant to Paragraph 16(v) below, the rescheduled date of such advance (which shall be no sooner than three (3) Business Days after such notice). In the event that the Agent shall have funded the entire Advance that was the subject of the delinquency (including the Delinquent Lender's portion) pursuant to Article III, Paragraph 1(iv)(b)(2) of this Loan Agreement, and the Borrower shall not have refunded such advance pursuant to Paragraph 16(v) below, then the Electing Lender(s) shall remit to the Agent the Delinquent Lender's portion of such Advance, or their ratable shares thereof, as the case may be, within three (3) Business Days of the notice provided for in the immediately preceding sentence, and the Agent shall reimburse itself from such funds for making the Delinquent Lender's portion of such Advance.



(ii)    In connection with the adjustment of the amounts of the Commitments of the Delinquent Lender and the Electing Lender(s) upon the expiration of the Election Period as aforesaid, the Borrower hereby covenants and agrees that it shall, promptly following the request of the Electing Lender(s), execute and deliver to each Electing Lender and the Delinquent Lender substitute Notes in the form of the Notes with an additional statement contained therein as follows: "This Note is a substitute note as contemplated by Article VI, Paragraph 16 of the Loan Agreement and it replaces and is in lieu of that certain note made by the Borrower dated _____ to the order of _____ in the principal sum of $_____." Such substitute Notes shall be in amounts equal to such Lenders' respective Commitments, as adjusted. All such substitute Notes shall constitute "Notes" and the obligations evidenced by such substitute Notes shall be secured by the Mortgage, the Assignment of Leases and all of the other Loan Documents. In connection with the Borrower's execution of substitute Notes as aforesaid, the Borrower shall deliver to the Agent such evidence of the due authorization, execution and delivery of the substitute Notes and any related documents as the Agent may reasonably request. The execution and delivery of substitute Notes as required above shall be a condition precedent to any further Advances. Upon receipt of its substitute Note, the Electing Lender and the Delinquent Lender will return to the Borrower their Notes that were replaced, *provided that* the delivery of a substitute Note to the Delinquent Lender pursuant to this Paragraph 16 shall operate to void and replace the Note(s) previously held by the Delinquent Lender regardless of whether or not the Delinquent Lender returns same as required hereby. The Borrower, the Agent and the Lenders shall execute such modifications to the Loan Documents as shall, in the reasonable judgment of the Agent, be necessary or desirable in connection with the adjustment of the amounts of the Commitments in accordance with the foregoing provisions of this Paragraph 16.

[PROJECT CONSTRUCTION/TERM LOAN AGREEMENT]
PRCLIB-466320.4-cjmaurer 12/28/07 11:37 AM

(iii)    Subject to the requirements placed on North Fork Bank in Paragraph 16(vi) below, in the event that no Lender elects to commit to fund the Delinquency Amount within the Election Period as provided in subparagraph (i) of this Paragraph 16, the Agent shall, upon the expiration of the Election Period, so notify the Borrower and each Lender and the provisions of Article III, Paragraph 1(x)(b) shall apply.

(iv)    Subject to a Delinquent Lender's right to cure as provided in Paragraph 17 below, but notwithstanding anything else to the contrary contained in this Loan Agreement, the Delinquent Lender's interest in, and any and all amounts due to a Delinquent Lender under, the Loan Documents (including, without limitation, all principal, interest, fees and expenses) shall be subordinate in lien priority and to the repayment of all amounts (including, without limitation, interest) then or thereafter due and owing or to become due and owing to the Non-Delinquent Lenders under the Loan Documents (including future advances), and the Delinquent Lender thereafter shall have no right to participate in any discussions among and/or decisions by the Lenders hereunder and/or under the Loan Documents. Further, subject to Paragraph 17 any Delinquent Lender shall be bound by any amendment to, or waiver of, any provisions of, or any action taken or omitted to be taken by the Agent and/or the Non-Delinquent Lenders under, any Loan Document which is made subsequent to the Delinquent Lender's becoming a Delinquent Lender.

(v)    Subject to the requirements placed on North Fork Bank in Paragraph 16(vi) below, if, pursuant to the operation of Article III, Paragraph 1(iv)(b)(2), an Advance of proceeds of the Loan Facility is made without the Agent's receipt of a Delinquent Lender's portion thereof, in addition to the Borrower's obligations under Article III, Paragraph 1(iv)(b), the Borrower shall, upon demand of the Agent (which may be made only after the completion of the procedures described in Paragraphs 16(i) through (iv) above), refund the entire amount of such Advance to the Agent. The Borrower's failure to do so within ten (10) days of such demand shall, notwithstanding anything to the contrary contained herein or in the Mortgage, the Assignment of Leases, and all of the other Loan Documents, constitute an Event of Default hereunder.

(vi)    Notwithstanding any term, condition, or provision of this Loan Agreement to the contrary, in the event that a Lender becomes a Delinquent Lender, North Fork Bank, in its capacity as a Lender, shall fund said Delinquent Lender's portion of the applicable Advance(s) on the day the Borrower has requested such Advance be made as described in the applicable Request for Advance; provided, however, in no event shall the sum of (a) the Commitment of North Fork Bank with respect to the Loan Facility plus (b) the "Commitment" (as such term is defined in the Building Loan Agreement) with respect to the Land Loan Facility and the Building Loan Facility ever exceed $48,240,000.00 in the aggregate.

17.    **Cure by Delinquent Lender**.  A Delinquent Lender may cure a delinquency arising out of its failure to fund its required portion of any Advance of proceeds of the Loan Facility if, within the Election Period, it remits to the Agent its required portion of such Advance (together with interest thereon at the Default Rate payable to the Agent from the date such Advance was to have been made if such Advance was made by the Agent and not refunded by the Borrower pursuant to either Article III, Paragraph 1(iv)(b) or Paragraph 16(v) above), in which event the Agent shall so notify the Borrower and the Non-Delinquent Lenders (i) of its receipt of such funds and (ii)(a) if the Advance that was the subject of the delinquency shall not have been made (or shall have been refunded by the Borrower pursuant to Paragraph 16(v) above), of the rescheduled date of the Advance (which shall be no sooner than three (3) Business Days after such notice) or (b) if the Agent shall have funded the entire Advance that was the subject of the delinquency (including the Delinquent Lender's portion) and the Borrower shall not have refunded such advance pursuant to Paragraph 16(v) above, of its intention to

reimburse itself from funds received from the Delinquent Lender's required portion of the Advance. In the event any Delinquent Lender cures a delinquency prior to the expiration of the Election Period (or thereafter with the consent of all of the Non-Delinquent Lenders), such Delinquent Lender nonetheless shall be bound by any amendment to or waiver of any provision of, or any action taken or omitted to be taken by the Agent and/or the Non-Delinquent Lenders under, any Loan Document which is made subsequent to that Lender becoming a Delinquent Lender and prior to its curing the delinquency as provided for in this Paragraph 17, provided that such amendment or waiver of action was taken in accordance with the provisions of this Loan Agreement. A Delinquent Lender shall have absolutely no right to cure any delinquency after the expiration of the Election Period unless all Non-Delinquent Lenders, in their sole and absolute discretion, elect to permit such cure. In the event a Delinquent Lender shall cure any delinquency pursuant to the terms, conditions, and provisions of this Paragraph 17, any substitute Notes which had been given by the Borrower pursuant to Paragraph 16(ii) above to reflect such Delinquent Lender's reduced Commitment shall be returned to the Borrower and new Notes shall be executed and delivered by the Borrower in order to reflect such cure.

18.     **Calculations**.   In the absence of gross negligence or willful misconduct, the Agent shall not be liable for any error in computing the amount payable to any Lender whether in respect of the Loan Facility, fees or any other amounts due to the Lenders under this Loan Agreement. In the event an error in computing any amount payable to any Lender is made, the Agent, the Borrower and each affected Lender shall, forthwith upon discovery of such error, make such adjustments as shall be required to correct such error, and any compensation therefor will be calculated at the Base Rate; provided, however, that the Borrower shall have no duty or obligation to pay compensation at such rate or any other rate in the event of an error by the Agent in calculating or remitting to any Lender such Lender's proportionate share of any payment received from the Borrower.

19.     **Agent's Fee**.   The Borrower shall pay to the Agent a nonrefundable underwriting fee (hereinafter referred to as the "Agent's Fee") under the terms of the Agent's Letter.

## ARTICLE VII

## MISCELLANEOUS

1.     **Incorporation of Provisions.**   The Notes and the Mortgage are subject to the conditions, stipulations, agreements and covenants contained herein to the same extent and effect as if fully set forth therein until this Loan Agreement is terminated by the payment in full of the Debt.

2.     **Further Assurances.**   The Borrower shall on demand of the Agent do any act or execute any additional documents reasonably required by the Agent to secure the Notes or confirm the lien of the Mortgage as a valid third lien with respect to the entire Mortgaged Premises, including, without limitation, a note, mortgage, and other security documents, or an agreement extending or otherwise modifying the Notes and the Mortgage, and a certificate as to the amount of the Debt.

3.     **Construction of Agreement.**   The titles and headings of the paragraphs of this Loan Agreement have been inserted for convenience of reference only and are not intended to summarize or otherwise describe the subject matter of such paragraphs and shall not be given any consideration in the construction of this Loan Agreement.

4.     **Trust Fund**.   The Borrower shall receive the Advances to be made under this Loan Agreement subsequent to the Advance made on the Closing Date and shall hold the right to receive such Advances as a trust fund to be applied first for the purpose of paying the costs of the Improvements, and

the Borrower shall apply the same first to the payment of the costs of the Improvements before using any part of the total of the same for any purpose.

5.  **Parties Bound, etc.**  The provisions of this Loan Agreement shall be binding upon and inure to the benefit of the Borrower, the Agent, the Lenders and their respective heirs, executors, legal representatives, successors and assigns (except as otherwise prohibited by this Loan Agreement).

6.  **Amendments and Waivers**.  Notwithstanding anything in this Loan Agreement to the contrary:

(i)   No amendment or modification of any provision of this Loan Agreement or the other Loan Documents shall be effective without the written agreement of the Required Lenders (which, to the extent there are two or more Lenders under this Loan Agreement at the time, shall include at least two Lenders) and, unless such amendment or modification affects solely the rights and obligations of the Agent and/or the Lenders and not those of the Borrower, and the Borrower, and no termination or waiver of any provision of this Loan Agreement or other Loan Documents, or consent to any departure by the Borrower or the Guarantor therefrom, shall in any event be effective without the written concurrence of the Required Lenders, which the Required Lenders shall have the right to grant or withhold in their sole and absolute discretion; except that any amendment, modification or waiver of any of the following provisions shall be effective only if evidenced by a writing signed by or on behalf of all Lenders holding any Commitments (or if the Commitments are not in effect but there is Debt outstanding under the Loan Documents, then all Lenders holding any portion of said Debt):

(a)   Increase the Commitment of any Lender over the amount thereof then in effect, except as expressly provided for in Article VI, Paragraph 16 of this Loan Agreement; or

(b)   Extend the Initial Maturity Date (other than in accordance with the terms, conditions, and provisions of Article III, Paragraph 1(iii) of this Loan Agreement) or extend the Extended Maturity Date; or

(c)   Reduce the principal amount of or extend the time for any scheduled payment of principal of the Loan Facility, or reduce the rate of interest or the amount of interest due and payable under the Loan Facility or extend the time for payment of interest payable in connection with the Loan Facility or extend the time for payment or reduce the payment of any fees, or reduce or postpone the payment of any other expenses, indemnities or amounts payable under any of the Loan Documents; or

(d)   Change the definition of "Required Lenders", amend this Paragraph 6 or any provision of the Loan Documents requiring the consent of all of the Lenders; or

(e)   Release or reduce any collateral or any guarantees of the Loan Facility except as expressly provided for or permitted in the Loan Documents; or

(f)   Change the definition of "Commitment Percentage", except as expressly provided for in Article VI, Paragraph 16 of this Loan Agreement.

(ii)   No amendment, modification, termination, or waiver of any provision of Article VI of this Loan Agreement or any other provision imposing any obligation on the Agent shall be effective without the prior express written consent of the Agent.  The Agent may, but shall have no obligation to, with the concurrence of any Lender, execute amendments, modifications, waivers or consents on behalf of such Lender.

(iii)    Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.  No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.  Any amendment, modification, termination, waiver or consent effected in accordance with the provisions of this Paragraph 6 shall be binding on each assignee, transferee or recipient of a Lender's Commitment or Commitment Percentage of the outstanding principal balance of the Loan Facility, each future assignee, transferee or recipient of a Lender's Commitment, and, if signed by the Borrower, on the Borrower.

(iv)    All communications from the Agent to the Lenders and/or the Borrower requesting the Lender's and/or the Borrower's determination, consent, approval or disapproval (a) shall be given in the form of a written notice to each Lender and the Borrower, as the case may be, (b) shall be accompanied by or include a description or copy of the matter or thing as to which such determination, approval, consent or disapproval is requested, and (c) shall include with respect to notices to the Lenders only, the Agent's recommended course of action or determination in respect thereof.

(v)    Each Lender shall reply promptly, but in any event within ten (10) Business Days (or five (5) Business Days with respect to any decision to accelerate or stop acceleration of the Loan Facility) after receipt of the request therefor by the Agent. In the event that the Agent requests the consent of a Lender and the Agent does not receive a written denial thereof within ten (10) Business Days (or five (5) Business Days with respect to any decision to accelerate or stop acceleration of the Loan Facility) after such Lender's receipt of such request, then such Lender shall be deemed not to have given its consent to the requested amendment, modification or waiver.

7.    **Governing Law**.  This Loan Agreement is and shall be deemed to be a contract entered in pursuant to the laws of the State of New York and shall in all respects be governed, construed, applied and enforced in accordance with the laws of the State of New York.

8.    **Waiver of Jury Trial**.  **THE BORROWER, THE AGENT AND THE LENDERS HEREBY WAIVE ANY AND ALL RIGHTS THAT THEY MAY NOW OR HEREAFTER HAVE UNDER THE LAWS OF THE UNITED STATES OF AMERICA OR ANY STATE, TO A TRIAL BY JURY OF ANY AND ALL ISSUES ARISING EITHER DIRECTLY OR INDIRECTLY IN ANY ACTION OR PROCEEDING BETWEEN THE BORROWER AND THE AGENT, THE LENDERS OR THEIR SUCCESSORS AND ASSIGNS, OUT OF OR IN ANY WAY CONNECTED WITH THIS LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS. IT IS INTENDED THAT SAID WAIVER OF JURY TRIAL SHALL APPLY TO ANY AND ALL DEFENSES, RIGHTS, AND/OR COUNTERCLAIMS IN ANY ACTION OR PROCEEDING. THE BORROWER, THE AGENT AND THE LENDERS RECOGNIZE THAT ANY DISPUTE ARISING IN CONNECTION WITH THE LOAN FACILITY IS LIKELY TO BE COMPLEX AND CONSEQUENTLY THEY WISH TO STREAMLINE AND MINIMIZE THE COST OF THE DISPUTE RESOLUTION PROCESS BY AGREEING TO WAIVE THEIR RIGHTS TO A JURY TRIAL.**

9.    **Severability**.  If any term, covenant or provision of this Loan Agreement shall be held to be invalid, illegal or unenforceable in any respect, this Loan Agreement shall be construed without such term, covenant or provision.

10.    **Notices**.  Unless otherwise indicated differently, all notices which may be required hereunder shall be in writing and shall be delivered or sent by confirmed telecopy transmission, nationally recognized overnight courier service or first-class certified or registered United States mail, postage prepaid, return receipt requested, and sent to the party at its address appearing below or such other address as any party shall hereafter inform the other party by notice given as aforesaid:

| | |
|---|---|
| If to the Borrower: | 48-52 Franklin, LLC<br>1094 River Avenue, Area C<br>Lakewood, New Jersey 08701<br>Attn.:  Mr. Marshall Weisman<br>Telecopy No.:  (732) 942-5547 |
| With a copy to: | Silberberg & Kirschner, LLP<br>360 Lexington Avenue<br>12th Floor<br>New York, New York 10017<br>Attn.:  Uri Kirschner, Esq.<br>Telecopy No.:  (212) 953-7755 |
| If to the Agent: | North Fork Bank, a division of Capital One, N.A.<br>399 Thornall Street<br>Edison, New Jersey 08837<br>Attn.:  Mr. Timothy Thompson<br>       Senior Vice President<br>Telecopy No.:  (732) 635-0993 |
| With a copy to: | Reed Smith LLP<br>Princeton Forrestal Village<br>136 Main Street, Suite 250<br>Princeton, New Jersey 08540<br>Attn.:  Daniel F. Peck, Jr., Esq.<br>Telecopy No.:  (609) 951-0824 |
| If to North Fork Bank: | North Fork Bank, a division of Capital One, N.A.<br>399 Thornall Street<br>Edison, New Jersey 08837<br>Attn.:  Mr. Timothy Thompson<br>       Senior Vice President<br>Telecopy No.:  (732) 635-0993 |
| With a copy to: | Reed Smith LLP<br>Princeton Forrestal Village<br>136 Main Street, Suite 250<br>Princeton, New Jersey 08540<br>Attn.:  Daniel F. Peck, Jr., Esq.<br>Telecopy No.:  (609) 951-0824 |

All notices, payments, requests, reports, information or demands so given shall be deemed effective upon receipt or, if mailed, upon receipt or the expiration of the third (3rd) Business Day following the date of mailing, whichever occurs first, except that any notice of change in address shall be effective only upon receipt by the party to whom said notice is addressed.  A failure to send the requisite copies does not invalidate an otherwise properly sent notice to the Agent, the Lenders, and/or the Borrower.

      11.    **Fees and Expenses**.  Upon the occurrence and during the continuation of an uncured Event of Default, the Borrower shall pay to the Agent, for the benefit of the Lenders, upon demand, all

[PROJECT CONSTRUCTION/TERM LOAN AGREEMENT]<br>PRCLIB-466320.4-cjmaurer 12/28/07 11:37 AM

expenses incurred by the Agent and/or the Lenders in connection with the collection of the Debt, the enforcement of the Loan Documents and in curing any defaults under the Loan Documents (including, without limitation, reasonable attorneys' fees and any and all post-judgment collection costs and expenses), with interest thereon at the Default Rate; provided that such interest rate shall in no event exceed the maximum interest rate which Borrower may by law pay, from the date incurred by the Agent and/or the Lenders to the date of repayment to the Agent and/or the Lenders, which sums and interest shall be secured by the Mortgage.

12.   **Counterparts**. This Loan Agreement may be executed in counterparts, each of which when so executed and delivered shall be deemed an original and all such counterparts together shall constitute but one and the same instrument.

13.   **Lenders' Obligation to Advance Proceeds of the Loan Facility**.  All conditions of the obligation of the Lenders to make Advances hereunder are imposed solely and exclusively for the benefit of the Lenders and their assigns and no other Person or Persons shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that the Lenders will refuse to make Advances in the absence of strict compliance with any or all thereof and no other Person or Persons shall, under any circumstances, be deemed to be a beneficiary or beneficiaries of such conditions, any and all of which may be waived in whole or in part by the Lenders if in their sole discretion they deem advisable to do so.

14.   **Erection of Sign**.  To the extent permitted by law, the Borrower shall permit the erection on the Mortgaged Premises of one or more signs of the Agent's choosing, to be supplied by the Agent, at the Borrower's sole cost and expense, which signs will state that construction financing is provided by the Lenders. The Borrower shall obtain any approvals required for the erection of the signs. The signs are to be located at or near the entrance to the Project or at other mutually acceptable locations which will permit the viewing of the signs by the public.

15.   **Successors and Assigns**.  (i) This Loan Agreement shall be binding upon and shall inure to the benefit of the Lenders, the Agent and the Borrower and their respective successors and assigns, except that the Borrower may not assign or transfer any of its rights and obligations hereunder or any interest herein. Each Lender may, at its own cost, (a) make assignments of all or any part of its Commitment and/or its Commitment Percentage of the outstanding principal balance of the Loan Facility, as applicable, to one or more banks or other Persons, subject to the consent of the Agent and the Borrower, which consent shall not be (1) unreasonably withheld or delayed by the Agent or the Borrower or (2) required in the event such assignment is made to a Person who is already a Lender as of the date such proposed assignment is to be made and (b) sell participations in all or any part of its Commitment and/or its Commitment Percentage of the outstanding principal balance of the Loan Facility, as applicable, to one or more banks or other entities, without the consent of the Agent or the Borrower; provided that (1) no consent of the Borrower shall be required (A) in the case of an assignment by a Lender to an affiliate of such Lender or (B) when an Event of Default or Potential Default has occurred and is continuing, (2) assignments may not be made in amounts less than $5,000,000.00, and (3) the Agent and the Lenders shall comply with the provisions of subparagraph (ii) below.  In the case of an assignment, upon receipt by the Agent of the Assignment and Assumption Agreement, the assignee shall have, to the extent of such assignment, the same rights, benefits and obligations as it would have if it had been a signatory Lender hereunder, the Commitments shall be adjusted accordingly, and the assigning Lender shall be released from its obligations hereunder to a corresponding extent and upon surrender of any Note subject to such assignment, the Borrower shall execute and deliver a replacement Note to the Assignee in an amount equal to the amount of the Commitment assumed by said assignee and a new Note to the assigning Lender in an amount equal to the Commitment retained by it hereunder. All such Notes shall constitute "Notes" and the obligations evidenced thereunder shall constitute Debt under the Loan Documents.  The assignee Lender shall pay to the Agent a service fee in the amount of $3,500.00 for each

assignment. In the case of a participation, the participant's rights against such Lender in respect of such participation shall be those set forth in the agreement executed by such Lender in favor of the participant relating thereto and shall not include any voting rights, except for voting rights of the type described in Paragraph 6 above, all of such Lender's obligations under this Loan Agreement or any other Loan Documents shall remain unchanged and all amounts payable by the Borrower hereunder or thereunder shall be determined as if such Lender had not sold such participation.

(ii)    All information regarding the Borrower and the Guarantor may be furnished, without liability of such Lender, to any prospective purchaser of or participant in the Loan Facility. All documentation, financial statements, appraisals and other data relevant to the Borrower, the Guarantor and/or the Loan Facility may be exhibited to and retained by any such purchaser or participant in its files. Such Lender will use its commercially reasonable efforts to have any prospective purchaser or participant agree in writing (a copy of said written agreement to be furnished to the Borrower) to keep any non-public information confidential and not release such information to any third party unless required by law or banking regulations; provided, however, in no event shall the failure of such Lender to obtain from a prospective purchaser or participant said written confidentiality agreement prohibit such Lender from selling said interest in the Loan Facility to said purchaser or participant. Each assignee or participant agrees to be bound by the provisions of this Loan Agreement concerning confidentiality of all information concerning the Borrower and the Guarantor.

(iii)   Any assignee or participant which is not incorporated under the laws of the United States of America or a state thereof shall comply in all respects with Paragraph 16 below relative to Federal income tax withholding.

(iv)   Notwithstanding any other provision in this Loan Agreement, any Lender may at any time pledge or grant a security interest in all or any portion of its rights under this Loan Agreement, its Note and the other Loan documents to any Federal Reserve Bank in accordance with Regulation A of the FRB or U.S. Treasury Regulation 31 CFR Section 203.14 without notice to or consent of the Borrower or the Agent. No such pledge or grant of a security interest shall release the transferor Lender of its obligations hereunder or under any other Loan Document.

(v)    In case of any loss, theft, destruction or mutilation of any Lender's Note, the Borrower shall, upon its receipt of (a) an affidavit of an officer of such Lender as to such loss, theft, destruction or mutilation and (b) an appropriate indemnification from such Lender, execute and deliver a replacement Note to such Lender in the same principal amount and otherwise of like form, content and tenor as the lost, stolen, destroyed or mutilated Note.

16.    **Taxes.**

(i)    Payments Net of Taxes. Provided that each Lender and the Agent shall have complied with the provisions of Paragraph 16(iii) below, all payments made by the Borrower under this Loan Agreement or any other Loan Document shall be made free and clear of, and without reduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authorities, including, without limitation, any taxes assessed by the United States of America and/or any state in the United States of America, and all liabilities with respect thereto, excluding

(a)    in the case of the Agent and each Lender, net income or franchise taxes imposed on the Agent or such Lender by the jurisdiction under the laws of which the Agent or such Lender is organized or any political subdivision or taxing authority thereof or therein or as a result of a

connection between such Lender and any jurisdiction (whether or not attributable to the transactions contemplated hereby), and

(b)      in the case of each Lender, net income or franchise taxes imposed by any jurisdiction in which such Lender's lending offices which make or book loans are located or any political subdivision or taxing authority thereof or therein (all such non-excluded taxes, levies, imposts, duties, deductions, charges, fees or withholdings of such Governmental Authorities, including, without limitation, any taxes assessed by the United States of America and/or any state in the United States of America, being hereinafter collectively referred to as the "Taxes").   If any Taxes are required to be withheld or deducted from any amounts payable to the Agent or any Lender under this Loan Agreement or any other Loan Document, the Borrower shall pay the relevant amount of such Taxes and the amounts so payable to the Agent or such Lender shall be increased to the extent necessary to yield to the Agent or such Lender (after payment of all Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in this Loan Agreement and the other Loan Documents.   Whenever any Taxes are paid by the Borrower with respect to payments made in connection with this Loan Agreement or any other Loan Document, as promptly as possible thereafter, the Borrower shall send to the Agent for its own account or for the account of such Lender, as the case may be, a certified copy of an original official receipt received by the Borrower showing payment thereof.

(ii)      Indemnity.   Provided that each Lender and the Agent shall have complied with the provisions of Paragraph 16(iii) below, the Borrower hereby agrees to indemnify the Agent and each of the Lenders for the full amount of all Taxes attributable to payments by or for the benefit of the Borrower hereunder or under any of the other Loan Documents paid by the Agent or such Lender (including any incremental Taxes, interest or penalties that may become payable by the Agent or such Lender as a result of any failure to pay such Taxes), whether or not such Taxes were correctly or legally asserted, excluding any of the foregoing arising out of the Agent's or any Lender's gross negligence or willful misconduct. The amount of Taxes due pursuant to the preceding sentence shall only be payable to the extent such Taxes exceed the amount of Taxes paid pursuant to Paragraph 16(i) above.   Such indemnification shall be made within thirty (30) days from the date such Lender or the Agent, as the case may be, makes written demand therefrom together with the calculation thereof and the basis therefor.

(iii)      Withholding and Backup Withholding.   Each Lender or assignee or participant of a Lender that is not incorporated under the laws of the United States of America or a state thereof agrees that it will deliver to each of the Borrower and the Agent two (2) duly completed copies of the following: (i) if such Lender or assignee or participant of a Lender is a "bank" (as such term is defined in Section 881(c)(3)(A) of the Internal Revenue Code of 1986, as amended (hereinafter referred to as the "Code"), either (a) Internal Revenue Service Form W-9, W-8ECI or W-8BEN, or other applicable form prescribed by the Internal Revenue Service, certifying that such Lender, assignee or participant is entitled to receive payments under this Loan Agreement and the other Loan Documents without deduction or withholding of any United States Federal income taxes, or is subject to such tax at a reduced rate under an applicable tax treaty or (b) Internal Revenue Service Form W-8 or other applicable form or a certificate of such Lender, assignee or participant indicating that no such exemption or reduced rate is allowable with respect to such payments and (ii) if such Lender or assignee or participant of a Lender is not a "bank" (as such term is defined in the Code), a "Non-Bank Compliance Certificate" in substantially the form of the Exhibit "A" attached to the Assignment and Assumption Agreement, with blanks appropriately completed.   Each Lender, assignee or participant required to deliver to the Borrower and the Agent a form or certificate pursuant to the preceding sentence shall deliver such form or certificate as follows:  (A) each Lender which is a party hereto on the Closing Date shall deliver such form or certificate at least five (5) Business Days prior to the first date on which any interest or fees are payable by the Borrower hereunder for the account of such Lender and (B) each assignee or participant shall deliver such form or certificate at least five (5) Business Days before the effective date of such assignment or participation (unless the Agent in its sole discretion shall permit such

assignee or participant to delivery such form or certificate less than five (5) Business Days before such date in which case it shall be due on the date specified by the Agent). Each Lender, assignee or participant which so delivers a Form W-8, W-9, W-8ECI or W-8BEN further undertakes to deliver to each of the Borrower and the Agent two (2) additional copies of such form (or a successor form) on or before the date that such form expires or becomes obsolete or after the occurrence of any event requiring a change in the most recent form so delivered by it, and such amendments thereto or extensions or renewals thereof as may be reasonably requested by the Borrower or the Agent, either certifying that such Lender, assignee or participant is entitled to receive payments under this Loan Agreement and the other loan Documents without deduction or withholding of any United States Federal income taxes or is subject to such tax at a reduced rate under an applicable tax treaty or stating that no such exemption or reduced rate is allowable. The Agent shall be entitled to withhold United States Federal income taxes at the full withholding rate unless the Lender, assignee or participant establishes an exemption or that it is subject to a reduced rate as established pursuant to the above provisions.

(iv)    Any Lender or the Agent claiming amounts payable under this Paragraph 16 or Article III, Paragraph 1(xi)(g) of this Loan Agreement shall use reasonable efforts to mitigate taxes (e.g., changing the jurisdiction of its lending office) if such efforts would reduce the amounts payable under this Paragraph 16 or Article III, Paragraph 1(xi)(g) of this Loan Agreement and would not be disadvantageous to it.

(v)    Upon the payment in full to a Lender or the Agent with respect to Taxes or LIBO Rate Taxes under this Paragraph 16 or Article III, Paragraph 1(xi)(g) above the Borrower shall be subrogated to all rights of the applicable Lender or the Agent to seek recovery or reimbursement from any Person of such amounts. Provided a Lender has complied with the terms of this Paragraph 16 or Paragraph 15 above, there shall be no right of the Borrower to recover or receive reimbursement against or from said Lender or the Agent for foreign tax credits in respect of said Lender's taxable income in respect of such Taxes or LIBO Rate Taxes. Each Lender and the Agent shall reasonably assist the Borrower to recover amounts paid pursuant to this Paragraph 16 or Article III, Paragraph 1(xi)(g) above from the relevant taxing authority. If a Lender or the Agent subsequently recovers, or receives a net tax benefit with respect to any amount of Taxes or LIBO Rate Taxes paid or indemnified by the Borrower, then such Lender or the Agent, as applicable, shall pay to the Borrower the amount of any such recovery or net tax benefit within thirty (30) days of the receipt of such refund.

(vi)    None of the Lenders or the Agent shall be entitled to a payment under this Paragraph 16 or Article III, Paragraph 1(xi)(g) above to the extent such payment arises out of the Lender's or the Agent's gross negligence or willful misconduct.

(vii)    No amounts will be payable under this Paragraph 16 to the extent that such amounts have been covered pursuant to another section of this Loan Agreement.

(viii)    All payments made pursuant to this Paragraph 16 or Article III, Paragraph 1(xi)(g) above shall be treated by the relevant parties as additional interest hereunder.

17.    **Changes; Legal Restrictions**. Except as provided in Article III, Paragraph 1(xi)(d) hereof with respect to certain determinations of the LIBO Rate on any applicable date, in the event that after the date hereof (i) the adoption of or any change in any law, treaty, rule, regulation, guideline or determination of a court or Governmental Authority or any change in the interpretation or application thereof by a court or Governmental Authority or (ii) compliance by any Lender with any request or directive (whether or not having the force of law and whether or not the failure to comply therewith would be unlawful) from any central bank or other Governmental Authority or quasi-governmental authority:

(a)     does or may impose, modify, or hold applicable, in the determination of a Lender, any reserve, special deposit, compulsory loan, Federal Deposit Insurance Corporation insurance, capital allocation or similar requirement against assets held by, or deposits or other liabilities in or for the account of advances or loans by, commitments made, or other credit extended by, or any other acquisition of funds by, a Lender or any applicable lending office or eurodollar affiliate of such Lender (except, with respect to Prime Rate Loans, to the extent that the reserve and Federal Deposit Insurance Corporation insurance requirements are reflected in the definition of "Prime Rate" and, with respect to a LIBO Rate Loan, to the extent that the reserve requirements are reflected in the definition of "LIBO Rate"); or

(b)     does impose on such Lender any other condition materially more burdensome in nature, extent or consequence than those in existence as of the Closing Date;

and the result of any of the foregoing is to increase the cost to such Lender of making, renewing or maintaining the Loan Facility and/or its Commitment to the Borrower then, in any such case, the Borrower shall pay to such Lender, within thirty (30) days following demand, and delivery to the Borrower and the Agent of the statement described in the next sentence, such amount or amounts (based upon an allocation thereof by such Lender to the financing transactions contemplated by this Loan Agreement and effected by this Paragraph 17) as may be necessary to compensate that Lender for any such additional cost incurred or reduced amount received. Such Lender shall deliver to the Borrower a written statement of the costs or reductions claimed and the basis therefor, and the allocation made by such Lender of such costs and reductions shall be conclusive, absent manifest error if made in good faith. If a Lender subsequently recovers any amount previously paid by the Borrower pursuant to this Paragraph 17, such Lender shall, within thirty (30) days after receipt of such recovery and to the extent permitted by applicable law, pay to the Borrower the amount of any such recovery.

18.    **Increased Capital**. If either (i) the introduction of or any change in or in the interpretation of any law or regulation or (ii) compliance by any Lender with any guideline or request from any central bank or other Governmental Authority (whether or not having the force of law and whether or not the failure to comply therewith would be unlawful) affects or would affect the amount of capital required or expected to be maintained by such Lender or any corporation controlling such Lender and such Lender determines that the amount of such capital is increased by or based upon the existence of such Lender's Commitment and other commitments of this type then, upon demand by such Lender, together with the certificate referred to in the last sentence of this Paragraph 18, the Borrower shall immediately pay to such Lender, from time to time as specified by such Lender, additional amounts sufficient to compensate such Lender for any loss in its net yield from the transactions contemplated by this Loan Agreement in the light of such circumstances, to the extent that such Lender determines such increase in capital to be allocable to the existence of such Lender's Commitment. A certificate as to such amounts, together with calculations evidencing such additional amount and the law, rule, interpretation, regulation or guideline with respect thereto, submitted to the Borrower by such Lender, shall, in the absence of manifest error, be conclusive and binding for all purposes.

19.    **Credit Support Document**. This Loan Agreement is intended to act (i) as a Credit Support Document with respect to the Borrower and is hereby made a part of the Schedule of any Master Agreement, which such Master Agreement includes the Schedules thereto and all Confirmations exchanged between the parties confirming transactions thereunder, and (ii) as a "transfer" under a swap agreement made by or to a swap participant, in connection with a swap agreement, within the meaning of Section 546(g) of the Federal Bankruptcy Code.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;**
**SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, the parties hereto have caused this Loan Agreement to be duly executed and delivered by their proper and duly authorized Manager and officers, respectively, all as of the day and year first above written.

**WITNESS:**

**BORROWER:**

**48-52 FRANKLIN, LLC,** a New York limited liability company

By: _____
    Marshall Weisman
    Manager

Uri Kirschner, Esq.

**LENDERS:**

**NORTH FORK BANK, A DIVISION OF CAPITAL ONE, N.A.**

By: _____
    James P. Meicke
    Senior Vice President

**AGENT:**

**NORTH FORK BANK, A DIVISION OF CAPITAL ONE, N.A.**

By: _____
    James P. Meicke
    Senior Vice President

[PROJECT CONSTRUCTION/TERM LOAN AGREEMENT]
PRCLIB-466320.4-cjmaurer 12/19/07 1:58 PM

## EXHIBIT "A"

**ATTACHED TO AND MADE A PART OF THAT CERTAIN PROJECT CONSTRUCTION/TERM LOAN AGREEMENT, BY AND AMONG 48-52 FRANKLIN, LLC, AS THE BORROWER, NORTH FORK BANK, A DIVISION OF CAPITAL ONE, N.A., AS THE AGENT, AND NORTH FORK BANK, A DIVISION OF CAPITAL ONE, N.A., *ET AL*, AS THE LENDERS, DATED DECEMBER 21, 2007**

### Metes and Bounds Description of the Land

**ALL** that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

**BEGINNING** at a point on the northerly side of Franklin Street, distant 50.12 feet (50 feet 1 1/2 inches per deed) easterly from the corner formed by the intersection of the northerly side of Franklin Street with the easterly side of Cortlandt Alley;

**RUNNING THENCE** northerly, at right angles to the northerly side of Franklin Street, 100 feet (100 feet per deed);

**THENCE** easterly, parallel with the northerly side of Franklin Street, 75.17 feet (75 feet 2 inches per deed);

**THENCE** southerly, at right angles to the northerly side of Franklin Street and part of the distance through a party wall, 100 feet (100 feet per deed) to the northerly side of Franklin Street;

**THENCE** westerly, along the northerly side of Franklin Street, 75.17 feet (75 feet 2 inches per deed) to the point or place of **BEGINNING**.

**BEING INTENDED TO BE** the same property described in that certain survey entitled "ALTA/ACSM Land Title Survey situated in The Borough of Manhattan, City of New York, State of New York" prepared by John J. Vida, for True North Surveyors, Inc., dated February 20, 2007, as last revised on November 27, 2007.

66

<u>EXHIBIT "B"</u>

**ATTACHED TO AND MADE A PART OF THAT CERTAIN PROJECT CONSTRUCTION/TERM LOAN AGREEMENT, BY AND AMONG 48-52 FRANKLIN, LLC, AS THE BORROWER, NORTH FORK BANK, A DIVISION OF CAPITAL ONE, N.A., AS THE AGENT, AND NORTH FORK BANK, A DIVISION OF CAPITAL ONE, N.A., *ET AL*, AS THE LENDERS, DATED DECEMBER 21, 2007**

<u>Form of Assignment and Assumption Agreement</u>

Reference is hereby made to that certain Project Construction/Term Loan Agreement dated December 21, 2007 (hereinafter, as it may be from time to time amended, modified, extended, renewed, refinanced and/or supplemented, referred to as the "<u>Loan Agreement</u>"), executed by and among **48-52 FRANKLIN, LLC**, a New York limited liability company (hereinafter referred to as the "<u>Borrower</u>"), the "Lenders" (as such term is defined in the Loan Agreement), **NORTH FORK BANK, A DIVISION OF CAPITAL ONE, N.A.**, as Agent for the Lenders (hereinafter referred to as the "<u>Agent</u>"), and the Lenders.  Defined terms used and not expressly defined herein shall have the same meanings when used herein as in the Loan Agreement.

_____ (hereinafter referred to as the "<u>Assignor</u>") and _____ (hereinafter referred to as the "<u>Assignee</u>"), intending to be legally bound hereby, make this Assignment and Assumption Agreement this ___ day of _____, 20___ and hereby agree as follows:

1.       As of the "Effective Date" (as such term is defined below), the Assignor hereby sells and assigns to the Assignee, and the Assignee hereby purchases and assumes from the Assignor, **WITHOUT RECOURSE** to the Assignor, a _____ percent (____%) interest in the Assignor's Commitment as in effect on the Effective Date, the principal amount of the Loan Facility owing to the Assignor on the Effective Date and the Note evidencing the outstanding Loan Facility held by the Assignor together with all of the Assignor's rights and obligations under the Loan Agreement and the Loan Documents related to the aforesaid assigned interest.  As of the Effective Date and after giving effect to the assignment contemplated herein, the Assignee's Commitment shall be $_____.

2.       The Assignor (i) hereby represents and warrants that, as of the Effective Date but prior to giving effect to the assignment contemplated herein, (a) its Commitment is [$_____], (b) the unpaid outstanding principal amount of the Loan Facility owing to the Assignor is [$_____] and (c) it is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any adverse claim; (ii) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Loan Agreement or any of the Loan Documents or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Agreement or any of the Loan Documents or any other instrument or document furnished pursuant thereto; (iii) makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrower or of the Guarantor or the performance or observance by the Borrower or by the Guarantor of any of their respective obligations under the Loan Agreement and/or any of the other Loan Documents or any other instrument or document furnished pursuant thereto; and (iv) attaches the Note referred to in <u>Paragraph 1</u> above and requests that the Agent exchange such Note for a new Note or Notes in the aggregate amount of the Assignor's Commitment.

3.       The Assignee hereby (i) confirms that it has received a copy of the Loan Agreement and all of the other Loan Documents, together with copies of the financial statements (if any) referred to in the

Loan Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption Agreement; (ii) agrees that it will, independently and without reliance upon the Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Agreement; (iii) appoints and authorizes the Agent to take such actions on its behalf and to exercise such powers under the Loan Documents as are delegated to the Agent by the terms thereof; (iv) agrees that it does hereby become a party to the Loan Agreement and is bound by the terms, conditions and provisions of the Loan Agreement and all of the other Loan Documents on the Effective Date as if it were an original Lender under the Loan Agreement and will have the rights and obligations of a Lender thereunder and will perform in accordance with their terms all of the obligations which by the terms of the Loan Agreement or such other Loan Documents are required to be performed by it as a Lender; and (v) specifies as its address for notices the office set forth beneath its name on the signature pages hereof.

4.      The effective date of this Assignment and Assumption Agreement shall be _____, 20___ (hereinafter referred to as the "<u>Effective Date</u>").  Following the execution of this Assignment and Assumption Agreement, this Assignment and Assumption Agreement will be delivered to the Agent for acceptance and recording by the Agent.

5.      Upon such acceptance and recording, as of the Effective Date, (i) the Assignee shall be a party to the Loan Agreement and, to the extent provided in this Assignment and Assumption Agreement, have the rights and obligations of a Lender thereunder and under the Loan Documents and (ii) the Assignor shall, to the extent provided in this Assignment and Assumption Agreement, relinquish its rights and be released from its obligations under the Loan Agreement.

6.      Upon such acceptance and recording, from and after the Effective Date, the Agent shall make all payments under the Loan Agreement and the Note in respect of the interest assigned hereby (including, without limitation, all payments of principal, interest, and any fees with respect thereto) to the Assignee.  The Assignor and Assignee shall make all appropriate adjustments in payments under the Loan Agreement and the Note for periods prior to the Effective Date directly between themselves.

7.      The Assignor makes this assignment to the Assignee in consideration of the payment of $3,500.00 by the Assignee to and for the account of the Agent, receipt of which is hereby acknowledged by the Agent by its execution below.

8.      This Assignment and Assumption Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without regard to its conflicts of law principles.

[9.      **This section is applicable only if the Assignee is organized outside of the United States.**]  The Assignee has delivered, at least five (5) Business Days prior to the Effective Date, two (2) duly completed copies of Internal Revenue Service Form W-9, Form W-8ECI or Form W-8BEN, or other applicable form prescribed by the Internal Revenue Service, certifying that such Assignee is entitled to receive payments under the Loan Agreement and the other Loan Documents without deduction or withholding of any United States Federal income taxes, or is subject to such tax at a reduced rate under an applicable tax treaty.  [**Alternative:  The Assignee has delivered, at least five (5) Business Days prior to the Effective Date, two (2) duly completed copies of Internal Revenue Service Form W-8 of Assignee indicating that Assignee is subject to withholding of United States Federal income taxes.**]

[10.      [**This section is applicable only if the Assignee is organized within the United Kingdom.**]  The Assignee has delivered, at least five (5) Business Days prior to the Effective Date,

two (2) duly completed copies of United Kingdom Inland Revenue Form REF FD 13, or other applicable form prescribed by Inland Revenue, certifying that such Assignee is entitled to receive payments under the Loan Agreement and the other Loan Documents without deduction or withholding of any United Kingdom or English income or other taxes.]

[11.     [This section is applicable only if the Assignee is not a "bank" (as such term is defined in Section 881(c)(3)(A) of the Internal Revenue Code of 1986, as amended.]  The Assignee has delivered, at least five (5) Business Days prior to the Effective Date, two (2) duly completed copies of a certificate in substantially the form attached to this Assignment and Acceptance Agreement as <u>Exhibit "A"</u> with blanks appropriately filled in (hereinafter each referred to as a "Non-Bank Compliance Certificate".]

[SIGNATURE PAGE TO THE ASSIGNMENT AND ASSUMPTION AGREEMENT]

[NAME OF ASSIGNOR]

By:_____
Name: _____
Title: _____

[NAME OF ASSIGNEE]

By:_____
Name: _____
Title: _____

Notice Address:

_____
_____
_____

Telephone No.: _____
Telecopier No.: _____
Attn.: _____

CONSENTED TO this _____ day of _____, 20___:

**AGENT:**

**NORTH FORK BANK, A DIVISION OF CAPITAL ONE, N.A.**


By:_____
　　　　　Name:
　　　　　Title:


**BORROWER:**
**(only required if no Event of Default shall have occurred**
**and be continuing on the Effective Date)**

**48-52 FRANKLIN, LLC,**
a New York limited liability company


By: _____
　　　　　Marshall Weisman
　　　　　Manager

## EXHIBIT "A"

**ATTACHED TO AND MADE A PART OF <u>EXHIBIT "B"</u> ATTACHED TO AND MADE A PART OF THAT CERTAIN PROJECT CONSTRUCTION/TERM LOAN AGREEMENT, BY AND AMONG 48-52 FRANKLIN, LLC, AS THE BORROWER, NORTH FORK BANK, A DIVISION OF CAPITAL ONE, N.A., AS THE AGENT, AND NORTH FORK BANK, A DIVISION OF CAPITAL ONE, N.A., *ET AL*, AS THE LENDERS, DATED DECEMBER 21, 2007**

### Form Of Non-Bank Compliance Certificate

**[INSERT DATE]**

North Fork Bank, a division of Capital One, N.A.      48-52 Franklin, LLC
399 Thornall Street                                        1094 River Avenue, Area C
Edison, New Jersey 08837                          Lakewood, New Jersey 08701
Telecopy No.:  (732) 635-0993                   Attn.:  Mr. Marshall Weisman
                                                   Manager
                                                   Telecopy No.:  (___) ___-____

Re:      Project Construction/Term Loan Agreement by and among 48-52 Franklin, LLC, North Fork Bank, a division of Capital One, N.A., as Agent and as a Lender, and certain other Lenders, dated December 21, 2007 (hereinafter, as it may be from time to time amended, modified, extended, renewed, refinanced, and/or supplemented, referred to as the "<u>Loan Agreement</u>")

_____ (hereinafter referred to as the "<u>Company</u>") hereby certifies as of the date hereof that:  (1) the Company is not a "bank" within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code of 1986, as amended (hereinafter referred to as the "Code"), is not subject to regulatory or other legal requirements as a bank in any jurisdiction, and has not been treated as a bank for purposes of any tax, securities law or other filing or submission made to any Governmental Authority, and application made to a rating agency or qualification for any exemption for tax, securities law or other legal requirements; (2) the Company is not a ten percent (10%) shareholder (within the meaning of Section 871(h)(3)(B) of the Code) of any obligor under the Loan Agreement; (3) the Company is not a "controlled foreign corporation" related to any obligor under the Loan Agreement (within the meaning of Section 864(d)(4) of the Code); and (4) the Company is entitled to receive payments under the Loan Agreement without deduction or withholding of any United States Federal income taxes.

**[INSERT COMPANY NAME]**

By: _____
           Name:
           Title:

<u>EXHIBIT "C"</u>

**ATTACHED TO AND MADE A PART OF THAT CERTAIN PROJECT CONSTRUCTION/TERM LOAN AGREEMENT, BY AND AMONG 48-52 FRANKLIN, LLC, AS THE BORROWER, NORTH FORK BANK, A DIVISION OF CAPITAL ONE, N.A., AS THE AGENT, AND NORTH FORK BANK, A DIVISION OF CAPITAL ONE, N.A., *ET AL*, AS THE LENDERS, DATED DECEMBER , 2007**

<u>**Form of Request for Advance**</u>

III.            <u>REQUEST FOR ADVANCE</u>

_____, 200__

[Ms.] [Mr.] _____
IV.             North Fork Bank - Commercial Real Estate
275 Broadhollow Road
Melville, New York  11747

*RE: Loan #* _____

*Premises*_____

Dear [Ms.] [Mr.] _____:

    This letter will serve to authorize and direct you to advance on _____ a portion of the referenced loan (hereinafter referred to as the "<u>Loan</u>") in the aggregate amount of $_____ and disburse this amount into Account No. _____ at North Fork Bank, a division of Capital One, N.A. (hereinafter referred to as the "<u>Agent</u>") in the name of 48-52 Franklin, LLC, a New York limited liability company (hereinafter referred to as the "<u>Borrower</u>").

    The Borrower hereby represents and warrants to the Agent that (i) the representations and warranties of the Borrower set forth in that certain Project Construction/Term Loan Agreement dated December  , 2007, executed by and among the Borrower, the Agent, and certain lenders (hereinafter, as it may be from time to time amended, modified, extended, renewed, substituted, and/or supplemented, referred to as the "<u>Loan Agreement</u>") and in any of the other "Loan Documents" (as such term is defined in the Loan Agreement), except (a) representations and warranties which expressly speak only as of a different date, and (b) representations and warranties that are subject to change as permitted or contemplated by the Loan Documents ) are true and correct in all material respects as of the date hereof; (ii) no Event of Default or Potential Default has occurred and is continuing under the Loan Agreement or any of the other Loan Documents or will result from this proposed Advance; and (iii) the Borrower has performed in all material respects all agreements contained in and satisfied all conditions under the Loan Agreement and the other Loan Documents required to be performed by it on or prior to the date hereof and in connection with the requested Advance.

The Borrower hereby represents and warrants and agrees that the proceeds of the Loan requested by this Request for Advance shall be used for the purposes provided for in the Loan Agreement.

**BORROWER:**

WITNESS:

**48-52 FRANKLIN, LLC**, a New York limited liability company

By: _____

_____

Name: _____

    Marshall Weisman
    Manager

73

**EXHIBIT "C-1"**

**ATTACHED TO AND MADE A PART OF EXHIBIT "C" ATTACHED TO AND MADE A PART OF THAT CERTAIN PROJECT CONSTRUCTION/TERM LOAN AGREEMENT, BY AND AMONG 48-52 FRANKLIN, LLC, AS THE BORROWER, NORTH FORK BANK, A DIVISION OF CAPITAL ONE, N.A., AS THE AGENT, AND NORTH FORK BANK, A DIVISION OF CAPITAL ONE, N.A., ET AL., AS THE LENDERS, DATED DECEMBER 21, 2007**

**Form of Construction Affidavit**

**CONSTRUCTION AFFIDAVIT**

STATE OF _____       :
                          :        ss.
COUNTY OF _____       :

Title No.:_____
Date: _____, 20__
Disbursement No. _____

_____, of full age, being duly sworn according to law, upon his oaths, depose and say:

1.    I am the _____ of **48-52 FRANKLIN, LLC**, the Owner of premises designated as Lot(s) 27, in Block 172, on the Tax Maps of the City of New York, New York (hereinafter referred to as the "Premises"), upon which is being erected a (describe project).

2.    The following have furnished services, labor, or transportation for this construction:

FIRM:                WHAT FURNISHED:  (A) AMOUNT DUE:  (B) AMOUNT PAID:

**SEE SCHEDULE "A" ATTACHED
HERETO AND MADE A PART HEREOF**

3.    THE PROCEEDS OF THIS ADVANCE WILL BE USED TO: (l) Pay to the above firms the amounts shown in Column (A), which sums are due to said firms for services, labor, or transport furnished for said construction; and (2) reimburse Owner for payments shown in Column (B) made to indicated firms for services, labor, materials, or transport furnished for said construction, for which payments owner has not be reimbursed.

4.    All funds received from the Lender previously as advances under the Project Construction/Term Loan Agreement (hereinafter, as it may be from time to time amended, modified, extended, renewed, substituted, and/or supplemented, referred to as the "Loan Agreement") have been expended or are being held in trust for the sole purpose of paying costs of construction (hereinafter referred to as the "Costs") previously certified to North Fork Bank, a division of Capital One, N.A. (hereinafter referred to as the "Agent") in prior Requests for Advances; and no part of said funds has been used, and the funds to be received pursuant to the Request for Advance submitted herewith shall not be used, for any other purpose. No item of Costs previously certified to the Agent in any Request for Advance remains unpaid as of the date of this Construction Affidavit. Defined terms used but not expressly defined herein shall have the same meanings when used herein as set forth in the Loan Agreement.

[PROJECT CONSTRUCTION/TERM LOAN AGREEMENT]
PRCLIB-466320.4-cjmaurer 12/19/07 1:58 PM

5.       No Event of Default exists under the Loan Agreement, the Notes, the Mortgage, or any other security document, and no event or condition has occurred and is continuing or existing or would result from the advance about to be made which, with the lapse of time or the giving of notice, or both, would constitute such an Event of Default.

6.       Nothing has occurred subsequent to the date of the Loan Agreement that has or may result in the creation of any lien, charge or encumbrance upon the Premises or the improvements or any part thereof, or anything affixed to or used in connection therewith or that has or may substantially or adversely impair the ability of the Borrower to make all payments of principal and interest on the Note, the ability of the Borrower to meet its obligations under the Loan Agreement or, to the best of their knowledge, the ability of the Guarantor to meet obligations under the Agreement of Guaranty.

7.       This Affidavit is made specifically to induce the Agent and the Lenders to advance the sum of $_____ in loan proceeds to the Owner, knowing that the Agent, the Lenders, and the Title Company will rely on the truth of these statements in disbursing funds.

**48-52 FRANKLIN, LLC**, a New York limited liability company


By: _____
          Name:
          Title:


Sworn to and Subscribed before me
this _____ day of _____ 20___.

_____

## SCHEDULE "A"

| Payee | Amount | Service |
|-------|--------|---------|

## EXHIBIT "C-2"

**ATTACHED TO AND MADE A PART OF <u>EXHIBIT "C"</u> ATTACHED TO AND MADE A PART OF THAT CERTAIN PROJECT CONSTRUCTION/TERM LOAN AGREEMENT, BY AND AMONG 48-52 FRANKLIN, LLC, AS THE BORROWER, NORTH FORK BANK, A DIVISION OF CAPITAL ONE, N.A., AS THE AGENT, AND NORTH FORK BANK, A DIVISION OF CAPITAL ONE, N.A., *ET AL*, AS THE LENDERS, DATED DECEMBER 21, 2007**

### Form of Application and Certification for Payment

<u>See Attached</u>.

PRCLIB-466320.4-cjmaurer 12/19/07 1:58 PM

# APPLICATION and CERTIFICATION for PAYMENT

Borrower: ********************************************************************************

Premises:

Page: _____ of _____ Pages

From: _____

To: _____

********************************************************************************

Application No.: _____

The undersigned hereby requests North Fork Bank for an advance of

$ _____ pursuant to its BLA with NFB and,

in connection therewith, hereby represents and warrants as follows:

1)  The amounts set forth in the schedules attached
    hereto are true and correct.

2)  All change orders, actual and proposed, for the project
    have been submitted to NFB architect or engineer.

Sworn to this _____ day of _____, 2007

By: _____

    BORROWER

_____

NOTARY PUBLIC

The undersigned Contractor certifies that: 1) the work covered by this Application for Payment has been completed in accordance with the Plans and Specifications and conforms with all applicable building codes, zoning ordinances and the building permit(s); 2) that the amounts requested on the requisition is true and correct; and, 3) that all amounts paid to the General Contractor for work and/or materials under a prior requisition have been received and paid to all subcontractors and/or materialmen who have supplied services or material which were covered by such prior requisitions.

Sworn to this _____ day of _____, 2007

_____

NOTARY PUBLIC

COMPANY NAME: _____

BY: _____

| | |
|---|---|
| Original Scheduled Value | $ _____ |
| Revisions in Hard Costs | $ _____0.00 |
| Revised Value | $ _____- |
| Total completed and Stored to Date | $ _____- |
| Less Retainage (10%) | $ _____- |
| Total Earned Less Retainage | $ _____- |
| Less: Previous Payments | $ _____0.00 |
| CURRENT PAYMENT DUE | $ _____- |
| Plus Soft Costs - This Application | $ _____- |
| Plus Subordinate Soft Costs - This Application | $ _____- |
| TOTAL THIS DRAW | $ _____- |

Revised 4-2-07

### EXHIBIT "C-3"

**ATTACHED TO AND MADE A PART OF EXHIBIT "C" ATTACHED TO AND MADE A PART OF THAT CERTAIN PROJECT CONSTRUCTION/TERM LOAN AGREEMENT, BY AND AMONG 48-52 FRANKLIN, LLC, AS THE BORROWER, NORTH FORK BANK, A DIVISION OF CAPITAL ONE, N.A., AS THE AGENT, AND NORTH FORK BANK, A DIVISION OF CAPITAL ONE, N.A., *ET AL*, AS THE LENDERS, DATED DECEMBER __, 2007**

### Form of Waiver of Lien for Material or Labor

# WAIVER OF LIEN
# MATERIAL OR LABOR

**STATE OF** _____           :

                                :   **ss.**          Date: _____, 20__

**COUNTY OF** _____           :

**TO ALL WHOM IT MAY CONCERN:**

Whereas the undersigned _____,

has been employed by _____

                                                  General Contractor/Owner

to furnish labor and/or materials for _____

_____ (Nature of work)

for the Building and Premises located at 48-52 Franklin Street, in the Borough of Manhattan, City of New York, County of New York, and State of New York, Lot No. 27, in Block 172 on the Tax Maps of the City of New York, New York.

**Now, Therefore, Know Ye,** That the undersigned, for and in consideration of the sum of _____ ($_____) Dollars and other good and valuable considerations, the receipt whereof is hereby acknowledged, do hereby waive and release any and all lien, or claim or right to lien on said above described building and premises under the Statutes of the State of New York relating to Mechanics' Liens, on account of labor or materials, or both, furnished or which may be furnished, by the undersigned to or on account of the said firm or individual therein named for said building on said premises.

_____

By: _____

          Name:

          Title:

Sworn to before me this

____ day of _____ 20__

_____

### EXHIBIT "C-4"

**ATTACHED TO AND MADE A PART OF EXHIBIT "C" ATTACHED TO AND MADE A PART OF THAT CERTAIN PROJECT CONSTRUCTION/TERM LOAN AGREEMENT, BY AND AMONG 48-52 FRANKLIN, LLC, AS THE BORROWER, NORTH FORK BANK, A DIVISION OF CAPITAL ONE, N.A., AS THE AGENT, AND NORTH FORK BANK, A DIVISION OF CAPITAL ONE, N.A., *ET AL*, AS THE LENDERS, DATED DECEMBER 31, 2007**

### Form of Final Lien Waiver

## Final Lien Waiver

DATE: _____

PROJECT: _____

PROJECT NO. _____

Listed below is the final information regarding the above contract:

|                              |                 |
| ---------------------------- | --------------- |
| Contract Price               | _____ |
| Net Extras and Deductions    | _____ |
| Adjusted Contract Price      | _____ |
| Amount Previously Paid       | _____ |
| Balance Due/Final Payment    | _____ |

The undersigned hereby acknowledges that when balance due is paid, it will represent payment in full for all labor, materials, etc., furnished in accordance with the contract made by them with _____ as agent or otherwise.

The undersigned further warrants that, in order to induce _____ to release this final payment, they have paid all claims for labor, material, insurance, taxes, equipment, etc., employed in the prosecution of the above.

The undersigned hereby releases and agrees to hold harmless _____ from any and all claims in connection with the furnishing of such labor and materials, etc., for the construction of the aforementioned project.

- 79 -

The undersigned further guarantees that all portions of the work furnished and performed by them are in accordance with the contract and that the terms of the contract with respect to these guarantees will hold for the period specified in said contract.

[_____]

By: _____

      Name:

      Title:

Sworn to before me this

____ day of _____ 20__

_____

- 80 -

## EXHIBIT "D"

**ATTACHED TO AND MADE A PART OF THAT CERTAIN PROJECT CONSTRUCTION/TERM LOAN AGREEMENT, BY AND AMONG 48-52 FRANKLIN, LLC, AS THE BORROWER, NORTH FORK BANK, A DIVISION OF CAPITAL ONE, N.A., AS THE AGENT, AND NORTH FORK BANK, A DIVISION OF CAPITAL ONE, N.A., *ET AL*, AS THE LENDERS, DATED DECEMBER 31, 2007**

### Permitted Exceptions

1.    Matters reflected in that certain title commitment dated November 6, 2007, No. GR27-18239CWMBL issued to the Agent, for the benefit of the Lenders, by the Title Company, as continued and modified up through and including the Closing Date.

2.    Real Estate Taxes that are not yet due and payable for the 1st half of 2008 and later.

3.    Matters reflected on the Preliminary Survey.

4.    The Building Loan Mortgage and the Land Loan Mortgage.

- 81 -

EXHIBIT "E"

**ATTACHED TO AND MADE A PART OF THAT CERTAIN PROJECT CONSTRUCTION/TERM LOAN AGREEMENT, BY AND AMONG 48-52 FRANKLIN, LLC, AS THE BORROWER, NORTH FORK BANK, A DIVISION OF CAPITAL ONE, N.A., AS THE AGENT, AND NORTH FORK BANK, A DIVISION OF CAPITAL ONE, N.A., *ET AL*, AS THE LENDERS, DATED DECEMBER 31 , 2007**

**Project Cost Statement**

See Attached

- 82 -

## Project Cost Statement (Project Loan)

Borrower: 48-52 Franklin, LLC

Loan No.:

Premises: 48-52 Franklin Street
New York, New York

Date: December _____, 2007

| A | B | C | D |
|---|---|---|---|
| Item Nos. | Items of Cost | Total Costs (Estimates if no firm Contracts) | Loan Budget Amounts |
| 1. | Land Acquisition | $1,900,000.00 | $1,900,000.00 |
| 2. | General Conditions | $1,431,428.00 | $1,431,428.00 |
| 3. | Interest on Project Loan | $284,619.00 | $284,619.00 |
| 4. | Recording Documents Mortgage Tax Fees | | |
| 5. | Borrower's Legal Fees | | |
| 6. | Title Insurance | | |
| 7. | Marketing Advertising Leasing | | |
| 8. | Brokers | | |
| 9. | Accounting | | |
| 10. | Contingency | | |
| 11. | Other | | |
| Totals | | $3,616,047.00 | $3,616,047.00 |

## EXHIBIT "F"

**ATTACHED TO AND MADE A PART OF THAT CERTAIN PROJECT CONSTRUCTION/TERM LOAN AGREEMENT, BY AND AMONG 48-52 FRANKLIN, LLC, AS THE BORROWER, NORTH FORK BANK, A DIVISION OF CAPITAL ONE, N.A., AS THE AGENT, AND NORTH FORK BANK, A DIVISION OF CAPITAL ONE, N.A., *ET AL*, AS THE LENDERS, DATED DECEMBER 21 , 2007**

### Form of Budget Reallocation Request

**NORTH FORK BANK**                    **BUDGET REALLOCATION REQUEST**

Borrower:        _____          Date:_____

Project:          _____          Requisition #_____

ALL Change Orders for direct construction costs must be referenced on this form are subject to Agent approval as set forth in the Loan Documents.  Copies of all Change Orders must be submitted to the Agent, regardless of Agent approval limitations.  All cost adjustments should be tracked through the Contingency category of the Project Budget.

Note:  PRIOR (i) AGENT APPROVAL IS REQUIRED ON INDIVIDUAL CHANGE ORDERS IN EXCESS OF $50,000.00, AND ON ALL CHANGE ORDERS IN EXCESS OF AN AGGREGATE CHANGE OF $100,000.00 and (ii) REQUIRED LENDER APPROVAL IS REQUIRED ON INDIVIDUAL CHANGE ORDERS IN EXCESS OF $100,000.00, AND ON ALL CHANGE ORDERS IN EXCESS OF AN AGGREGATE CHANGE OF $250,000.00.

Below is a list of the current Budget Reallocations requested, together with explanations and appropriate documentation to support this request.

| AMOUNT | [from] CATEGORY | [to] CATEGORY | C.O. NO. | EXPLANATION |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

Change Order Summary:                         Explanation Codes:

$_____    this request          1.    Adjust to ACTUAL CONTRACTED SUM
$_____    prior request          2.    Increase due to material CHANGE IN WORK
$_____    Total To Date          3.    Decrease due to material CHANGE IN WORK
                                    4.    Increase for additional work/repairs
                                    5.    Cost Savings on 100% completed category
                                    6.    New work/not included in original budget
                                    7.    Other: _____

- 83 -

The authorized signature below verifies that reallocations described above are approved by the Borrower, are valid and reasonable, and that copies of related documentation in the form of change orders, invoices, or other appropriate support required by the Agent are attached hereto.

BORROWER:_____

By:_____

Title:_____

Bank approval

By:_____

Date:_____

- 84 -

## SCHEDULE 1

**ATTACHED TO AND MADE A PART OF THAT CERTAIN PROJECT CONSTRUCTION/TERM LOAN AGREEMENT, BY AND AMONG 48-52 FRANKLIN, LLC, AS THE BORROWER, NORTH FORK BANK, A DIVISION OF CAPITAL ONE, N.A., AS THE AGENT, AND NORTH FORK BANK, A DIVISION OF CAPITAL ONE, N.A., *ET AL*, AS THE LENDERS, DATED DECEMBER 31, 2007**

### Ownership of the Borrower as of the Closing Date

A.      **Members/Partners/Shareholders of the Borrower**

| Name of Person/Entity | Percentage Interest |
|---|---|
| 1.      Marshall Weisman | 100% |

- 85 -